FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

'Ih JUL 28  P 1: 02

| | |
|---|---|
| **CAMERON BRACH** ) | ERK US DISTRICT COURT<br>ALEX... |
| ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | |
| ) | |
| **CONFLICT KINETICS CORPORATION** ) | |
| 22977 Eaglewood Court ) | **Case No.** 1:16-cv-978 |
| Suite 160 ) | |
| Sterling, Virginia 20166 ) | |
| ) | |
|     Serve Registered Agent: ) | |
|     Joseph Sean Morris ) | |
|     22977 Eaglewood Court ) | |
|     Suite 160 ) | |
|     Sterling, Virginia 20166, ) | |
| ) | |
| ) | |
| **BRIAN STANLEY** ) | |
| 43542 Riverpoint Dr. ) | |
| Leesburg, Virginia 20176 ) | |
| ) | |
| **And** ) | |
| ) | |
| **KATHLEEN HENDERSON** ) | |
| 12611 Old Dorm Pl. ) | |
| Herndon, Virginia 20170 ) | |
| ) | |
|     **Defendants.** ) | |
| ) | |
| ) | |

## CIVIL COMPLAINT FOR EQUITABLE
## AND MONETARY RELIEF AND DEMAND FOR JURY TRIAL

1

## INTRODUCTION

1.        Defendants Conflict Kinetics Corporation ("CKC"), Brian Stanley, and Kathleen Henderson (collectively "Defendants"), terminated Plaintiff Cameron Brach ("Brach") on August 9, 2015 (1) because he took acts in furtherance of a *qui tam* suit and/or made efforts to stop one or more false claims from being submitted, in violation of the anti-retaliation provision of the False Claims Act ("FCA") 31 U.S.C. § 3730(h); (2) in reprisal for disclosing a violation of rule, law, or regulation, a gross waste of funds, and a gross mismanagement of a Department of Defense ("DoD") contract, in violation of the 2013 National Defense Authorization Act ("NDAA"), 10 U.S.C. §§ 2409, *et seq*.; (3) in violation of the Employment Retirement Income Security Program ("ERISA"), 29 U.S.C §§ 1001 *et seq*.; and (4) in violation of the Fair Labor Standards Act, ("FLSA"), 29 U.S.C §§ 201 *et seq*.

2.        Defendants hired personnel, including Brach, as 1099 Contractors to avoid paying for employee benefits in violation of the ERISA.

3.        Defendants failed to pay Brach overtime outside of a forty hour work week in violation of the FLSA.

4.        Brach, the Director of Operations for CKC, discovered, documented, and reported Defendants' government overbilling.

5.        Brach warned Defendants management that its inaccurate billing of the government constituted fraudulent conduct.

6.        Brach reasonably believed that Defendants' knowing overbilling misled the government under false pretenses.

7.        Defendants terminated Brach because of his protected conduct under the FCA.

2

8.      Defendants also terminated Brach because of his protected conduct under the NDAA.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, because this is an action arising under the laws of the United States, specifically, the FCA, 31 U.S.C. § 3730(h), the NDAA, 10 U.S.C. §§ 2409 *et seq.*, the ERISA, 29 U.S.C §§ 1001 *et seq.*, and the FLSA, 29 U.S.C §§ 201 *et seq.*

10.     Venue in this judicial district and division is appropriate pursuant to 28 U.S.C. § 1391 because this is the judicial district where the unlawful employment practices are alleged to have been committed, and because Defendants maintain offices in and transact significant business in this judicial district and division.

## PARTIES

11.     Brach is a resident of the Commonwealth of Virginia and resides at 112 Burt Court, Leesburg, Virginia 20176.

12.     CKC's principal office is located at 22977 Eaglewood Court, Suite 160, Sterling, Virginia 20166. CKC is incorporated under the laws of Virginia.

13.     Brian Stanley is a resident of the Commonwealth of Virginia and resides at 43542 Riverpoint Drive, Leesburg, Virginia 20176.

14.     Kathleen Henderson is a resident of the Commonwealth of Virginia and resides at 12611 Old Dorm Place, Herndon, Virginia 20170.

## ADMINISTRATIVE EXHAUSTION

15.     Brach filed a Complaint of Reprisal with the DoD Inspector General ("IG")'s office on or around December 11, 2015.

16.     In a letter dated June 30, 2016, DoD IG informed Brach that it had closed its investigation into Brach's Complaint. Thus, Brach has exhausted his administrative remedies.

17.     And, as more than 210 days have passed since Brach filed his Complaint with DoD IG, Brach has exhausted his administrative remedies pursuant to 10 U.S.C. § 2409(c)(2).

## FACTUAL ALLEGATIONS

18.     Brach is an operations director with over eighteen years of experience.  Brach holds a B.S. in International Trade & Finance and a Masters of Business Administration in Project Management. Brach served in the military for ten years in both active duty and in the National Guard. Brach served in Iraq in 2003 and 2004.  Brach currently maintains an Active DoD security clearance.

19.     CKC sells electronic firearms training devices and services to the U.S. military. This includes "synthetic weapons training," which is a computer-assisted shooting simulator that helps to improve speed and accuracy when using pistols and rifles. The system does not use live ammunition, but rather a computer simulation wherein guns are outfitted with sensors and laser "bullets."

20.     CKC hired Brach as a Program Coordinator on September 29, 2014. Defendants classified Brach as a 1099 Contractor.

21.     CKC employed Brach at its Sterling, Virginia, office from September 2014, until CKC terminated his employment on August 9, 2015.

4

22.     As a Program Coordinator, Defendants tasked Brach with traveling to client sites for inspections, trainings, and demonstrations; coordinating with stakeholders, defining deliverables and budgets; training the technicians and trainers; and developing standard operating procedures for all deliverables.

23.     At the time of his termination, Brach earned an annual salary of $95,000, paid on an employee-facing, biweekly basis.

24.     Defendants had complete control over the manner in which Brach completed his work.

25.     Brach's schedule and hours were dictated by Defendants. Brach reported to CKC's previous Shaw Road worksite on a daily basis from 8:30 AM until approximately 5:00 PM. Brach completed all of his duties on CKC's premises.

26.     Brach was scheduled to work approximately forty hours per week. Frequently, however, Brach worked in excess of forty hours per week, but Defendant Henderson verbally instructed Brach not to exceed forty hours per week on his timesheet. Brach's paycheck did not increase when he worked in excess of forty hours per week.

27.     Brach was paid for a week-long period of vacation that he took while he was employed by Defendants. Defendant Henderson instructed Brach to claim one week of labor for this period of time, rather than vacation.

28.     Defendants paid Brach for other, shorter periods of vacation leave.

29.     Brach received assignments directly from and reported to CKC's executive staff, including CKC Chief Executive Officer Brian Stanley, CKC Controller Kathy Henderson, CKC Chief Information Officer Clay Schultz, and CKC Executive Vice President Alison Rubin.

30.     Defendants determined the methods by which Brach completed his assignments.

5

31.     Defendants did not provide any way for Brach to employ substitutes, helpers, or assistants.

32.     Defendants did not provide Brach with any employment benefits while Brach was employed by Defendants.

33.     But, Brach was reimbursed for business expenses and received a phone stipend, as did other CKC executives.

34.     Defendants provided Brach with the necessary training for his position in gunfighter gymnasium components and synthetic weapons systems.

35.     Early on, Brach developed a good relationship with Defendant Stanley and Defendant Henderson.

36.     Defendant Stanley and  Defendant Henderson told Brach that Ms. Rubin felt threatened by Brach's education and background.

37.     Brach was continually praised for his work as a Program Coordinator by Defendant Stanley.  Defendant Stanley admired that Brach had taken on more responsibility, and felt that Brach was taking the company in the right direction with his hands-on approach with CKC's client base.

38.     In or around January or February 2015, Brach had a meeting with Defendant Stanley and Ms. Rubin to discuss a possible promotion and Ms. Rubin's treatment of Brach.  Ms. Rubin told Brach during this meeting that, should he be promoted to Director, she had no faith in Brach's ability.

39.     Brach was promoted to Director of Operations and Logistics in February 2015.

40.     Brach was still classified as a 1099 Contractor, despite his promotion.

6

41.     CKC management told Brach that he and others were classified as 1099

Contractors due to the high cost of benefits.

42.     When Brach asked Defendant Henderson why all employees in Mississippi,

California, and Illinois are classified as 1099 Contractors, Defendant Henderson replied that

"[CKC] cannot afford the insurance, taxes, and social security."

### CKC frequently mismanages money.

43.     CKC routinely cuts corners and is aware that it is billing for items it cannot

deliver.

44.     James Wendt, who held Brach's position prior to Brach, told Brach that CKC had

previously incorrectly billed the government for services that CKC did not perform.

45.     Mr. Wendt also told Brach that Ms. Rubin previously had a romantic relationship

with the government contracting officer, and because of that relationship, the government did not

discipline CKC for its incorrect billing.

46.     Several times during Brach's time at CKC, there was a spending freeze because

CKC lacked funds. During this time, the only way for CKC to obtain money was to bill the

government.

47.     On an ongoing basis, Defendant Stanley's mismanagement and CKC's frequent

spending freezes caused problems in delivering products to CKC customers.

48.     Defendant Stanley habitually delayed the purchase of certain lasers that are

needed for CKC's German contract weapons to function because he wanted to wait for research

and development to complete a new type of laser.

7

49.     Ultimately, CKC had to ship orders of weapons for the German contract without lasers. The lasers faced problems in customs and had to be installed last-minute on site when they were finally cleared.

**Defendant Henderson resigns and Brach discovers inaccurate government billing.**

50.     On May 7, 2015, Defendant Henderson resigned from CKC.

51.     Brach recommended to Defendant Stanley that CKC perform a review of all invoices to get a sense of CKC's cash flow. Defendant Stanley asked Brach to take on the task, and he did.

52.     On May 7, 2015, Brach notified Ms. Rubin via email that he would begin reviewing billing on the NATICK contract with the U.S. Navy. This was the only contract that CKC was executing at the time.

53.     On May 8, 2015, Brach conducted an invoice audit for current contracts. Brach discovered that CKC billed the government for over $300,000 worth of services that it had not yet performed.

54.     Specifically, CKC billed the Navy for services not performed in Imperial Beach, California, Guam, Spain, and Bahrain, totaling $409,274.

55.     On May 8, 2015, Brach reported the billing inaccuracy to Defendant Stanley and Ms. Rubin via email, attaching a spreadsheet that outlined the issues. There were major issues with four invoices: (1) CKC billed the Navy on November 10, 2014 for $16,460 worth of pistols that were never delivered to Pt. Hueneme, California; (2) CKC billed the Navy on November 19, 2014 for $54,156 worth of installation services that it had not yet provided in Imperial Beach, California, and billed the Navy for $89,805 worth of support related to the installation that had not yet occurred; (3) CKC billed the Navy on November 19, 2014 for $55,700 worth of

8

installation services that it had not yet provided in Guam, and billed the Navy for $89,806 worth of support related to the installation that had not yet occurred; and (4) CKC billed the Navy for $89,806 worth of support services that it had not yet provided in Norfolk, Virginia.

56.       On May 8, 2015, Ms. Rubin responded by email, copying Defendant Stanley, stating, "Cameron, so let's put this into perspective. There are no double charges, the only issue is we billed for items we shouldn't have billed for in regards to Guam and [Imperial Beach]. Remember, parts were being shipped and dropped off at all different times."

57.       Brach took Ms. Rubin's statement to mean that if the Navy was billed for parts but had not received them yet, it could be because the parts were in the process of being shipped.

58.       Brach took issue with the fact that CKC billed the Navy for installation and support when the government had received the parts, but the installation and support services had not been performed.

59.       On May 11, 2015, Brach met with Ms. Rubin to further discuss the situation. Ms. Rubin at first denied that CKC inaccurately billed the Navy, but upon Brach's showing Ms. Rubin the calculations, she agreed that CKC had billed for services not rendered.

60.       CKC billed the Navy for installation or support for the installation but did not perform the service until several months later.

61.       The NATICK contract states that CKC cannot bill for such services in advance; CKC may only bill for licenses in advance.

62.       Ms. Rubin was unconcerned about the billing inaccuracies, and was only concerned about a situation where CKC had *under* billed by $89,804.57. Ms. Rubin immediately billed the Navy for the outstanding balance in that instance.

63.       No further action was taken to address the overbilling that Brach identified.

9

64.     On May 18, 2015, Defendant Henderson resumed her position at CKC.

65.     After Defendant Henderson returned, CKC applied for a line of credit.

66.     Brach asked Defendant Henderson about the billing inaccuracies. Defendant Henderson replied, "I don't know why Cameron, perhaps I figured we needed the money at the time."

67.     Defendant Henderson knew that CKC was incorrectly billing the Navy, but remained unconcerned.

68.     By July 1, 2015, CKC still had not completed $179,612 of the outstanding product delivery that it owed to the Navy due to the inaccurate billing.

**CKC's hiring of Joe Trippodo and subsequent clearance issues.**

69.     Part of Brach's position at CKC involved helping with the deployment of a CKC setup in Germany.

70.     In June and July 2015, Brach was in Germany for three weeks installing CKC systems there.

71.     Defendant Stanley hired two friends to work for CKC in Germany: Duffy Paulson and Adam Berkley. Neither Mr. Paulson nor Mr. Berkley had military or training experience.

72.     Mr. Paulson's salary as a Systems Technician III was $180,000 per year.

73.     Mr. Berkley's salary as a Systems Technician II was $70,000 per year.

74.     Defendant Stanley hired two of Brach's military colleagues, Thomas "Nick" Moto and Joe Trippodo, to work for CKC in or around December 2014 as 1099 Contractors.

75.     Mr. Moto and Mr. Trippodo worked periodically for CKC throughout the United States between December 2014 and July 2015.

76.　　　　In July 2015, Mr. Moto and Mr. Trippodo were assigned to work for CKC in Germany.

77.　　　　Mr. Moto's salary as a Systems Technician II was $70,000 per year.

78.　　　　Mr. Trippodo's salary as a Systems Technician II was $70,000 per year.

79.　　　　Only a secret level security clearance, or secret level security clearance eligibility, was required for Systems Technician positions.

80.　　　　Neither Mr. Paulson nor Mr. Berkley had any level of security clearance.

81.　　　　When Mr. Trippodo worked for the Navy, he had a top secret ("TS")/sensitive compartmented information ("SCI") security clearance. However, the Navy removed the SCI portion of Mr. Trippodo's clearance.

82.　　　　Mr. Trippodo represented to Brach that his TS security clearance remained intact at the time CKC hired him.

83.　　　　Mr. Trippodo told Brach that he had applied for a job with the Navy in April 2015, and that the Navy was in the process of securing a new secret security clearance. Brach thought Mr. Trippodo was ahead of the other new CKC staff members in Germany because he previously held a TS clearance and was in the process of securing a new secret security clearance.

84.　　　　On July 25, 2015, the U.S. Government Security Officer learned of Mr. Trippodo's flagged SCI clearance and raised the issue with CKC. Dave Darnall, the Contracting Officer Representative assigned to the German contract by the U.S. government, was not informed of any clearance issue until Mr. Darnall returned to Germany from the United States on or around September 12, 2015.

11

85.     Mr. Stanley was angry over the situation with Mr. Trippodo's clearance and claiming that Brach was being "deceitful" with him, despite Mr. Trippodo's meeting the requirements of the position.

86.     Mr. Stanley told Brach that it was a trust issue, and that Brach did not tell him about Mr. Trippodo's past because Mr. Trippodo was Brach's friend.

87.     CKC does not use a vetting process for new hires.

**The government complains of missing weapons.**

88.     On or around July 15, 2015, Ms. Rubin was conducting a weapons warranty list and requested that Brach complete a rundown of the full inventory at each one of CKC's contract locations. Brach asked Defendant Stanley for guidance on how to do this.

89.     While on a conference call with Defendant Stanley and Mr. Schultz on or around July 16, 2015 to discuss the weapons warranty list inventory assignment, Defendant Stanley instructed Brach to review the billings from November 2014.  Brach explained that he was not involved with shipments prior to December 2014.

90.     On or around July 30, 2015, while Brach was not in the office, Brach received a frantic phone call from Ms. Rubin informing Brach that the Navy Chief Officer Dickey in Gulfport, Mississippi filed a complaint about twenty synthetic pistols were missing from Gulfport, Mississippi.

91.     The U.S. Navy initiated review of all inventory throughout the NATICK contract and revealed that CKC did not deliver the weapons to California that CKC billed for in or around November 2014.

92.     Ms. Rubin blamed Brach for the unshipped pistols, which were supposed to have been sent in or around November 2014 and handled by CKC staff in Virginia Beach.

93.     Brach learned from Mr. Trippodo during a conversation between Defendant Stanley, James Fleming, part-time consultant whom accompanied Defendant Stanley to Germany, and Mr. Trippodo that Defendant Stanley knew that the weapons had not been shipped to California because the pistols in stock did not work.  Defendant Stanley said, "I don't have any pistols to send out there."

94.     Producing these pistols was a complex process, involving Israeli-made lasers and Korean guns. The persistent cash flow issues at CKC complicated the matter further. Defendant Stanley said, in Mr. Trippodo and Mr. Fleming's presence, "Apparently we billed for it, but I didn't think anyone would notice."

**CKC terminates Brach.**

95.     On or around August 9, 2015, Brach and Mr. Trippodo received termination notices from Defendants.

96.     Defendant Stanley emailed Brach and told Brach that the company was "moving in a different direction."

97.     Brach asked for more details, and Defendant Stanley replied, saying, "I certainly understand your concern. Legal counsel has advised me to avoid chit chatting over the issues. I am sure you understand."

## COUNT I
### Retaliation in Violation of the False Claims Act, 31 U.S.C. § 3730(h)

98.     Brach hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

99.     Congress intended the whistleblower provision of the FCA to protect employees while they are collecting information about a possible fraud, and, thus, for a plaintiff to be

engaged in protected activity, it is sufficient that the plaintiff be investigating matters that reasonably could lead to a viable FCA claim.

100.    In 2009, Congress amended 31 U.S.C. § 3730(h) through the Fraud Enforcement Recovery Act ("FERA"), Pub. L. No. 111–21, § 386, 123 Stat. 1617 (2009) to broaden the scope of FCA protected activity. Like the original FCA, the amended FCA continues to protect acts taken "in furtherance of an action under this section." 31 U.S.C § 3730(h)(1).

101.    31 U.S.C. § 3730(h), as amended by the FERA, further provides that an employee engages in protected conduct when he takes lawful actions in furtherance of an FCA action or when he makes other efforts to stop one or more violations of the FCA. *See* 31 U.S.C. § 3730(h).

102.    Defendants cannot retaliate against an employee who engages in protected conduct under the FCA, 31 U.S.C. § 3730(h), by taking lawful actions in furtherance of an FCA action, including investigation for, testimony for, or assistance in an action filed under the FCA, or by making other efforts to stop one or more violations of the FCA.

103.    An employee has engaged in protected conduct when litigation under the FCA is a distinct possibility, when the conduct reasonably could lead to a viable FCA action, when litigation is a reasonable possibility, or when she makes other efforts to stop one or more violations of the FCA.

104.    An employee need not actually file a *qui tam* suit or even know about the protections of section 3730(h) to qualify for protection under the retaliation provision.

105.    An employee who characterizes the employer's conduct as illegal or fraudulent, or recommends that legal counsel become involved, engages in protected conduct.

106.     An employee who makes efforts to stop a false record or statement material to a false or fraudulent claim engages in protected conduct.

107.     When an individual engages in protected conduct by making an effort to stop an FCA violation, the act of internal reporting itself suffices as both the effort to stop an FCA violation and the notice to the employer that the employee is engaging in protected activity.

108.     Brach reasonably believed that CKC was committing fraud against the federal government.

109.     Brach observed, discovered, and documented CKC's false bills to the government, which indicated that CKC billed for delivered goods and performed certain services when it had not yet done so.

110.     Brach warned CKC management that CKC's failure to investigate the inaccurate billing discovered on May 8, 2015 constituted fraudulent conduct.

111.     Brach knew that it was improper for CKC to bill the government for services not yet rendered.

112.     Brach took lawful actions in furtherance of an FCA action by investigating billing discrepancies on May 8, 2015.

113.     CKC's knowledge of Brach's protected activity was evidenced on or around July 30, 2015, when Ms. Rubin blamed Brach for the Navy's undelivered pistols after previously denying the inaccurate billing discovered on or around May 8, 2015.

114.     CKC retaliated against Brach by terminating his employment after he engaged in protected conduct under the FCA.

115.     CKC would not have made its retaliatory decision to terminate Brach's employment had Brach not engaged in protected activities under the FCA.

116.    Brach has suffered damages in an amount to be determined at trial as a direct and proximate result of CKC's unlawful retaliation.

117.    Brach demands such legal or equitable relief as will effectuate the purposes of the FCA, including, but not limited to economic damages, compensatory damages, special damages, punitive damages, reasonable attorney's fees, pre-judgment interest, court costs, and any other relief that this Court deems just and equitable.

**COUNT II**
**Reprisal in Violation of the National Defense Authorization Act,**
**10 U.S.C. § 2409**

118.    Brach hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

119.    Each year, Congress passes a National Defense Authorization Act to fund defense-related activities and provide guidance as to the manner in which various programs are to be carried out.

120.    CKC is a contractor with the Department of Defense.

121.    Brach was employed by CKC.

122.    Brach reasonably believed that CKC's failure to promptly intervene, investigate, and correct the billing inaccuracies discovered on May 8, 2015, evidenced a violation of rule, law, or regulation; a gross waste of funds; and gross mismanagement of a DoD contract.

123.    Defendant Stanley, at all relevant times, was a member of CKC's management who had the responsibility to investigate, discover, or address misconduct.

124.    Ms. Rubin, at all relevant times, was a member of CKC's management who had the responsibility to investigate, discover, or address misconduct.

125.     Defendant Henderson, at all relevant times, was a member of CKC's management who had the responsibility to investigate, discover, or address misconduct.

126.     Brach reported CKC's failure to promptly intervene, investigate, and correct the inaccurate billing discovered on or around May 8, 2015 to Defendant Stanley.

127.     Brach reported CKC's failure to promptly intervene, investigate, and correct the inaccurate billing discovered on May 8, 2015 to Ms. Rubin.

128.     Brach reported CKC's failure to promptly intervene, investigate, and correct the inaccurate billing discovered on or around May 8, 2015 to Defendant Henderson.

129.     On each of those occasions, Brach disclosed to Defendant Stanley, Ms. Rubin, and Defendant Henderson information regarding inaccurate billing Brach reasonably believed was evidence of a violation of rule, law, or regulation; a gross waste of funds; and gross mismanagement of a DoD contract.

130.     CKC terminated Brach's employment on August 9, 2015, as a reprisal for internally disclosing evidence of a violation of rule, law, or regulation; a gross waste of funds; and gross mismanagement of a DoD contract.

131.     Brach has suffered damages in an amount to be determined at trial.

### COUNT III
**Wrongful Denial of Employment Benefits in Violation of the Employment Retirement Income Security Program, 29 U.S.C § 1132(a).**

132.     Brach hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged therein.

133.     Defendants are "employers" within the meaning of 29 U.S.C. § 1002(5).

134.     Defendants classified approximately twelve of CKC employees as 1099 Contractors, rather than employees, in order to avoid paying for employee benefits.

135.    Defendants classified Brach as a 1099 Contractor when it hired him as a Program Coordinator on September 29, 2014.

136.    But, Brach's work schedule and assigned duties were actually that of an employee, not a 1099 Contractor.

137.    Accordingly, Brach is an "employee" within the meaning of 29 U.S.C. § 1002(6) and a "participant" within the meaning of 29 U.S.C. § 1002(7).

138.    Defendants failed to provide Brach with any employment benefits while Brach worked for Defendants in violation of 29 U.S.C § 1132(a)(1).

139.    Under 29 U.S.C. § 1132(a)(1), Brach is entitled to recover employment benefits that should have been paid under an employee benefit plan.

140.    As a direct and proximate consequence of Defendants' conduct, Brach has suffered the loss of employment benefits and income amounting to thousands of dollars.

## COUNT IV
### Wrongful Denial of Overtime Pay in Violation of Fair Labor Standards Act, 29 U.S.C § 207(a)(1)

141.    Brach hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged therein.

142.    Defendants are "employers" within the meaning of 29 U.S.C. § 203(d).

143.    At all relevant times, Defendants exercised extensive control over Brach.

144.    Brach received assignments directly from and reported to Defendants' executive staff, including Defendant Stanley, Defendant Henderson, Mr. Schultz, and Ms. Rubin.

145.    Defendants determined the methods by which Brach completed his assignments.

146.    Defendants did not provide any way for Brach to employ substitutes, helpers, or assistants.

18

147.     Defendants provided Brach with the necessary training for his position in gunfighter gymnasium components and synthetic weapons systems.

148.     Hence, Brach was an employee of Defendants and was accordingly an "employee" within the meaning of 29 U.S.C. § 203(e)(1).

149.     Frequently, Brach worked in excess of forty hours per week, but Defendant Henderson verbally instructed Brach not to exceed forty hours per week on his timesheet. Brach's paycheck did not increase when he worked in excess of forty hours per week.

150.     Under 29 U.S.C § 207(a)(1), Brach is entitled to recover overtime pay that should have been paid to him by Defendants.

151.     As a direct and proximate consequence of Defendants' conduct, Brach has suffered the loss of overtime pay amounting to thousands of dollars.

### PRAYER FOR RELIEF

152.     Based on the foregoing retaliation, Brach respectfully requests that he be awarded the following relief:

A.     Economic damages for lost wages and benefits, including two times the amount of back pay and interest on the back pay;

B.     Compensatory (non-economic) damages, including damages for emotional distress and loss of reputation;

C.     Non-economic damages for mental and emotional distress, embarrassment and humiliation, career damage, and harm to reputation;

D.      Injunctive or equitable relief, as may be appropriate, to prevent further harm to others and the public caused by CKC's retaliation against a whistleblower;

E.      Reasonable litigation costs, expert fees and reasonable attorney's fees, together with all other relief available from law and equity.

## JURY DEMAND

Brach demands a trial by jury for any and all issues proper to be so tried.


Respectfully submitted,


R. Scott Oswald, VA Bar No. 41770
Richard Peterson, VA Bar No. 83305
The Employment Law Group, P.C.
888 17th Street, NW, Suite 900
Washington, D.C. 20006
(202) 261-2831
(202) 261-2835 (facsimile)
*Counsel for Plaintiff*

21