# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

|  |  |  |
|---|---|---|
| **CAMERON BRACH,** *et al.,* | ) | |
| | ) | |
| *Plaintiff-Counterclaim Defendants,* | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:16-cv-978-TSE/JFA** |
| | ) | |
| **CONFLICT KINETICS CORPORATION,** | ) | |
| | ) | |
| *Defendant-Counterclaim Plaintiff.* | ) | |

## PLAINTIFF-COUNTERCLAIM DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

R. Scott Oswald, VA Bar No. 41770
Nicholas Woodfield, VA Bar No. 48938
Kellee Boulais Kruse, VA Bar. No. 78710
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
nwoodfield@employmentlawgroup.com
soswald@employmentlawgroup.com
*Counsel for Cameron Brach and*
*Independent Recruiting Consultants, LLC*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

I.   INTRODUCTION ...................................................................................................... 1

II.  STATEMENT OF UNDISPUTED MATERIAL FACTS ........................................ 2

III. LEGAL STANDARD ................................................................................................ 10

IV.  ARGUMENT ............................................................................................................ 11

    A.   Counterclaim Plaintiff's Computer Fraud and Abuses Act (CFAA)
        Claim Fails Because There Is No Evidence That Brach or IRC
        Intentionally Accessed a Computer Without Authorization ...................................... 11

        1.   Brach or IRC did not access a CKC computer after Brach's
            termination ................................................................................................... 12

        2.   CKC's forensic expert did not determine that Brach or IRC
            accessed a CKC computer after his termination ............................................. 13

        3.   CKC only suffered damages as a result of the actions of its own
            contractors and employees ............................................................................. 14

    B.   Counterclaim Plaintiff's Virginia Computer Crimes Act Fails Because
        There Is No Evidence That Brach or IRC Altered or Disabled Any
        Data, Files, or Computer Programs ......................................................................... 16

        1.   No one, including CKC's forensic expert, can point to any
            specific files that were allegedly deleted ....................................................... 16

        2.   Brach and IRC did not disable any CKC computer ...................................... 18

        3.   CKC has not suffered any damages ............................................................. 18

    C.   Counterclaim Plaintiff's Constructive Fraud Claim Fails Because CKC
        Has Not Shown That Brach Made a False Representation of a
        Material Fact With The Intent That CKC Would Act on His
        Representation ......................................................................................................... 19

        1.   Brach was unaware that Trippodo would be unable to perform
            on the contract ............................................................................................. 21

        2.   Trippodo himself kept CKC informed of security clearance
            issues ........................................................................................................... 22

3.      CKC suffered no damages attributable to Brach, because it did
        not lose any contract or business opportunities as a result of
        Trippodo...........................................................................................................22

4.      CKC failed to mitigate any damages by requiring
        reimbursement from Trippodo ......................................................................23


CONCLUSION.................................................................................................................23

# TABLE OF AUTHORITIES

## CASES

*Anderson v. Liberty Lobby, Incorporated*
    477 U.S. 242 (1986).....................................................................................................10

*Beale v. Hardy*
    769 F.2d 213 (4th Cir. 1985) ......................................................................................11

*Evaluation Research Corporation v. Alequin*
    439 S.E.2d 387 (Va. 1994)...........................................................................................20

*Henderson v. Henderson*
    495 S.E.2d 496 (Va. 1998)...........................................................................................20

*Mortarino v. Consultant Engineering Services, Incorporated*
    467 S.E.2d 778 (Va. 1996)...........................................................................................20

*Nguyen v. CAN Corporation*
    44 F.3d 234 (4th Cir. 1995) ........................................................................................11

*Parkman v. Elam*
    2009 WL 736067 (E.D. Va. March 17, 2009) .........................................................19, 20

*Supervalu, Incorporated v. Johnson*
    666 S.E.2d 335 (Va. 2008)...........................................................................................20

*WEC Carolina Energy Solutions LLC v. Miller*
    687 F.3d 199 (4th Cir. 2012) ......................................................................................16

## RULES AND STATUTES

Computer Fraud and Abuses Act, 18 U.S.C. § 1030  ............................................11, 12

Federal Rule of Civil Procedure 56 ......................................................................10

Virginia Computer Crimes Act, Va. Code Ann. § 18.2-152.4 ....................................16

## I.   __INTRODUCTION__

Cameron Brach and Independent Recruiting Consulting (IRC) are entitled to summary judgment on all counterclaims.  In its counterclaims CKC alleges that Brach and IRC violated the Computer Fraud and Abuses Act and the Virginia Computer Crimes Act by accessing and damaging its IT systems through a computer program called TeamViewer.  However, CKC cannot establish that Brach or IRC intentionally accessed a Conflict Kinetic Corporation (CKC) computer after Brach's termination. Moreover, there is no evidence that Brach or IRC altered or disabled any CKC data, files, or computer programs. CKC's own forensic expert did not determine that Brach or IRC accessed a CKC computer after Brach's termination, nor can he identify specific files that were allegedly deleted. Finally, the evidence shows that any damage caused to CKC's computers was caused by CKC's own employees and contractors.

CKC also alleges that Brach and IRC engaged in constructive fraud when they did not inform CKC that Joe Trippodo might not be able to perform on one of its contracts because of a "blemish" on his security clearance record.  However, the evidence shows that Brach was unaware that Trippodo might be unable to perform on the contract and also that Trippodo himself kept CKC informed of security clearance issues.  Moreover, Brian Stanley, CKC's President and founder, testified in his deposition that the only reason he decided to file counterclaims against Brach was because Brach filed a lawsuit against CKC and Stanley, resulting in clear retaliatory actions and a personal vendetta against Brach. CKC suffered no damages attributable to Brach because it did not lose any contract or business opportunities as a result of the Trippodo issues. Finally, CKC proffered invoices of costs related to Trippodo, but it failed to mitigate its damages by enforcing its contract with Trippodo and seeking reimbursement of these costs from Trippodo himself.

## II.    STATEMENT OF UNDISPUTED MATERIAL FACTS

### Joe Trippodo's Security Clearance

1.      Stanley and Chief Information Officer Clay Schultz hired Trippodo in 2014. Although Brach recommended Trippodo, Brach did not participate in the hiring process. Trippodo Declaration at ¶¶ 5-7 (attached as Exhibit 1).

2.      Stanley does not recall asking Trippodo about his background.  Stanley Dep. Tr. at 81:21-82:1 (attached as Exhibit 2).

3.      Trippodo has held a Top Secret/sensitive compartmented information ("SCI") clearance for approximately twenty-five years.  Trippodo Declaration at ¶ 9.

4.      Trippodo applied for a position with the United States Department of the Navy shortly before coming to CKC.  Hiring officials with the Navy informed Trippodo that it would reinvestigate his SCI security clearance.  Trippodo Declaration at ¶ 12.

5.      Stanley does not remember if CKC performed any background check on Trippodo or verified that he held a security clearance.  Stanley Dep. Tr. at 81:21-82:01.

6.      Trippodo started work for CKC in or about December 2014, on an as-needed basis.  Trippodo Declaration at ¶ 7.

7.       In July 2015, Trippodo accepted to work long-term for CKC on a government contract in Germany.  Trippodo was aware that this position required a secret level security clearance.  Trippodo Declaration at ¶ 8.

8.      Trippodo was aware that the SCI portion of his security clearance had been "flagged" in 2012.  However, he was also aware that the TS access portion of his security clearance remained unaffected and that his Secret and Top Secret clearances were still active. Thus he believed he was qualified for the position with CKC.  Trippodo Dec. at ¶¶ 11-12, 20-22.

2

9.      Trippodo kept CKC apprised of the status of the security clearance investigation during his employment. Trippodo Declaration at ¶ 13.

10.     Between 2014 and the end of July 2015, Brach, based on Trippodo's assurances, believed that any problems relating to Trippodo's security clearance had been "cleared up" because the Navy had requested a new secret clearance for Trippodo. Brach Dep. Tr. at 205:14-206:18 (attached as Exhibit 3).

11.     On May 12, 2015, Trippodo told Brach that the Department of the Navy was issuing him a security clearance. Brach Dep. Tr. at 211:04-212:20.

12.     Brach only learned from Stanley on July 28, 2015 that Trippodo could not access the base in Germany. Brach Dep. Tr. at 216:03-22; July 28, 2015 Emails (attached as Exhibit 4).

13.     Stanley testified that when he asked Brach about Trippodo's background, Brach did not know of any major issues with Trippodo's security clearance and thought it was "all going to work out." Stanley Dep. Tr. at 88:01-21.  Stanley did not ask Brach to identify any blemishes in Trippodo's background.  *Id.*

14.     Even after learning of a potential problem with Trippodo's security clearance, Stanley did not ask Trippodo for any details about the problem.  Stanley Dep. Tr. at 88:22-89:10.

15.     It was Brach's understanding that Trippodo still held a Secret security clearance. Brach Dep. Tr. at 217:01-19.  In email communications on July 28, 2015, Brach encouraged Trippodo to be truthful with CKC regarding any problems with his security clearance. Brach Dep. Tr. at 220:11-221:04; Ex. 4, July 28, 2015 Emails.

16.     On August 9, 2015, CKC terminated its employment relationship with Brach and IRC. Brach Dep. Tr. at 52:13-16.

17.     CKC terminated Trippodo on the same day.  Trippodo Declaration at ¶ 28.

**Brach's Access to CKC Information Technology Systems**

18.     During the time that Brach worked for CKC, Chief Information Officer Clay
Schultz allowed Brach remote access to CKC data using his Outlook account. Brach Dep. Tr. at
12:14-13:05.

19.     After his termination, Brach had no physical access to the building, his former
office, or CKC's conference room.  Myrick Dep. Tr. at 15:13-16:17; 22:16-23:11 (attached as
Exhibit 5).

20.     On the morning of August 9, 2015, at approximately 10:02am, CKC changed
Brach's password to his CKC accounts, including his Outlook account. CKC_003432.1-
003432.4 (attached as Exhibit 6). CKC revoked Brach's email account and log-in credentials
immediately upon his termination.  Myrick Dep. Tr. at 12:21-13:17; 24:08-18.

21.     Brach had no access to CKC's shared servers after his termination.  Myrick Dep.
Tr. at 14:07-15:02; Brach Declaration at ¶ 3 (attached as Exhibit 7).

22.     Although Brach no longer had access to CKC's IT systems after August 9, 2015,
others had access to Brach's email account during his employment and after his termination.
Canali Dep. Tr. at 45:18-46:18; 49:13-50:20 (attached as Exhibit 8); Myrick Dep. Tr. at 21:06-
22:15.

23.     Canali did not determine that Brach accessed his CKC e-mail account after his
termination. Canali Dep. Tr. at 35:02-07.

24.     Canali did not independently verify that Brach had access to his workstation
through a program called TeamViewer after Brach's termination. Canali Dep. Tr. at 38:02-17.
Stanley simply told Canali that Brach had accessed his former computer.  *Id.* at 13:20-14:03;
38:02-17.

25.     Brach did not have one of CKC's TeamViewer licenses or access to CKC's TeamViewer passwords.  Myrick Dep. Tr. at 16:18-17:17; 19:03-07; Brach Declaration at ¶ 4.

26.     Further, after his termination, Brach did not have the credentials necessary to access CKC's systems through TeamViewer.  Myrick Dep. Tr. at 17:21-19:02; Brach Declaration at ¶ 4.

27.     Even if Brach had his own TeamViewer license, he would need a second set of credentials to access CKC's system.  Myrick Dep. Tr. at 19:13-20:09.

28.     If the computers located in CKC's building were shut down after Brach's termination, he could not access them again, even if he had his own TeamViewer license, as he no longer had log-in credentials.  Myrick Dep. Tr. at 29:01-04.

29.     Canali found no definitive proof of unauthorized access.  Canali Dep. Tr. at 42:14-43:21; FedCMS Report (attached as Exhibit 9).

30.     If Canali had detected unauthorized access, CKC would have informed the government as required by the Federal Information Security Management Act.  *Id.*

31.     Canali testified that it was unnecessary to inform the government because of the lack of definitive evidence to suggest unauthorized access. Canali Dep. Tr. at 43:22-44:20.

**Computer Located in Brach's Former Office**

32.     After Brach's termination CKC allowed Robinson to use the computer in Brach's former office to review his files.  Myrick Dep. Tr. at 23:15-24:07; Robinson Statement (attached as Exhibit 10).

33.     Robinson accessed the computer using Brach's log-in and a new password that Myrick had created.  This new password was unavailable to Brach. Myrick Dep. Tr. at 23:15-24:18.

34.     Robinson alleged that the WAWF website opened while she was out of the room, but it did not display Brach's credentials. Myrick Dep. Tr. at 29:12-30:13.

35.     While still employed, Brach had enabled an option in his web browser to save certain user names and passwords, which would have allowed Robinson to open his Gmail after CKC terminated Brach. Myrick Dep. Tr. at 33:03-17; Brach Declaration at ¶ 1.

36.     When Robinson alerted Myrick to seeing WAWF website and Brach's Gmail account, Myrick simply mass deleted Brach's saved credentials and took no other steps. Myrick Dep. Tr. at 34:15-18.

37.     CKC allowed a contractor access to the computer in Brach's former office. Myrick Dep. Tr. at 34:22-36:22.

38.     The contractor caused the computer to crash, leaving it in a state in which Robinson could no longer use it.  Robinson Dep. Tr. at 49:12-50:05 (attached as Exhibit 11); Myrick Dep. Tr. at 46:17-47:15.

39.     The contractor destroyed the computer that Brach had previously used. Myrick Dep. Tr. at 46:17-47:15.

40.     After the contractor caused the computer to crash, Installation and Repair Technician Myrick reformatted the hard drive on Brach's desktop computer, destroying and damaging the files on the hard drive. Canali Dep. Tr. at 11:12-12:13; Myrick Dep. Tr. at 34:22-36:22; 37:04-38:02.

41.     However, after Myrick reformatted the hard drive, the computer was functional and could be used by any CKC employee.  Myrick Dep. Tr. at 38:03-10.

42.     Although Robinson could have continued to use the computer, she requested a laptop so that she could work remotely. Robinson Dep. Tr. at 52:11-14; Myrick Dep. Tr. at

38:15-21.

43.     After Robinson received her laptop computer, the computer that Brach had used, now in working condition, sat in Robinson's office unused for approximately one year. Robinson Dep. Tr. at 50:19-51:08.

44.     Even if CKC had security concerns regarding the computer that Brach had used, it was unnecessary for Myrick to reformat the hard drive, destroying and damaging files.  It simply needed to unplug the computer from the wall. Canali Dep. Tr. at 12:14-13:14.

45.     The computer that Brach had used did not have wireless internet capabilities. Canali Dep. Tr. at 12:14-13:14.

46.     However, CKC waited until a few days before CKC's forensic expert, Luigi Canali, arrived to disconnect Brach's computer. Canali Dep. Tr. at 13:15-19.

47.     When Canali arrived at CKC for his observation and analysis, CKC had reformatted the computer and damaged the files saved on it. Canali Dep. Tr. at 14:11-13; Robinson Dep. Tr. at 51:20-52:10.

48.     Any files that Robinson believed to be tampered with were destroyed by CKC's actions. Canali could not recover any of the contents of the files. Canali Dep. Tr. at 14:16-16:03.

49.     Robinson could not specify any files that were allegedly missing or how many files were allegedly removed from Brach's computer. Robinson Dep. Tr. at 42:13-16; 47:07-21.

50.     Canali was unable to determine when the remaining files were created and who accessed the files because there was almost no metadata intact. Canali Dep. Tr. at 16:07-16.

51.     Canali does not know the titles or types of any documents that were allegedly deleted.  Canali Dep. Tr. at 20:04-15.

52.     No one at CKC can identify any files that were allegedly deleted or identify how

many files were allegedly deleted.  Myrick Dep. Tr. at 44:03-18.

53.     Myrick made no effort to look for files that may have been removed or deleted.

Myrick Dep. Tr. at 45:01-04.

54.     Ultimately, Canali was unable to obtain any information about the allegedly

missing documents from his evaluation. Canali Dep. Tr. at 20:04-15.

55.     Canali could not determine if, in fact, there were any files that were deleted from

Brach's computer. Canali Dep. Tr. at 27:21-28:08.

56.     Canali determined that a limited number of specific files were accessed on August

18, 2015, after Brach no longer had access to the system. Canali Dep. Tr. at 41:08-42:05;

FedCMS Report. However, Robinson could have accessed those files and Canali does not know

if those files were from Brach's CKC email account. *Id.*

**<u>Computer Located in the Conference Room</u>**

57.     Brach had logged onto the conference room computer using his own credentials

while he was still working at CKC.  Canali Dep. Tr. at 29:11-30:14; Brach Declaration at ¶ 2.

58.     Brach had no physical access to the conference room computer after his

termination.  Myrick Dep. Tr. at 40:04-41:04; 43:08-15.

59.     The conference room computer was not connected to any CKC servers or the

internet.  Myrick Dep. Tr. at 43:08-15.

60.     Myrick and Stanley saw that Brach was still logged in to the conference room

computer after Brach's termination.  Myrick Dep. Tr. at 40:04-14.

61.     Myrick could have simply deleted Brach's Microsoft profile, but Stanley

instructed him not to do so.  Myrick Dep. Tr. at 41:12-42:04.

**Post-Termination Retaliation**

62.     After Brach filed this lawsuit against CKC and Stanley, Stanley sent Brach text messages stating "you'll eat it all up in the counter lawsuits" and "[w]arm up your savings for the counter suit. Don't run out." Brach0030650; Brach0030649 (attached as Exhibits 12 and 13).

63.     Stanley sent Brach these text messages because Brach's counsel served Stanley with the complaint in this suit. Stanley Dep. Tr. at 249:13-250:15.

64.     Stanley testified that he would not have filed claims against Brach for allegedly accessing CKC computer systems or for the situation with Trippodo if Brach had not filed claims against CKC and Stanley. Stanley Dep. Tr. at 250:16-20.

**Damages**

65.     CKC's contract with Trippodo required Trippodo to reimburse CKC for expenses related to his training and for relocating him to Germany.  Stanley Dep. Tr. at 98:09-21.

66.     CKC did not enforce the clause in Trippodo's contract requiring reimbursement because Stanley testified that he and CKC "just [doesn't] do that kind of thing." *Id.*

67.     CKC did not lose its contract with the government client, Joint Multinational Training Center (JMTC), as a result of the problems with Trippodo's security clearance.  Stanley Dep. Tr. at 233:09-21; Rubin Dep. Tr. at 87:03-17 (attached as Exhibit 14).

68.     CKC expects that the government client will continue to extend its contract. Rubin Dep. Tr. at 87:03-17.

69.     CKC has not lost any business opportunities as a result of the problems with Trippodo's security clearance. *Id.*

70.     CKC replaced Trippodo with an employee who was already living in Germany and who was able to perform all of the tasks that the client requested.  Rubin Dep. Tr. at 84:09-

87:02.

71.     The computer in Brach's former office is operable and available for employees to use.  Indeed, Robinson used it for several months until she requested a laptop so that she could work remotely.  Myrick Dep. Tr. at 28:02-22.

72.     By the time CKC's contractors damaged the computer in Brach's former office, Robinson had already ordered a laptop, so she was never without a computer.  Robinson Dep. Tr. at 51:20-52:14.

73.     The computer from Brach's former office has been unused since Robinson acquired a laptop computer.  Robinson Dep. Tr. at 50:19-51:08; Myrick Dep. Tr. at 38:15-39:05.

74.     Stanley instructed Myrick not to simply delete Brach's Microsoft profile from the conference room computer, which would have made it accessible to any CKC employee.  Myrick Dep. Tr. at 41:12-42:04. Instead, Stanley paid Canali to unlock the conference room computer. Canali Dep. Tr. at 28:09-29:10.

75.     Aside from the fact that the computer needed to be unlocked, there was no damage to the conference room computer. Myrick Dep. Tr. at 46:07-12.

76.     CKC has not lost any business as a result of any alleged unauthorized access to its information technology systems. Stanley Dep. Tr. at 233:22-234:16.

## III.     <u>LEGAL STANDARD</u>

Summary judgment is proper when there are no genuine disputes as to any material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Facts are material when proof of their existence or nonexistence would affect the case's outcome. *Anderson*, 477 U.S. at 248.  An issue is genuine if a reasonable decision-maker might return a verdict in favor of the nonmoving party

on the basis of such issues. *Id.* at 248.  While all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the nonmoving party, the nonmoving party cannot rest on mere allegations or speculation. *Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir. 1985). A party can succeed on summary judgment by showing the nonmoving party's absence of evidence to support their case. *Nguyen v. CNA Corp.,* 44 F.3d 234, 236-37 (4th Cir. 1995).

## IV. <u>ARGUMENT</u>

There is no evidence supporting CKC's Computer Fraud and Abuses Act claim, Virginia Computer Crimes Act claim, and constructive fraud claim.[1] In fact, CKC's own forensics expert did not determine that Brach or IRC accessed his former CKC account or any documents or data after his termination. Any damage to computers located at CKC offices was done by CKC's own contractors and employees. As to the constructive fraud claim, Brach was unaware that Trippodo would be unable to perform on the contract. Further, CKC suffered little to no damages attributable to Brach because of Trippodo's security clearance.

### A. Counterclaim Plaintiff's Computer Fraud and Abuses Act (CFAA) Claim Fails Because There Is No Evidence That Brach or IRC Intentionally Accessed a Computer Without Authorization.

The Computer Fraud and Abuses Act ("CFAA") provides for civil liability when a person (1) "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any department or agency of the United States," in violation of 18 U.S.C. § 1030(a)(2)(B); (2) "intentionally accesses a computer without authorization or exceeds authorized access, and thereby obtains information from any protected computer," in

---

[1]      Stanley, who sent Brach threatening text messages after being served with Brach's complaint, testified that he brought these counterclaims only because Brach sued him. Exs.12, 13 (Brach0030650; Brach0030649); Stanley Dep. Tr. at 250:16-20.  Although the parties established through discovery that there are no damages associated with these claims, CKC continues to pursue them in an attempt to gain leverage and to retaliate against Brach.

violation of 18 U.S.C. § 1030(a)(2)(C); or (3) "intentionally accesses a protected computer

without authorization, and as a result of such conduct, causes damage and loss," in violation of

18 U.S.C. § 1030(a)(5)(C). Each of these statutory provisions requires that the person either

intentionally access a computer without authorization or exceed authorization.

### 1. Brach or IRC did not access a CKC computer after Brach's termination.

Brach and IRC are entitled to summary judgment on this claim because CKC cannot

establish that either Brach or IRC accessed any CKC computer after Brach's termination.  CKC

cannot even establish that Brach or IRC had access to any of CKC's computers or networks after

his termination, let alone that either accessed any CKC computer after Brach's termination.

Immediately after CKC terminated Brach on August 9, 2015, CKC changed Brach's

password to his CKC accounts, including his Outlook account, and revoked his log-in

credentials. Ex. 6 (CKC_003432.1-003432.4); Myrick Dep. Tr. at 12:21-13:17; 24:08-18. Brach

had no access to CKC's shared servers after his termination.  *Id.* at 14:07-15:02.  Brach did not

have one of CKC's TeamViewer licenses or access to CKC's TeamViewer passwords.  *Id.*  at

16:18-17:17; 19:03-07; Brach Declaration at ¶ 4.  Further, after his termination, Brach did not

have the credentials necessary to access CKC's systems through TeamViewer.  Myrick Dep. Tr.

at 17:21-19:02. If the computers located in CKC's building were shut down after Brach's

termination, he could not access them again, even if he had his own TeamViewer license, as he

no longer had log-in credentials.  *Id.* at 29:01-04.

After his termination Brach had no physical access to the building, his former office, or

CKC's conference room.  *Id.* at 15:13-16:17; 22:16-23:11. Although Brach no longer had access

to CKC's IT systems after August 9, 2015, others had access to Brach's email account during his

employment and after his termination. Canali Dep. Tr. at 45:18-46:18; 49:13-50:20; Myrick Dep. Tr. at 21:06-22:15.

CKC cannot show by a preponderance of the evidence that Brach accessed a CKC computer after his termination. Brach's clear denial of these actions (*see* Brach Declaration) in contrast to CKC's pure conjecture based on speculative information (*see* FedCMS Report) clearly shows that there is no dispute in fact. Thus, the evidence clearly establishes that Brach could not have possibly had access to any of CKC's computers or networks after his termination.

     **2.**     **CKC's forensic expert did not determine that Brach or IRC accessed a CKC computer after his termination.**

Although CKC retained a forensic expert in an effort to support its counterclaims, the expert could not establish that Brach or IRC accessed any CKC system after his termination. CKC's retained expert did not independently verify that Brach accessed his former workstation after his termination.  Canali Dep. Tr. at 13:20-14:07; 38:02-07. Rather he took Stanley at his word that Brach had done so.  *Id.*  In fact, Canali did not determine that Brach accessed his CKC e-mail account after his termination. *Id.* at 35:02-07. Moreover, Canali found no definitive proof of unauthorized access.  *Id.* at 42:14-43:21; Ex. 9, FedCMS Report.

Critically, by failing to report an unauthorized breach to the Federal government CKC acknowledges that it has no evidence that such a breach occurred.[2]  CKC's own retained expert, Canali, found no definitive proof of unauthorized access.  Canali Dep. Tr. at 42:14-43:21.

---

[2]     Ex. 9, FedCMS Report at 3 ("Note that if the government is contacted, they can report this incident as unauthorized access to their systems and may proceed with submitting this incident to their Computer Incident Response Team (CIRT) as required by the Federal Information Security Management Act (FISMA). In our experience with other incidents similar to this, and in today's heightened security climate of breached Federal Computing Systems, this will more than likely trigger some sort of investigation led by a Federal Agency. Very simply put, anyone that accesses a Federal Computing System must be authorized to do so."

If Canali had detected unauthorized access, CKC would have informed the government as required by the Federal Information Security Management Act. *Id.* Canali testified that it was unnecessary to inform the government because of the lack of definitive evidence to suggest unauthorized access. *Id.* at 43:22-44:20. Put simply, if CKC had any proof that unauthorized access by Brach occurred, it was required to report the breach to the federal government as per the Federal Information Security Management Act.  Because CKC made no such report and the forensics expert determined that it was unnecessary to make such a report to the government in this instance, CKC can point to no evidence of any unauthorized access.

### 3.  CKC only suffered damages as a result of the action of its own contractors and employees

Even if CKC could demonstrate that Brach or IRC had accessed any computer system after Brach's termination, it is unable to demonstrate that it suffered any loss or damage as a result.  Any damage or loss suffered was a result of the actions of CKC's own contractors and employees.

Brach had logged onto the conference room computer using his own credentials while he was still working at CKC.  Canali Dep. Tr. at 29:11-30:14; Brach Declaration at ¶ 2. Myrick could have deleted Brach's Microsoft profile, but Stanley instructed him not to do so.  Myrick Dep. Tr. at 41:12-42:04. There is no dispute of fact that CKC could have used the conference room computer by having its IT professional, Myrick, delete Brach's profile and credentials.

CKC allowed a contractor access to the computer in Brach's former office.  Myrick Dep. Tr. at 34:22-36:22.  The contractor caused the computer to crash, leaving it in a state in which Robinson could no longer use it.  Robinson Dep. Tr. at 49:12-50:05; Myrick Dep. Tr. at 46:17-47:15. The contractor only destroyed the computer that Brach had previously used. Myrick Dep. Tr. at 46:17-47:15.

After the contractor caused the computer to crash, Installation and Repair Technician Myrick reformatted the hard drive on Brach's desktop computer, destroying and damaging the files on the hard drive. Canali Dep. Tr. at 11:12-12:13; Myrick Dep. Tr. at 34:22-36:22; 37:04-38:02. However, after Myrick reformatted the hard drive, the computer was functioning and could be used by any CKC employee.  Myrick Dep. Tr. at 38:03-10. Although Robinson could have continued to use the computer, she requested a laptop so that she could work remotely. Robinson Dep. Tr. at 52:11-14; Myrick Dep. Tr. at 38:15-21. After Robinson received her laptop computer, the computer that Brach had used, now in working condition, sat in Robinson's office unused for approximately one year. Robinson Dep. Tr. at 50:19-51:08.

Even if CKC had security concerns regarding the computer that Brach had used, it was unnecessary for Myrick to reformat the hard drive, destroying and damaging files.  They simply needed to unplug the computer from the wall. Canali Dep. Tr. at 12:14-13:14. When Canali arrived at CKC for his observation and analysis, CKC had reformatted the computer and damaged the files saved on it. *Id.* at 14:11-13; Robinson Dep. Tr. at 51:20-52:10. Any files that Robinson believed to be tampered with were virtually destroyed by CKC's actions. Canali could not recover any of the contents of the files. Canali Dep. Tr. at 14:16-16:03.

There is no dispute of fact that CKC's own contractor caused Brach's computer to crash, CKC's own employee destroyed and damaged all the files on Brach's computer by unnecessarily reformatting the hard drive. In addition, there is no dispute of fact that after the hard drive was reformatted, Brach's computer was functioning, could be used by any CKC employee, but instead sat in Robinson's office unused for one year.

**B.      Counterclaim Plaintiff's Virginia Computer Crimes Act Fails Because There Is No Evidence That Brach or IRC Altered or Disabled Any Data, Files, or Computer Programs.**

The Virginia Computer Crimes Act or "VCCA" reads in relevant part:

> A. It shall be unlawful for any person, with malicious intent, to:
>
>> 1. Temporarily or permanently remove, halt, or otherwise disable any computer data, computer programs or computer software from a computer or computer network;
>>
>> …
>>
>> 3. Alter, disable, or erase any computer data, computer programs or computer software;
>>
>> …
>>
>> 6. Use a computer or computer network to make or cause to be made an unauthorized copy, in any form, including, but not limited to, any printed or electronic form of computer data, computer programs or computer software residing in, communicated by, or produced by a computer or computer network

Va. Code Ann. § 18.2-152.4.  Like the CFAA, the VCCA is a criminal and civil statute that is to be strictly construed, avoiding interpretations not clearly warranted by the text, and relying on the rule of lenity. *WEC Carolina Energy Sols. LLC v. Miller*, 687 F.3d 199, 203–04 (4th Cir. 2012).

**1.      No one, including CKC's forensic expert, can point to any specific files that were allegedly deleted.**

Robinson alleged that the WAWF website opened while she was out of the room, but it did not display Brach's credentials. Myrick Dep. Tr. at 29:12-30:13. When Robinson alerted Myrick to seeing WAWF website and Brach's Gmail account, Myrick simply mass deleted Brach's saved credentials and took no other steps. *Id.* at 34:15-18. When Canali arrived at CKC for his observation and analysis, CKC had reformatted the computer and damaged the files saved

16

on it. Canali Dep. Tr. at 14:11-13; Robinson Dep. Tr. at 51:20-52:10.

As a result of CKC's actions, any files that Robinson believed to be tampered with were destroyed by CKC's own actions. Canali Dep. Tr. at 14:16-16:03. Canali could not recover any of the contents of the files. *Id.* Robinson did not know which files were allegedly missing or how many files were allegedly removed from Brach's computer. Robinson Dep. Tr. at 42:13-16; 47:07-21. Canali was also unable to determine when the remaining files were created and who accessed the files because there was almost no metadata intact. Canali Dep. Tr. at 16:07-16. Canali could not determine the titles or types of any documents that were allegedly deleted. *Id.* at 20:04-15.

No one at CKC can identify any files that were allegedly deleted or identify how many files were allegedly deleted. Myrick Dep. Tr. at 44:03-18. Myrick made no effort to look for files that may have been removed or deleted. *Id.* at 45:01-04. Ultimately, Canali was unable to obtain any information about the allegedly missing documents from his evaluation. Canali Dep. Tr. at 20:04-15. Canali could not determine if, in fact, there were any files that were deleted from Brach's computer. Canali Dep. Tr. at 27:21-28:08. The only thing Canali could determine was that a limited number of specific files were accessed on August 18, 2015, after Brach no longer had access to the system. Canali Dep. Tr. at 41:08-42:05; Ex. 9, FedCMS Report. However, Robinson could have accessed those files, and Canali does not know if those files were from Brach's CKC email account. *Id.* Therefore, there is no evidence that Brach or IRC altered or deleted any files because CKC cannot even show which files were allegedly deleted.

This claim also fails because CKC has not shown by a preponderance of the evidence that Brach altered or deleted any CKC files after his termination. Brach's clear denial of these actions (*see* Brach Declaration) in contrast to CKC's pure conjecture based on speculative information

17

(*see* FedCMS Report and Robinson statement) clearly shows that there is no dispute in fact. Thus, the evidence clearly establishes that Brach alter or delete any files remotely after his termination.

**2.      Brach and IRC did not disable any CKC computer.**

There is also no evidence that Brach or IRC disabled a computer located in CKC's conference room. Again, in light of Brach's clear denial of disabling the conference room computer with and CKC's own IT professional and forensic expert's testimony, CKC cannot show by a preponderance of the evidence that Brach disabled any CKC computer.

While he was still working at CKC, Brach had logged onto the conference room computer using his own credentials.  Canali Dep. Tr. at 29:11-30:14; Brach Declaration at ¶ 2. After his termination, Brach had no physical access to the conference room computer.  Myrick Dep. Tr. at 40:04-41:04; 43:08-15. The conference room computer was not connected to any CKC servers or the internet.  *Id.* at 43:08-15. After Brach's termination, Myrick and Stanley saw that Brach was still logged in to the conference room computer.  *Id.* at 40:04-14. Myrick could have simply deleted Brach's Microsoft profile, but Stanley instructed him not to do so. *Id.* at 41:12-42:04. There is no evidence that Brach or IRC disabled a computer, especially when Brach had no physical access to the computer and CKC's IT professional could have made the computer usable by simply deleting Brach's login and profile.

**3.      CKC has not suffered any damages.**

Any damages that CKC allegedly suffered were as a result of its own employees' and contractors' actions.  As explained above in Section A(3), CKC's own contractor caused Brach's computer to crash and CKC's own employee destroyed and damaged all the files on Brach's computer by unnecessarily reformatting the hard drive. In addition, after the hard drive was

reformatted, Brach's computer was functioning and could have been used by any CKC employee but instead sat in Robinson's office unused for one year.

Regarding the conference room computer, CKC's IT professional, Myrick, could have made the computer usable by deleting Brach's profile and login credentials. Instead CKC unnecessarily hired an expert to unlock the conference room computer, and Stanley instructed Myrick not to delete Brach's Microsoft profile from the conference room computer, which would have made it accessible to any CKC employee.  Myrick Dep. Tr. at 41:12-42:04. Instead, Stanley paid Canali to unlock the conference room computer.  Canali Dep. Tr. at 28:09-29:10.

Both computers (Brach's computer and the conference room computer) are still in CKC's possession and are operational. Aside from the fact that the computer needed to be unlocked, there was no damage to the conference room computer. Myrick Dep. Tr. at 46:07-12. Although Robinson could have continued to use Brach's former computer, she requested a laptop so that she could work remotely. Robinson Dep. Tr. at 52:11-14; Myrick Dep. Tr. at 38:15-21. After Robinson received her laptop computer, the computer that Brach had used, now in working condition, sat in Robinson's office unused for approximately one year. Robinson Dep. Tr. at 50:19-51:08. Moreover, CKC has not lost any business as a result of any alleged unauthorized access to its information technology systems. Stanley Dep. Tr. at 233:22-234:16. CKC has not suffered any damages as a result of any alleged altering of files, except for damage caused by its own employees or contractors.

**C.    Counterclaim Plaintiff's Constructive Fraud Claim Fails Because CKC Has Not Shown That Brach Made a False Representation of a Material Fact With The Intent That CKC Would Act on His Representation.**

This Court has noted that the "elements of a cause of action for constructive fraud are a showing by clear and convincing evidence that a false representation of a material fact was made

innocently or negligently, and the injured party was damaged as a result of his reliance upon the

misrepresentation." *Parkman v. Elam,* 2009 WL 736067, at *3 (E.D. Va. Mar. 17, 2009);

*Mortarino v. Consultant Eng'g Servs.,* 467 S.E.2d 778, 782 (Va. 1996) (citing *Evaluation*

*Research Corp. v. Alequin,* 439 S.E.2d 387, 390 (Va. 1994) (citations omitted)). "A finding of ...

constructive fraud requires clear and convincing evidence that one has represented as true what is

really false, in such a way as to induce a reasonable person to believe it, with the intent that the

person will act upon this representation." *See id.; Mortarino*, 467 S.E.2d at 782 (quoting *Alequin,*

439 S.E.2d at 390).

> It should be noted that the Supreme Court of Virginia has declared that:

> [a] finding of constructive fraud requires proof that a false representation of a material fact was made, innocently or negligently, and that the injured party suffered damage as a result of his reliance on the misrepresentation. <u>In addition, the evidence must show that the false representation was made so as to induce a reasonable person to believe it, with the intent that the person would act on this representation.</u>

*Henderson v. Henderson,* 495 S.E.2d 496, 499 (Va. 1998) (citations omitted)(emphasis added).

> The Virginia Supreme Court has unambiguously declared that:

> > [u]nder no circumstances, however, will a promise of future action support a claim of constructive fraud. *See Richmond Metro. Auth.,* 256 Va. at 560, 507 S.E.2d at 348; *Colonial Ford Truck Sales,* 228 Va. at 677, 325 S.E.2d at 94. The rationale underlying this rule is plain. If unfulfilled promises, innocently or negligently made, were sufficient to support a constructive fraud claim, every breach of contract would potentially give rise to a claim of constructive fraud. *See Richmond Metro. Auth.,* 256 Va. at 560, 507 S.E.2d at 348; *Blair Constr.,* 253 Va. at 347, 485 S.E.2d at 139; *Lloyd v. Smith,* 150 Va. 132, 145, 142 S.E. 363, 365 (1928).

*Supervalu, Inc. v. Johnson*, 666 S.E.2d 335, 342 (Va. 2008). In this counterclaim Stanley seeks

to hold Brach liable for an unfulfilled representation by Trippodo that he would be able to obtain

a security clearance and perform on the contract because Brach recommended Trippodo for the

job.

1.     **Brach was unaware that Trippodo would be unable to perform on the contract.**

Although Brach recommended Trippodo, Brach did not participate in the hiring process. Trippodo Declaration at ¶ 5. In July 2015, Trippodo accepted to work long-term for CKC on a government contract in Germany.  Trippodo was aware that this position required a secret level security clearance.  Trippodo Declaration at ¶ 8. It was Brach's understanding that Trippodo still held a Secret security clearance. Brach Dep. Tr. at 217:01-19. Between 2014 and the end of July 2015, Brach, based on Trippodo's assurances, believed that any problems relating to Trippodo's security clearance had been "cleared up" since the Navy had requested a new secret clearance for Trippodo. Brach Dep. Tr. at 205:14-206:18.

On May 12, 2015, Trippodo told Brach that the Department of the Navy was issuing him a security clearance. *Id.* at 211:04-212:20. Brach only learned from Stanley on July 28, 2015 that Trippodo could not access the base in Germany. *Id.* at 216:03-22; Ex. 4, July 28, 2015 Emails. Stanley testified that when he asked Brach about Trippodo's background, Brach did not know of any major issues with Trippodo's security clearance and thought it was "all going to work out." Stanley Dep. Tr. at 88:1-21.  Stanley did not ask Brach to identify any blemishes in Trippodo's background.  *Id.*

Even after learning of a potential problem with Trippodo's security clearance, Stanley did not ask Trippodo for any details about the problem.  Stanley Dep. Tr. at 88:22-89:10. In email communications on July 28, 2015, Brach encouraged Trippodo to be truthful with CKC regarding any problems with his security clearance. Brach Dep. Tr. at 220:11-221:04; Ex. 4, July 28, 2015 Emails. There is no evidence that Brach was aware or knew that Trippodo would eventually be unable to perform on the Germany contract because of an unresolved "flag" on Trippodo's clearance.

**2.    Trippodo himself kept CKC informed of security clearance issues.[3]**

Tellingly, Stanley does not recall asking Trippodo about his background.  Stanley Dep.

Tr. at 81:21-82:1. Trippodo was aware that the SCI portion of his security clearance had been

"flagged" in 2012.  However, he was also aware that the TS access portion of his security

clearance remained unaffected and that his Secret and Top Secret clearances were still active.

Thus, he believed he was qualified for the position with CKC.  Trippodo Declaration at ¶¶ 11,

12. Trippodo himself kept CKC apprised of the status of the security clearance investigation

during his employment. Trippodo Declaration at ¶ 13. Even if the court determines that Brach

somehow knew that in the future, Trippodo would not be able to perform on the contract because

of an unresolved security clearance issue, CKC and Stanley failed to look into Trippodo's

background and security clearance upon hiring. Nonetheless, CKC should have known about any

clearance issues with Trippodo because Trippodo himself kept CKC informed.

**3.    CKC suffered no damage attributable to Brach, because it did not lose any
       contract or business opportunities as a result of Trippodo.**

Stanley testified that he filed counter claims against Brach relating to Trippodo's security

clearance only because Brach filed claims against CKC. Stanley Dep. Tr. at 249:13-250:20. This

is because CKC did not lose its JMTC contract with the government as a result of the problems

with Trippodo's security clearance.  Stanley Dep. Tr. at 233:09-21; Rubin Dep. Tr. at 87:03-17.

CKC expects that the government client will continue to extend their contract.  Rubin Dep. Tr. at

87:03-17.  CKC has not lost any business opportunities as a result of the problems with

Trippodo's security clearance. *Id.* CKC replaced Trippodo with an employee who was already

living in Germany, who was able to perform all of the tasks that the client requested.  Rubin Dep.

---

[3]     Although Brach and IRC disclosed Trippodo as a witness in this matter and produced a
declaration from Trippodo during discovery, CKC made no effort to depose Trippodo.

Tr. at 84:09-87:02.  In summary, CKC has not suffered any lost business opportunities with its government clients as a result of issues with Trippodo's security clearance.

      **4.**      **CKC failed to mitigate any damages by requiring reimbursement from Trippodo.**

Even if this court determines that there is a dispute of material facts concerning the constructive fraud claim and that CKC did suffer damages, CKC failed to mitigate its damages by seeking reimbursement from Trippodo. CKC alleges that it spent approximately $24,324.29 in costs for hiring Trippodo, employing Trippodo, and bringing him back from Germany after the security clearance issues prevented him from performing on the contract. *See* CKC Invoices (attached as Exhibit 15). However Stanley testified that CKC's contract with Trippodo required Trippodo to reimburse CKC for expenses related to his training and for relocating him to Germany.  Stanley Dep. Tr. at 98:09-21. CKC did not enforce the clause in Trippodo's contract requiring reimbursement because Stanley and CKC "just [doesn't] do that kind of thing." *Id.* If CKC wanted to reimburse these costs, CKC should have enforced its contract with Trippodo and sought reimbursement of these costs from Trippodo. Instead, Stanley decided to file retaliatory counterclaims for Brach to reimburse the company for these costs.

<u>**CONCLUSION**</u>

For the foregoing reasons, Counter–Defendant Cameron Brach respectfully requests that the Court enter summary judgment on all counterclaims.

Respectfully submitted,


   /s/ Nicholas Woodfield
Nicholas Woodfield, VA Bar No. 48938
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
nwoodfield@employmentlawgroup.com
*Counsel for Cameron Brach and Independent*
*Recruiting Consultants, LLC*


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the foregoing Counterclaim Defendants' Memorandum in

Support of its Motion for Summary Judgment was served via electronic filing on May 22, 2017,

upon:

Russell J. Gaspar, Esq.
Victor G. Klingelhofer, Esq.
Andrew K. Wible, Esq.
COHEN MOHR LLP
1055 Thomas Jefferson Street, N.W.
Suite 504
Washington, D.C. 20007
*Attorneys for Conflict Kinetics Corporation*


/s/ Nicholas Woodfield
Nicholas Woodfield