# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Alexandria Division

| | | |
|---|---|---|
| CAMERON BRACH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:16-cv-978-TSE/JFA |
| | ) | |
| CONFLICT KINETICS CORPORATION, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| CONFLICT KINETICS CORPORATION, | ) | |
| | ) | |
| Counterclaim Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CAMERON BRACH and INDEPENDENT RECRUITING CONSULTANTS, LLC, | ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT BY CONFLICT KINETICS CORPORATION, BRIAN STANLEY <u>AND KATHLEEN HENDERSON</u>

Russell J. Gaspar
Andrew K. Wible
Victor G. Klingelhofer
Cohen Mohr, LLP
1055 Thomas Jefferson St., N.W.
Suite 504
Washington, D.C. 20007
(202) 342-2550 (telephone)
(202) 342-6147 (facsimile)

*Attorneys for Conflict Kinetics Corporation, Brian Stanley, and Kathleen Henderson*

## TABLE OF CONTENTS

**Section**                                                                                      **Page**

I.      Introduction ..................................................................................................... 1

II.     Statement Of Material Facts As To Which There Is No Genuine Dispute ...................... 2

    A.    Facts Relating to the Business Relationship Between Independent
        Recruiting Consultants, LLC, and Conflict Kinetics Corporation ......................... 2

    B.    Facts Relating to the CKC Billing Errors Under KC's NATICK
        Contract ................................................................................................ 6

    C.    Facts Relating to the Termination of ICSA Between CKC and IRC .................... 9

III.    Applicable Legal Standard ............................................................................... 14

IV.     ARGUMENT ................................................................................................. 15

    A.    CKC Is Entitled to Judgment on All Claims Because Brach Was Not
        An Employee of CKC. .............................................................................. 15

        1.   Brach Cannot Prevail Unless He Was An Employee (Counts I,
            II, IV-V), Or An Independent Contractor Or Agent Of CKC
            (Count I). ................................................................................ 16

        2.   The Undisputed Facts Show That There Was A Business-To-
            Business Relationship Between CKC And IRC, Not A Direct
            Employment or Independent Contractor Relationship Between
            CKC And Brach. ....................................................................... 17

        3.   Brach Is Estopped To Deny That IRC Was the Contracting
            Party Because He Elected To Structure His Relationship With
            CKC Through IRC and Received Benefits From That
            Arrangement. ........................................................................... 19

    B.    Brach's "Disclosure" Was Not Protected By The FCA or DCWPA and
        Cannot Give Rise to a Retaliation Claim. ..................................................... 21

        1.   Brach Cannot Establish A Prima Facie Claim For Retaliation. ............... 22

            a.   Brach Did Not Engage In Any Protected Activity ...................... 22

            b.   Brach Cannot Establish That He Was Terminated ..................... 26

                As A Result Of Any Protected Activity. ................................. 26

ii

| **Section** | **Page** |
|---|---|

2.    The Undisputed Facts Establish That CKC Had Legitimate, Non-Retaliatory Reasons To Terminate The ICSA. ............................... 26

C.    Even If Brach Were An Employee, He Cannot Establish A Violation of the FLSA Because He Was Exempt. ............................................................... 27

D.    Brach Constructively Defrauded CKC. ............................................................... 29

V.    Conclusion ..................................................................................................................... 32

## **TABLE OF AUTHORITIES**

**Page**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ................................................. 15

*Ash v. United Parcel Serv., Inc.,* 800 F.2d 409 (4th Cir.1986) ..................................... 15

*Bank of Montreal v. Signet Bank,* 193 F.3d 818 (4th Cir. 1999) .................................. 36

*Brainware, Inc. v. Scan-Optics, Ltd.*, No. 3:11CV755, 2012 WL 3555410 (E.D. Va. Aug. 16, 2012) ........................................................................................................ 23

*Brock v. Entre Computer Ctrs.,* 933 F.2d 1253 (4th Cir.1991) .................................... 16

*Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168 (4th Cir. 2016) ........................ 25, 26

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ...................................................... 15, 16

County School Bd. of Henrico County, Virginia v. RT, 433 F.Supp.2d 692 (E.D. Va. 2006) ......................................................................................................... 23

*Datastaff Tech. Grp., Inc. v. Centex Const. Co.*, 528 F. Supp. 2d 587 (E.D. Va. 2007) .............. 35

*David v. Alphin*, 704 F.3d 327 (4th Cir. 2013) ........................................................... 16

*Dellinger v. Sci. Applications Int'l Corp.*, 649 F.3d 226 (4th Cir. 2011)..................... 17

*Diaz Vicente v. Obenauer*, 736 F. Supp. 679 (E.D. Va. 1990) ............................... 35, 36

*Dillon v. SAIC, Inc.*, No. 1-12-CV-390, 2013 WL 324062 (E.D. Va. Jan. 28, 2013) ........... 28, 31

*Evans v. Techs. Applications & Serv., Co.,* 80 F.3d 954 (4th Cir.1996) ...................... 15

*Glynn v. EDO Corp.*, 710 F.3d 209 (4th Cir. 2013) ..................................................... 24

*IHFC Properties, LLC v. Whalen Furniture Mfg., Inc.,* 614 F. App'x 623 (4th Cir. 2015) ......... 22

*In re Robb*, 23 F.3d 895 (4th Cir. 1994) ...................................................................... 22

*Lawler v. Schumacher Filters Am., Inc.*, 832 F. Supp. 1044 (E.D. Va. 1993) ............. 21

*Lee v. Computer Scis. Corp.*, No. 1:14CV581 JCC/TCB, 2015 WL 778995 (E.D.Va. Feb. 24, 2015) ...................................................................................... 27

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014)........... 16

*Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316 (3d Cir. 2015) ................................... 18

*Mann v. Heckler & Koch Def., Inc.,* 630 F.3d 338 (4th Cir. 2010) ....................................... 26, 30

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).................................. 15

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) ......................................... 25

*McKelvy v. Capital One Servs., LLC,* No. 3:09CV821, 2010 WL 3418228 (E.D. Va. Aug. 20, 2010), <u>*aff'd*</u>, 431 F. App'x 237 (4th Cir. 2011) .................................. 24

*Mock v. Fed. Home Loan Mortg. Corp.,* No. 1:13CV01292 LMB/JFA, 2014 WL 3545096, (E.D. Va. July 15, 2014), *aff'd,* 589 F. App'x 127 (4th Cir. 2014) .......................... 34

*Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.,* 275 F.3d 838 (9th Cir. 2002)......................... 28

*Nifong v. SOC, LLC,* ---F. Supp. 3d ---, No. 1:16-CV-63, 2017 WL 590290 (E.D. Va. Feb. 13, 2017).............................................................................................................. passim

*Noell Crane Sys. GmbH v. Noell Crane & Serv., Inc.,* 677 F. Supp. 2d 852 (E.D. Va. 2009).................................................................................................................. 36

*Perry v. Kappos,* 489 F. App'x 637 (4th Cir. 2012)........................................................ 31

*Roberts v. Hamer,* 655 F.3d 578 (6th Cir. 2011) ......................................................... 18

*Rountree Motors, Inc. v. Commonwealth Dealers Life Ins. Co.,* No. 3:13CV47 DJN, 2013 WL 4102161 (E.D. Va. Aug. 13, 2013) .................................................................. 23

*Schultz v. Capital Int'l Sec., Inc.,* 466 F.3d 298 (4th Cir. 2006) ..................................... 18

*Smith v. Clark/Smoot/Russell,* 796 F.3d 424 (4th Cir. 2015)......................................... 28

*Smith v. EVB,* No. CIV.A. 3:09-CV-554, 2010 WL 1253986 (E.D. Va. Mar. 23, 2010)............ 22

*Sydnor v. Conseco Fin. Servicing Corp.,* 252 F.3d 302 (4th Cir. 2001)........................... 21

*U.S. ex rel. Abou–Hussein v. Sci. Applications Int'l Corp.,* Civ. No. 2:09–1858–RMG, 2012 WL 6892716 (D.S.C. May 3, 2012), *aff'd* 475 Fed.Appx. 851 (4th Cir.2012) (per curiam)............................................................................................................... 17

*U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.,* 816 F.3d 315 (5th Cir. 2016) ............................. 18

*United States ex rel. Cody v. Mantech Int'l Corp.,* 207 F. Supp. 3d 610 (E.D. Va. 2016) ..... 25, 27

*United States ex rel. Garzione v. PAE Gov't Servs., Inc.,* 164 F. Supp. 3d 806 (E.D. Va. 2016), *aff'd*, 670 F. App'x. 126 (4th Cir. 2016) ...................................................... 27

*Vander Boegh v. EnergySolutions, Inc.,* 772 F.3d 1056 (6th Cir. 2014) ....................................... 17

*Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911 (4th Cir. 1997) ..................................... 27, 30

**State Cases**

*Allen Realty Corp. v. Holbert,* 227 Va. 441 (1984) .................................................... 30

*Chandler v. Satchell,* 160 Va. 160 (1933) ................................................................. 31

*Cohn v. Knowledge Connections, Inc.,* 266 Va. 362 (2003) ......................................... 31

*First Nat. Exch. Bank of Roanoke v. Roanoke Oil Co.*, 169 Va. 99 (1937) .................... 19

*Gen. Ins. of Roanoke, Inc. v. Page*, 250 Va. 409 (1995) ............................................. 19

*Knopf v. R., F. & P.R. Co.,* 85 Va. 769 (1889) ......................................................... 19

*Packard Norfolk v. Miller,* 198 Va. 557 (1956) ......................................................... 30

*Prospect Dev. Co. v. Bershader*, 258 Va. 75 (1999) ................................................... 30

**Federal Statutes**

10 U.S.C. § 2409 ..................................................................................... 1, 17, 24

29 U.S.C § 215 ....................................................................................... 1, 17, 20

29 U.S.C. § 203 ............................................................................................ 18

29 U.S.C. § 207 ....................................................................................... 1, 17

29 U.S.C. § 213 ............................................................................................ 32

29 U.S.C. § 216 ....................................................................................... 1, 17

31 U.S.C. § 3730 ................................................................................... passim

5 U.S.C. § 1221 ............................................................................................ 28

**Federal Rules**

Fed.R.Civ.P. 56 ............................................................................................ 14

**Federal Regulations**

29 C.F.R. § 541.200 ...................................................................................... 28

29 C.F.R. § 541.201 ...................................................................................... 29

29 C.F.R. § 541.202 ...................................................................................... 29

## I.    INTRODUCTION

Cameron Brach ("Brach") claims that Conflict Kinetics Corporation ("CKC"), Brian Stanley ("Stanley"), and Kathleen Henderson ("Henderson"), are liable to him for retaliation under the False Claims Act, 31 U.S.C. § 3730(h) ("FCA") and the Defense Contractor's Whistleblower Protection Act, 10 U.S.C. § 2409(a) ("DCWPA").  He also claims that CKC failed to pay him overtime compensation required by the Fair Labor Standards Act, 29 U.S.C. §§ 207, 215, 216 ("FLSA"), and thereafter retaliated against him. CKC is entitled to judgment as a matter of law on these claims because the undisputed facts establish that Brach was an employee of Independent Recruiting Consultants, LLC ("IRC"), not an employee or independent contractor to CKC.

Even if this were not the case, the record shows that Brach has not and cannot make a showing sufficient to establish the element essentials to his case under the FCA, DCWPA or FLSA, and on which he will bear the burden of proof at trial.  First, Brach did not make any disclosure or engage in any activity protected by the FCA and DCWPA, and the undisputed facts show that the contract between CKC and IRC was not terminated in retaliation for anything he did.  The undisputed facts also establish that Brach was exempt from the overtime provisions of the FLSA.

Finally, CKC is entitled to a summary judgment against Brach and IRC as to liability on Count III of its Counterclaim (ECF No. 32), alleging constructive fraud.  The undisputed facts establish that Brach had superior knowledge that the security history of CKC's employee, Joe Trippodo, had been "flagged," making him ineligible to work on CKC's Army contract in Germany.  Brach concealed that material information from CKC, which relied on Brach's materially incomplete (and therefore misleading) statements about Brach's eligibility to its detriment.

II.     **STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS
        NO GENUINE DISPUTE**

      A.     **Facts Relating to the Business Relationship Between Independent
               <u>Recruiting Consultants, LLC, and Conflict Kinetics Corporation</u>**

1.      Conflict Kinetics Corporation ("CKC") is a Virginia corporation that sells electronic firearms training devices and services to the U.S. military and other customers. These include "synthetic weapons training," a computer-assisted simulator that improves speed and accuracy when using pistols and rifles. The system does not use live ammunition, but rather a computer simulation using weapons that are outfitted with sensors and laser "bullets." **Joint Statement of Uncontested Facts, ¶¶ 1-2 ("Jt. Stat.").**

2.      Brian Stanley is the President of CKC; Alison Rubin is the Executive Vice President of Business Development of CKC; and at all times relevant to this action Kathy Henderson was CKC's Controller. **Jt. Stip. ¶¶ 3-5.**

3.      Cameron Brach ("Brach") is a Virginia resident. He organized Independent Recruiting Consultants, LLC ("IRC"), in Virginia in 2013. Brach is the sole member of the LLC. **Jt. Stip. ¶ 6-8; CKC 10, 11; Brach Dep. 78:6 - 79:1.**

4.      During 2014 and 2015 IRC was engaged in the business of providing staffing services for government contractors, include persons holding security clearances. In those years it received over $190,000 in revenue from its business activities. **CKC 13, 22; Brach Dep. 79:11-18; 121:21 - 122:5.**

5.      In July 2014 Brach communicated with a recruiter, Thomas Breen, about a position at Conflict Kinetics. Brach was interviewed on at least three occasions by Brian Stanley, Alison Rubin, and Navy Captain Dan Schultz, a subject-matter expert advisor to CKC. **Brach Dep. 128:5 - 132:3; Stanley Dep. 17:16 – 20:12.**

6.      Ms. Rubin and Captain Schultz concluded that Brach had insufficient relevant experience for the responsibilities of the position, and was temperamentally not well-suited to work at CKC.  They recommended to Stanley that CKC not engage Brach.  Stanley, however, decided otherwise based on his belief that CKC needed to obtain Brach's services because a prior candidate, whom CKC had preferred, had declined the position.  Stanley also believed, based on Bach's representations, that Brach and IRC could supply additional management support services that CKC needed.  **Stanley Dep. 20:13 – 23:18, 25:14 – 28:16, 33:1 – 35:7; Rubin Dep. 20:15 – 22:7, 24:3 – 25:7, 27:4-17.**

7.      On September 25, 2014, Stanley emailed Brach an offer letter for a position as an independent contractor to CKC to perform specified services as a program coordinator.  Brach signed and returned the letter that day.  **CKC 27-29; Brach Dep. 139:7 - 140:14.**

8.      Brach met with Henderson at the CKC offices on September 29, 2014, to formalize the parties' relationship.  Prior to the meeting Henderson was unaware of IRC and had prepared a draft Independent Contractor Services Agreement ("ICSA") for Brach on the assumption that he would be entering into an agreement in his individual capacity.  However, Brach advised Henderson that he wanted the agreement to be between CKC and IRC.  Henderson therefore revised the agreement to reflect that IRC was the contracting party.  **CKC 30, 31A;**[1] **Henderson Dep. 101:17 – 105:22;**[2] **Brach Dep. at 58:16 - 59:1, 144:10 – 145:2.**

9.      Brach signed the ICSA with Conflict Kinetics on September 29, 2014, in his capacity as the "Principal Agent" of the "Contractor."  **CKC 32 at CKC_024035_0037.**  He also

---

[1]      CKC 31A was produced in discovery in native electronic format.  The metadata shows that it was prepared by Kathy Henderson and the last modification date was September 28, 2014, at 10:28 p.m.  A copy of the metadata summary follows the exhibit.

[2]      Henderson deposition Exhibit 2, referenced in the cited excerpt, is the document submitted in support of this motion as CKC 31A.

made handwritten entries in two locations on the document.  The agreement identifies the "Contractor" to be Independent Recruiting Consultants, LLC ("IRC").  It is governed by Virginia law. *Id*. **at CKC_024035_0024, _0033-34; Brach Dep. at 78:6-79:1.**

10.   Brach was the "Principal Agent" of IRC and his practice was to sign documents on behalf of IRC as "Principal Agent.   He signed the agreement as "Principal Agent" for IRC, and his handwriting appears not only in the signature block at the end of the document but also in the "Notices" section, where he entered IRC's contact information for the "Contractor."  **CKC 2 (Def. First Req. for Adm.); CKC 3 (Brach Ans. to First Req. for Adm.), at 3, Reqs.  2-4, 6; CKC 32 at CKC_024035_ 0033-34, 0037**; **Brach Dep. at 33:1-34:8, 34:21-35:13**.

11.   Although Brach disputes that the cover page of the ICSA he signed identified IRC as the "Contractor," he admits that the ICSA attached as CKC 31A is otherwise a true and accurate copy of the document.  Brach did not retain a complete copy of the ICSA he signed. **CKC 2, Exh. A; CKC 3 at 3, Reqs. 1, 2; *compare* CKC 31A *to* CKC 32; Brach Dep. at 27:2-28:21.**

12.   At the time Brach signed the ICSA he read and understood its contents.  **Brach Dep. at 151:10-15.**  He was solely responsible for the decision to execute the ICSA as IRC's Principal Agent:

> **Q     . . . did you ever discuss with anyone at Conflict Kinetics that you didn't want the business relationship to be set up through IRC?**
>
> **A**     Not that I recall.
>
> **Q     Did anyone force you to have the business relationship set up through IRC?**
>
> A     No.
>
> **Q     Ms. Henderson basically gave you a choice, didn't she, you can do it yourself or you can do it through an LLC, right?**

A That's correct.

**Q** **And you chose to do it through Independent Resource Consultants?**

A Independent Recruiting Consultants?

**Q** **Pardon me.  Recruiting Consultants. . . . .**

A Yes.

*Id*. **at 62:18-63:14**.  Brach made this decision to avail himself of the tax advantages of performing the contract through an LLC, something that he was already familiar with at the time he and Ms. Henderson met.  *Id*. **at 38:1-15, 58:2-15.**

 13. IRC's responsibilities under the ICSA were three-fold:  (a) accounting and budgeting support; (b) logistics, including developing procedures for contract deliverables, handling equipment tracking, ordering and movement, personnel analysis and workflow documentation, and (c) client deliveries of demos, equipment and training, as well as program coordination.  **CKC 29**; **Stanley Dep. at 50:8 – 51:9, 119:1 – 120:6.**

 14. Following execution of the ICSA Brach executed and delivered to CKC an IRS Form W-9 for IRC, and thereafter caused IRC to issue invoices to CKC for services rendered. Conflict Kinetics paid IRC for these invoices, and the payments were deposited into an IRC bank account.  CKC issued IRS Forms 1099 to IRC (not Brach) for 2014 and 2015.  Brach did not object.  **CKC 2, Exhs. F, H; CKC 3 at 5-7, Reqs. 14-15, 21-27; Brach Dep. at 36:5 – 37:2, 55:20 – 57:4, 59:3 - 60:21**.

 15. During 2015 IRC invoiced CKC, separately from and in addition to its invoice for services rendered by Brach, for services to recruit Amber Gollner as a CKC employee.  IRC also proposed that CKC use its services to recruit other personnel.  **CKC 2, Exh. G**; **CKC 3 at 7, Req. 23;  CKC 45**; **Brach Dep. at 195:5-18; 197:9-198:16.**

16.     During 2014-2016 IRC regularly conducted business other than the performance
of its contract with CKC, soliciting prospective customers and entering into contracts with
customers for recruiting services.  Brach signed these communications as the "Principal Agent"
of IRC.  **CKC 16-19, 44**; **Brach Dep. at 90:5-91:8, 92:7-93:3; 96:3-98:9, 196:4-197:8.**

17.      In conducting its business activities during 2014 and 2015 IRC utilized the
services of two persons other than Cameron Brach:  Amanda Lentz and David Dixon.  Both were
compensated by IRC for the work they did.  **CKC 20; Brach Dep. at 103:16-109:10.**

**B.**     **Facts Relating to the CKC Billing Errors Under CKC's NATICK Contract**

18.     During 2014 and early 2015 Henderson was responsible for preparing and issuing
bills under CKC's ACC-APG-NATICK Contract No. W911QY14P0278 with the Naval
Expeditionary Combat Command ("NECC") to supply electronic firearms training products and
services at multiple Navy facilities.  The contract was performed on a firm fixed-price basis;
CKC was entitled to charge specified amounts upon the completion of specified elements of
performance know as Contract Line Item Numbers ("CLINs").  **Stanley Dep. at 175:10 – 176:5**;
**Rubin Dep. at 61:9 – 62-4, 74:2 – 75:12, 115:17 – 116:5; 128:3 – 129:4.**

19.     CKC's procedure for submitting invoices under the contract began with Alison
Rubin advising Henderson that CKC had completed specified CLINS and was entitled to bill for
them.  Henderson would then create an invoice for the products and services performed, which
would be transmitted to Sandi Beinke to be uploaded electronically through the Defense
Department's Wide Area Work Flow (WAWF) system for government review, approval and
payment.  **Rubin Dep. 54:15 – 57:11; 59:18 – 60:14.**

20.     During the first quarter of 2015 Ms. Henderson asked Brach to assist her in
reviewing invoices issued under the NATICK contract.  During their discussion Brach informed
Henderson that an invoice to the Navy included charges for something that CKC had not yet

6

been entitled to bill.  Henderson then she realized that she had made a mistake.  She acknowledged that it was a total error on her part; she had not been under the mistaken understanding that the premature charges should be submitted at that time.   However, the mistake did not involve an overbilling or a double billing, nor could there have been on a firm fixed-price contract.  **Henderson Dep. 76:4 – 77:20, 78:12 – 79:18, 80:3-20.**

21.     In late April 2015 Ms. Henderson became concerned about the increasing complexity of the invoicing process for the NATICK contract and the possibility that other errors might occur.  At an evening meeting at the CKC offices with Mr. Stanley, Ms. Rubin and Mr. Brach, the participants decided to conduct an audit of all NATICK invoices.  **Henderson Dep. 76:4 - 77:13, 82:9-20; Henderson Decl. ¶¶ 2-3.**

22.     On May 6, 2015, shortly after the evening meeting at CKC, Ms. Henderson observed changes to her CKC email account that suggested to her that someone had "hacked" her email.   She communicated her concerns to Brach and Clay Schultz, CKC's information technology manager.  Mr. Schultz told Ms. Henderson that he didn't believe that anyone could have hacked her email account.  Ms. Henderson thought this response was unacceptable and that Mr. Schultz might have had something to do with the "hack."  Therefore, she resigned in protest.  **Henderson Dep. 67:5 – 72:21.**

23.     The next day, May 7, 2015, Brach, Ms. Rubin and Ms. Beinke communicated for the purpose of assuming Ms. Henderson's responsibilities in light of her resignation.  Part of this included reviewing the NATICK invoices.  Ms. Beinke forwarded the invoices to Brach, who in turn sent them on to Ms. Rubin.  Brach and Ms. Rubin agreed that they would independently review the invoices and compare results.  **CKC 65-67; Brach Dep. at 237:16 – 239:8; Rubin Dep. at 58:18 – 61:15.**

24.     On May 8, 2015, Ms. Rubin and Brach exchanged multiple emails concerning the results of their review.  Both noted that an invoice from the fall of 2014 included charges for support and installation work at Navy facilities in Guam and Imperial Beach, California, that had not yet been performed as of the date of the invoice.  However, the fixed-fee amount that had been billed was correct.  They confirmed that neither had authorized Kathy Henderson to bill for these items.  They also identified several invoices that apparently had not billed for all of the CLINs that CKC had completed, and therefore agreed to confirm whether CKC was entitled to invoice for those funds.  Brach also identified one charge that had been billed to the incorrect CLIN.  Finally, although Brach identified what he thought was a double-billing error, it was determined that the billing was correct.  **Jt. Stat. ¶¶ 10-11;  CKC 69-79, 128; Rubin Dep. at 62:5 – 64-10, 66:9-21, 110:4 – 117:3, 120:13 – 127:19; Brach Dep. at 242:2 – 245:15, 247:17 - 251:6.**

25.     Because Ms. Rubin and Brach did not have all of the information they needed to resolve these matters as of May 8, 2015, they continued the review and conferred further during the following week.  Ultimately they resolved all of the issues identified in their review.  **CKC 83-88, 129; Brach Dep. at 251:7 - 254:18; Rubin Dep. at 66:9-16, 127:20 – 129:19.**

26.     As part of this review, on May 8, 2015, Stanley directed Ms. Rubin and Brach to implement a revised process for handling NATICK invoices.  Brach had an increased role in this process along with Ms. Rubin; Ms. Henderson was not involved.  Subsequently, on May 20, 2015, Brach's role increased even further, in that he became responsible for preparing and uploading invoices to the WAWF system, replacing Sandi Beinke.  **CKC 141-144; Brach Dep. at 257:15 – 258:21; Rubin Dep. at 68:1-21, 72:22 – 74:4.**

27.     Brach was not disciplined, criticized or threatened in any way as a result of his role in the NATICK invoice review.  His only concern was that Alison Rubin said on several occasions that she did not have faith in his ability to handle the contracts, an opinion she had expressed beginning several months prior to the May invoice review.  **Brach Dep. at 258:22 – 260-17.**

28.     At the time the NATICK invoice errors were identified, CKC had already completed its support and installation work for one of the erroneously-billed CLINs.  In CKC's firm fixed-price contract the period of support starts after installation and is active for 365 days.  CKC was scheduled to perform supply and installation work for the other prematurely billed CLIN in June.  About a week after the early billing was identified, Alison Rubin advised CKC's Inspector/Acceptor at NECC, Eric Olson, that the two installation and support CLINS had been billed prematurely.   CKC supplemented this disclosure in December 2015 with a written year-end summary of its audit of all invoices under Contract No. W911QY14P0278CKC in December 2015.  CKC did not experience any adverse consequences due to the billing errors.    **CKC 140; Rubin Dep. at 64:11 – 67:14; Rubin Decl. ¶¶ 2-4; Henderson Dep. at 81:14 – 82:8.**

C.     **Facts Relating to the Termination of ICSA Between CKC and IRC**

29.     During the late spring and summer of 2015 IRC, through Brach, made a number of errors in the performance of its responsibilities under the ICSA.  Specifically:

a)     In July 2015 Brach erroneously directed that all of the CKC electronic training pistols be returned from the Navy facility at Gulfport, Mississippi, leaving the facility unable to conduct scheduled training and triggering angry reactions from Navy personnel and CKC's Inspector/Acceptor at NECC.  Brach admitted that this was a "fail."  **CKC 94**; **Rubin**

9

**Dep. Exh. 10**; **Rubin Dep. at 135:12 – 140:4, 140:18 – 142:20**;[3] **Stanley Dep. at 110:12 –**
**112:10, 112:17 – 115:12.**

    b)  Brach failed to confirm that proper quantities of electronic weapons were

in inventory at the Navy facility in Port Hueneme, California, leaving that facility short of

weapons and requiring that CKC deliver additional weapons by Federal Express.  In connection

with this, he had reported incorrect weapons inventory data to Alison Rubin and Stanley, which

was passed on to the customer, triggering additional customer dissatisfaction.  **CKC 92, 95A,**

**132**; **Rubin Dep. at 45:20 – 49:12**; **Stanley Dep. at 164:11 - 168:4**.

    c)  In July 2015, in connection with CKC's performance of contract

requirements for  synthetic weapons training for the Army Joint Military Training Command

("JMTC") in Germany, Brach had CKC personnel hand-carry lasers and other weapons parts

through Customs in Germany, without proper paperwork required to comply with the

International Traffic in Arms Regulations ("ITAR").[4]  This was contrary to an express warning

that Alison Rubin had communicated to Brach on May 12, 2015.  As a result, the CKC personnel

were detained in the airport by German authorities, requiring CKC to enlist the assistance of its

Army customer to resolve the situation and obtain their release, causing substantial

embarrassment to CKC on the eve of its contract performance.  **CKC 102, 104, 106, 107, 130**;

**Rubin Dep. 130:4-16**; **Stanley Dep. at 253:2 – 256:16**.[5]

---

   [3]  Rubin deposition Exhibit 9, referenced in the cited excerpt, is the document submitted in
support of this motion as CKC 94.

   [4]  22 C.F.R. Parts 120 - 130.

   [5]  Rubin deposition Exhibit 7 and Stanley deposition Exhibit 6, referenced in the cited
excerpts, are the document submitted in support of this motion as Exhibit CKC 130.

      d)      Later in July 2015, in connection with arranging for CKC personnel to travel to Germany to install CKC weapons training equipment and begin the training program, Brach made travel arrangements that sent CKC personnel and a training consultant to the wrong airports, far from the Army bases where they were expected, requiring them to make lengthy trips by car and delaying their arrivals. **Stanley Dep. at 154:19 – 155-8, 184:7 – 186:10**.

30.      During this period Stanley became increasingly concerned about the manner in which Brach dealt with CKC personnel.  Stanley had received multiple complaints about Brach going back to the fall of 2014, stating that Brach was arrogant, aggressive and sometimes threatening in his communications with others.  Stanley had counselled Brach on multiple occasions, but although Brach acknowledged that he had acted incorrectly, the problems persisted.  Alison Rubin, Henderson, and others also witnessed or were the victims of Brach's improper conduct. **Stanley Dep. at 51:19 – 60:8, 63:11 – 69:10; Rubin Dep. at 51:2 – 53:8; Henderson Dep. at 36:14 – 42:22, 44:7 – 46:22, 49:3 - 53:15, 54:11 – 58:5.**

31.      Finally, and most significantly, Brach failed to disclose to CKC that Joseph Trippodo, whom he had recommended that CKC hire to serve as a systems technician in support of the JMTC Army contract in Germany, had "red flags" on his security background:

      a)      Brach and Mr. Trippodo were friends, having known each other since they served in the Army in 1994.  They also both worked for the same employer, Kingfisher Systems, for a period of time.  Brach recommended Trippodo for a position on CKC's Germany contract.  The contract required that all CKC employees who would be performing services on site be sponsored under the Department of Defense Trusted Associate Sponsorship System ("TASS"). **Jt. Stat**. **¶¶ 13-14; Brach Dep. at 203:19 – 204:21.**

b)      In December 2014, Mr. Trippodo sent Brach an email forwarding a copy of his Joint Personnel Adjudication System (JPAS) Person Summary.  He stated that because of unresolved problems in the summary he was likely to be denied employment for a position with the Marine Corps; his security summary had a "flag" on it, and "nothing can be done" despite having hired counsel.  He also expressed his concern that the problem would prevent his from satisfying security requirements for the CKC Army contract in Germany.  Trippodo wrote:

> My point is...are you 100% sure that this wont happen with Conflict K? If the contract requires a secret, even though my secret is valid, so far no SSO has agreed to pass me while Kingfisher has an open RFI or something to that effect. . . .
>
> Here is my jpas summary, I just dont want you to be caught in a trick bag of me not being eligible to work.

Although Brach understood the nature of Trippodo's concerns, he did not advise anyone at CKC of this communication. **Jt. Stat. ¶ 15; CKC 50, 51**; **Brach Dep. at 202:12 – 203:18, 217:20 – 218:20**.

c)      Brach and Trippodo had several additional communications concerning the "flag" issue during May 2015.  On May 20, 2015, Trippodo advised Brach that he believed progress was being made to resolve the problems, but acknowledged they were not actually resolved.  He said, in response to a request from the Army for information about his clearance that Brach had forwarded to him:

> I have all this info of course, but I'm troubled about the clearance question.  My Secret is being processed by the Navy and apparently my TS/SCI is being finally handled by DODCAF, but not yet.
>
> I can't supply the date for the clearance.
>
> How should I proceed?

Brach failed to advise CKC of these communications.  **CKC 56, 57**; **Brach Dep. at 217:20 – 218:20**.

d) Brach was aware of the importance of proposing CKC employees who could satisfy the requirements of the Army contract. On May 20, 2015, in an email to Brian Stanley and Alison Rubin, he advocated against ineligible candidates who would "raise concerns about 'spoiling the batch.'" **CKC 145**.

e) On June 24, 2015, CKC offered and Trippodo accepted employment as a systems technician to support the CKC Army contract in Germany. CKC also hired three other individuals for the contract. At a meeting that included Mr. Stanley, Alison Rubin and Brach, the participants went through disclosures regarding anything in their backgrounds, or those of the new employees, that might present an issue for satisfying security requirements. Several individuals had made disclosures, and these were identified. However, Brach failed to disclose anything about Trippodo's security red flags; instead, he repeatedly assured the participants that Trippodo was "clean." **CKC 101**; **Stanley Dep. at 80:16 - 81:20, 101:8 – 103:14.**

f) When Trippodo arrived in Germany, the problems in his security background were identified almost immediately by Army security personnel. On July 28, 2015, Stanley informed Brach, who had remained in the United States, that the Army's security officer advised that Trippodo's access was a "non-starter" due to the flags in his record. In an email to Trippodo, copied to Stanley, Brach finally forwarded to Stanley the JPAS information Trippodo had provided in December 2014, claiming that Trippodo said that the "flag" on his record was a "non-issue." Trippodo replied, asking how he could "shield" Brach from the consequences of this issue. **CKC 60**, **61; Stanley Dep. at 75:22 – 77:9; Brach Dep. at 215:22 – 216:22.**

g) CKC tried unsuccessfully to resolve the matter over the next ten days. During this period Brach provided Stanley incorrect or incomplete information that had a negative impact on Stanley's efforts. In emails dated August 5-6, 2015, the Army advised CKC

13

that the problems with Trippodo's security background were unresolved and he was therefore

ineligible to work on the contract.   Brach then admitted to Stanley and Clay Schultz that he knew

Trippodo did not have a clean security background, but that he thought it was a "minor thing"

that "was all going to work out," and apologized.   **CKC 63, 124**; **Stanley Dep. at 77:10 - 81:7,**

**82:18 – 86:6, 87:2 – 88:21, 89:11 – 92:6, 186:11-19**; **Henderson Dep. at 109:13 – 111:14**.[6]

32.    As a result, Stanley consulted with other senior CKC management and concluded

that Trippodo had to be replaced, and that CKC's contract with IRC should be terminated

immediately.   He sent Brach an email to that effect on August 9, 2015.   Brach's response

revealed that he believed the decision was the product of the Trippodo problem.   He also implied

that to Kathy Henderson in a telephone call later that day.   **CKC 46, 47, 108**; **Stanley Dep. at**

**182:22 – 184:6, 193:20 – 195:8**; **Brach Dep. at 199:13 – 201:8.**

## III.    APPLICABLE LEGAL STANDARD

Summary judgment is appropriate when the movant shows that "there is no genuine issue

as to any material fact and [is] entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(a);

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48 (1986); *Evans v. Techs. Applications &*

*Serv., Co.,* 80 F.3d 954, 958–59 (4th Cir.1996).   The movant has the initial burden to show the

absence of a material fact.   *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986).

A genuine issue of material fact exists "if the evidence is such that a reasonable jury

could return a verdict for the non-moving party."   *Anderson,* 477 U.S. at 248.   Therefore, once a

motion for summary judgment is properly supported, the opposing party must show that a

genuine dispute exists; it may not rest upon mere allegations or denials.   Furthermore, a "mere

scintilla" of evidence or unsupported speculation is insufficient to defeat summary judgment.

---

[6]    Henderson deposition Exhibit 3, referenced in the cited excerpt, is the document
submitted in support of this motion as Exhibit CKC 124.

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986); *Anderson,* 477 U.S. at 248–52; *Ash v. United Parcel Serv., Inc.,* 800 F.2d 409, 411–12 (4th Cir.1986).

Specifically, summary judgment is appropriate when the opposing party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. In reviewing the summary judgment record "the court must draw any inferences in the light most favorable to the non-movant" and "determine whether the record taken as a whole could lead a reasonable trier of fact to find for the non-movant." *Brock v. Entre Computer Ctrs.,* 933 F.2d 1253, 1259 (4th Cir.1991).

## IV.    ARGUMENT

### A.    CKC Is Entitled to Summary Judgment on All Claims Because Brach Was Not Its Employee

CKC is entitled to judgment as a matter of law as to all claims alleged in the Second Amended Complaint because, as an employee or contractor of IRC, Brach lacks statutory standing to sue under the FCA, DCWPA, or FLSA. In order to prevail Brach must establish both constitutional and statutory standing. *David v. Alphin*, 704 F.3d 327, 338 (4th Cir. 2013). Statutory standing addresses whether a plaintiff falls within the class of plaintiffs whom Congress has authorized to sue under a particular statute; *i.e.*, whether the plaintiff have a cause of action under that statute. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387–88 (2014). This analysis turns on traditional principles of statutory interpretation to determine whether the cause of action was in fact authorized; it does not "ask whether in [the Court's] judgment Congress *should* have authorized [the cause of action]." *Id*. at 1388.[7]

---

[7]    A finding that a plaintiff lacks statutory standing is equivalent to a dismissal for failure to state a claim. *Leyse v. Bank of Am. Nat. Ass'n*, 804 F.3d 316, 320 (3d Cir. 2015); *accord Roberts v. Hamer*, 655 F.3d 578, 581 (6th Cir. 2011).

### 1.     Brach Cannot Prevail Unless He Was An Employee (Counts I, II, IV-V), Or An Independent Contractor Or Agent Of CKC (Count I)

An FCA retaliation claim may only be brought by an "employee, contractor, or agent" of a party that is reasonably believed to have submitted a false claim.  31 U.S.C. § 3730(h); *Vander Boegh v. EnergySolutions, Inc.*, 772 F.3d 1056, 1062–63 (6th Cir. 2014); *U.S. ex rel. Abou– Hussein v. Sci. Applications Int'l Corp.*, Civ. No. 2:09–1858–RMG, 2012 WL 6892716, at *3–4 (D.S.C. May 3, 2012), *aff'd* 475 Fed.Appx. 851 (4th Cir.2012) (per curiam).  Retaliation claims under the DCWPA may only be asserted by "employee[s] of a contractor, subcontractor, grantee, or subgrantee or personal services contractor."  10 U.S.C. § 2409.  Similarly, in order to sue for unpaid overtime or retaliation under the FLSA, the plaintiff must have been an employee.  29 U.S.C. §§ 207, 215, 216; *Dellinger v. Sci. Applications Int'l Corp.*, 649 F.3d 226, 228 (4th Cir. 2011).

Accordingly, in order to prevail Brach has the burden to establish as to Count I that he was an employee, contractor, or agent of CKC,[8] and that he was an employee of CKC with respect to Counts II, IV, and V.  The terms "employee, contractor, or agent" are not defined by the FCA, nor is the term "employee" defined by the DCWPA, and therefore courts use those terms' common law definitions.  *See e.g., U.S. ex rel. Bias v. Tangipahoa Par. Sch. Bd.*, 816 F.3d 315, 325 (5th Cir. 2016) (giving "employee" and "agent" by their common law definitions; finding "contractor" requires the existence of some form of contract between parties).  Similarly, although the FLSA defines "employee" as "any individual employed by an employer," 29 U.S.C. § 203(e)(1), courts apply a common-law test to determine whether a worker is in fact an employee.  *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304–05 (4th Cir. 2006).

---

[8]     Brach asserted in his Complaint *only* that he was an employee of CKC.  As argued *infra* at Section 3, Brach is estopped to now assert, in the alternative, that he was an independent contractor or agent of CKC.

2.   **The Undisputed Facts Show That There Was A Business-To-Business Relationship Between CKC And IRC, Not A Direct Employment or Independent Contractor Relationship Between CKC And Brach.**

The undisputed facts establish as a matter of law that Brach was not an employee, contractor, or agent to CKC, but rather an employee or contractor of IRC, an independent contractor to CKC.  The ICSA, which is governed by Virginia law, established the relationship with CKC.  Statement of Undisputed Material Facts, *supra* ("SMF"), ¶ 8.  The record establishes that the ICSA was between CKC and IRC and that Brach performed the contracted services on behalf of IRC.  He was not an employee, independent contractor, or agent of CKC.

The ICSA identifies the "Contractor" to be Independent Recruiting Consultants, LLC ("IRC"), a single-member Virginia limited liability company owned by Brach.  At the time he executed the ICSA Brach was the "Principal Agent" and sole member of IRC.  SMF ¶ 3.  He specifically executed the agreement in his capacity as "Principal Agent" of the "Contractor".  *Id.* ¶¶ 8-9.  He admits that the signature on the ICSA is his, that signed the agreement as "Principal Agent" for IRC, and that he hand-wrote IRC's contact information in the "Notices" section.  *Id.* ¶ 10.

Notwithstanding those admissions, Brach disputes that the first page of the ICSA is authentic.  *Id.* ¶ 11.  He contends that the first page of the ICSA he signed identified "Cameron Brach" as the "Contractor," not IRC.  *Id.* ¶¶ 8, 11.  Other than that single alleged discrepancy, there is no difference between the competing versions of the ICSA; all other terms and provisions are identical.  *Id.* ¶ 11.

Although CKC expressly denies that it altered the first page of the ICSA without Brach's knowledge and consent (*id.* ¶ 8), the parties' difference on this point does not create a genuine issue of material fact that could defeat summary judgment.  The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no *genuine* issue of *material* fact."
*Anderson, supra*.  Substantive law identifies which facts are material; only disputes over facts
that might affect the outcome of the suit under governing law can preclude the entry of summary
judgment.  *Id*.

In this case, the dispute is immaterial, because there is no genuine question as to which
party—Brach or IRC—was the "Contractor" to CKC under the ICSA.  The undisputed facts
relating to the performance of the agreement confirm the parties' intent and understanding and
conclusively establish that IRC was the "Contractor."

The parties performed the agreement in a manner that was only consistent with the fact
that IRC was the "Contractor."  Brach executed and delivered an IRS Form W-9 on behalf of
IRC to Conflict Kinetics, and thereafter caused IRC to issue invoices to Conflict Kinetics for
services provided.  SMF ¶ 14.   Conflict Kinetics paid IRC for these invoices, the payments were
deposited into an IRC bank account, and CKC issued IRS Forms 1099 to IRC, not Brach.  *Id*.  In
addition, in 2015 IRC invoiced CKC separately for services it provided to recruit CKC employee
Amber Gollner.  *Id*. ¶ 15.  These facts, which are not in dispute, objectively show that the ICSA
established a business-to-business relationship between IRC and CKC.

"The practical construction put by the parties upon the terms of their own contract is not
only to be regarded, but, where there is any doubt, must prevail over the literal meaning of the
contract."  *Knopf v. R., F. & P.R. Co.,* 85 Va. 769, 789 (1889) (citing *D.C. v. Gallaher*, 124 U.S.
505, 510 (1888)); *see First Nat. Exch. Bank of Roanoke v. Roanoke Oil Co.*, 169 Va. 99, 115
(1937) ("No rule for the construction of written instruments is better settled than that which
attaches great weight to the construction of the instrument by the parties themselves.").
Accordingly, the dispute concerning the identification of the "Contractor" on the first page of the

ICSA is conclusively resolved under applicable Virginia law by the parties' performance; it does not affect the outcome of the suit, and is therefore immaterial.

Giving legal effect to the ICSA deprives Brach of standing to assert any of his claims, because it establishes that Brach was not an employee, independent contractor, or agent of CKC. Section 17 of the ICSA expressly states that the "Contractor shall perform its obligations under this Agreement as an independent contractor and not as an agent, servant (employee), or representative of [CKC]."  SMF ¶ 9; CKC 32 at CKC_024035_0028, ¶ 17.  Under Virginia law, a party who executes a contract is presumed to know its contents and to assent to the terms, absent fraud or overreaching by the defendants.  *Gen. Ins. of Roanoke, Inc. v. Page*, 250 Va. 409, 412 (1995); *Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 306 (4th Cir. 2001); *Lawler v. Schumacher Filters Am., Inc.*, 832 F. Supp. 1044, 1051 (E.D. Va. 1993).  IRC and CKC were both ongoing businesses and the record establishes conclusively that Brach made a knowing and voluntary decision to structure the relationship between his company, IRC, and CKC.  SMF ¶¶ 3-4, 12, 16-17.  Accordingly, Brach lacks statutory standing.

### 3. Brach Is Estopped To Deny That IRC Was the Contracting Party Because He Elected To Structure His Relationship With CKC Through IRC and Received Benefits From That Arrangement.

In addition, because Brach purposefully structured his relationship with CKC through IRC and knowingly received benefits from that arrangement, he is estopped to repudiate the ICSA and assert he was an employee, independent contractor or agent of CKC.  "Under a quasi-estoppel theory, a party who accepts a transaction or instrument and then accepts benefits under it may be estopped to take a later position inconsistent with the prior acceptance of that same transaction or instrument."  *IHFC Properties, LLC v. Whalen Furniture Mfg., Inc.,* 614 F. App'x 623, 625 (4th Cir. 2015) (tenant who accepted the terms of a lease and enjoyed its benefits was estopped from later asserting its invalidity); *In re Robb*, 23 F.3d 895, 898 (4th Cir. 1994); *Smith*

*v. EVB*, No. CIV.A. 3:09-CV-554, 2010 WL 1253986, at *3 (E.D. Va. Mar. 23, 2010) ("The law does not permit Smith to execute loan documents in order to receive benefits and later, when it suits him, essentially contend that his previously signed attestations were incorrect.").

In this case, Brach *voluntarily and knowingly chose* to structure his relationship with CKC through IRC for the purpose of obtaining limited liability and favorable tax treatment. SMF ¶¶ 8, 12.  Although Brach contends that Kathleen Henderson asked him whether he wanted to execute the agreement as an individual or through a company, there is no dispute that it was his decision to execute the agreement on behalf of IRC, as its Principal Agent.  SMF ¶ 12.  Prior to this time, Henderson had not been aware of the existence of IRC.  SMF ¶ 8.  Brach could have chosen to have a personal independent contractor relationship with CKC, but instead opted to structure the relationship through IRC.  SMF ¶ 12.

Furthermore, as a result of IRC's prior operations Brach was familiar with the tax benefits available by channeling the revenue from the ICSA through IRC.  SMF ¶ 12.  By choosing to structure his relationship with CKC through IRC so that he could receive favorable tax treatment, Brach is estopped to now assert a direct employment, independent contractor, or agency relationship with CKC in derogation of the ICSA.

Finally the doctrine of quasi-estoppel also precludes Brach from evading this conclusion by arguing that he was an independent contractor or agent of CKC, in contradiction to the allegations of his Second Amended Complaint (ECF No. 11).  "[Q]uasi-estoppel applies when the offending party takes a different position than his or her original position, and, either the offending party gains an advantage or causes a disadvantage to the other party; the other party is induced to change positions; or, it would be unconscionable to permit the offending party to maintain an inconsistent position from which it has already derived a benefit or in which it has

acquiesced." *Rountree Motors, Inc. v. Commonwealth Dealers Life Ins. Co.*, No. 3:13CV47

DJN, 2013 WL 4102161, at *10 (E.D. Va. Aug. 13, 2013) (citing *County School Bd. of Henrico

County, Virginia v. RT,* 433 F.Supp.2d 692, 704 (E.D. Va. 2006)); *see Brainware, Inc. v. Scan-

Optics, Ltd.*, No. 3:11CV755, 2012 WL 3555410, at *4 (E.D. Va. Aug. 16, 2012) ("It is

fundamental to the law that parties cannot take inconsistent positions on the same basic issues.");

*McKelvy v. Capital One Servs., LLC*, No. 3:09CV821, 2010 WL 3418228, at *5 n. 7 (E.D. Va.

Aug. 20, 2010), *aff'd,* 431 F. App'x 237 (4th Cir. 2011) ("Plaintiff is bound by the allegations in

his Complaint and cannot use his opposition to summary judgment to bring new claims.").

###### B.       Brach's "Disclosure" Was Not Protected by the FCA or DCWPA and Cannot Give Rise to a Retaliation Claim.

Even if Brach has standing to sue, the undisputed facts show that he cannot prevail.

Counts I and II of the Amended Complaint assert nearly identical claims for retaliatory discharge

under the FCA, 31 U.S.C. § 3730(h), and the DCWPA, 10 U.S.C. § 2409(a).  To prove unlawful

retaliation under the FCA, Brach must establish that:  (1) he engaged in "protected activity;" (2)

his employer knew of the protected acts; and (3) his employer took adverse action against him as

a result of these acts.  *Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013); *Nifong v. SOC,

LLC*, ---F. Supp. 3d ---, No. 1:16-CV-63, 2017 WL 590290, at *9 (E.D. Va. Feb. 13, 2017).

Brach's burden under the DCWPA is essentially identical:  a whistleblower employee must

demonstrate that a protected activity was a "contributing factor" in the "personnel action which

was taken" and that "the official taking the personnel action knew of the . . . protected activity."

*United States ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp. 3d 610, 620 (E.D. Va. 2016).

If a plaintiff establishes a prima facie case of retaliation, the burden shifts to the

defendant to produce evidence of a legitimate, non-retaliatory reason for the adverse action.

*Nifong*, 2017 WL 590290, at *9 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802

(1973)).  The burden then shifts back to the plaintiff to demonstrate that the defendant's stated

reason is a pretext for retaliation.  *Id.*  Brach's proof fails at each stage of this inquiry and

therefore summary judgment is appropriate.

### 1.   Brach Cannot Establish A Prima Facie Claim For Retaliation.

#### a.   Brach Did Not Engage In Any Protected Activity.

As amended in 2009 and 2010, the FCA specified two kinds of activity that are protected

against retaliation:  (1) action taken "in furtherance of an action" under the FCA; and (2) "other

efforts to stop 1 or more" violations of the FCA.  31 U.S.C. § 3730(h)(1); *Carlson v. DynCorp

Int'l LLC*, 657 F. App'x 168, 170 (4th Cir. 2016); *Nifong,* 2017 WL 590290, at *9.  With respect

to the first, courts evaluate whether an employee has engaged in activity "in furtherance of" an

FCA action under the "distinct possibility" standard, *i.e.*, whether the activity "reasonably could

lead to a viable FCA action, or when . . . litigation is a reasonable possibility." *Mann v. Heckler

& Koch Def., Inc.,* 630 F.3d 338, 344 (4th Cir. 2010); *Nifong*, 2017 WL 590290, at *9.  The

"distinct possibility" standard is an objective one.  *Id.*

With respect to the second kind of protected activity, the Fourth Circuit has "assumed

without deciding" that the FCA prohibits retaliation against an employee's activities "motivated

by an *objectively reasonable belief* that the employee's employer is violating, or soon will

violate, the FCA."  *Nifong*, 2017 WL 590290, at *9, quoting *Carlson*, 657 F. App'x. at 172

(emphasis in original).  Under this standard the employee must show that he believed the

defendant was violating the FCA, that his belief was reasonable, that he took action based on that

belief, and that his actions were designed to "stop [one] or more violations of the FCA."  *Id.*

Under both types of protected activity the employee's conduct must relate to stopping

real or suspected fraud.  *Nifong*, 2017 WL 590290, at *9; *Carlson*, 657 F. App'x. at 174.  The

law is clear that mere "expressions of concern that do not raise the reasonable prospect of false

or fraudulent claims under the FCA . . . do not constitute 'protected activity.'" *Nifong*, 2017

5902090, at *9, quoting *Cody*, *supra*; *Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911, 914

(4th Cir. 1997). Simply reporting "a concern of a mischarging to the government to [an

employee's] supervisor" does not suffice to establish that a plaintiff was engaging in "protected

activity." *United States ex rel. Garzione v. PAE Gov't Servs., Inc.*, 164 F. Supp. 3d 806, 816–17

(E.D. Va. 2016), *aff'd*, 670 F. App'x. 126 (4th Cir. 2016); *Lee v. Computer Scis. Corp.*, No.

1:14CV581 JCC/TCB, 2015 WL 778995, at *6 (E.D. Va. Feb. 24, 2015).

Brach did not engage in protected activity. He alleges three instances in which he did so:

(1) on May 8, 2015, when Brach allegedly "warned" CKC that its failure to investigate

inaccurate billing constituted fraudulent conduct, and thereafter engaged in an investigation of

the billing discrepancies (Compl. ¶¶ 118, 120); (2) on December 11, 2015, when Brach filed a

Complaint of Reprisal with the DoD Inspector General, in which he disclosed CKC's alleged

fraud (*id*. ¶ 124); and (3) on August 15 and 17, 2016, when his counsel sent CKC's lawyer a

copy of the Complaint in this action with a request for waiver of service, and then served Brian

Stanley with a summons and the Complaint (*id*. ¶¶ 126, 128). However, the latter two events

cannot as a matter of law support a claim for retaliation under the FCA or DCWPA.[9]  Therefore,

---

[9]      Brach's actions in December 2015 and August 2016 cannot support a retaliation claim under the FCA or DCWPA because they occurred *after* the termination of Brach's alleged employment. *Nifong, supra*, at *11 ("The FCA, by its terms, defines an adverse action as 'discharg[ing], demot[ing], suspend[ing], threaten[ing], harass[ing], or in any other manner discriminat[ing] ... *in the terms and conditions of employment*.'") (quoting 31 U.S.C. § 3730(h)(1)) (emphasis added); *Dillon v. SAIC, Inc.*, No. 1-12-CV-390, 2013 WL 324062, at *7 (E.D. Va. Jan. 28, 2013) (finding that a plaintiff could not satisfy the notice and protected activity elements of a whistleblower claim where alleged protected activity followed termination of employment); *Cody, supra* at 624 ("A whistleblower plaintiff must prove … [an] adverse employment action taken against him or her.") (citing 5 U.S.C. § 1221(e)(1)). *See Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.*, 275 F.3d 838, 847–48 (9th Cir. 2002) ("behavior does not constitute retaliation under the False Claims Act … unless it would be sufficient to constitute an adverse employment action under Title VII"). Furthermore, since the alleged retaliation occurred *after* Brach had filed his lawsuit, and consisted only of statements that CKC would bring counterclaims, it could not reasonably have dissuaded Brach from making or supporting a charge of an FCA violation. *Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 434 (4th Cir. 2015).

CKC's analysis will discuss only whether Brach's actions on May 8, 2015, constitute protected activity within the scope of the FCA or DCWPA.

The undisputed facts establish that Brach's communications on and after May 8, 2015 did not constitute protected activity.  Contrary to the allegations in his Complaint, Brach did not "warn" CKC's management about a failure to investigate billing issues.  The facts establish, instead, that the decision to "audit" invoices under the NATICK contract had been discussed and decided in a prior meeting due to an error that Kathy Henderson had earlier identified, and that Brach and Alison Rubin began the process on May 7 because Kathy Henderson had unexpectedly resigned.  SMF ¶23.  The communications between Brach and Ms. Rubin on May 8 and the following week involved a comparison of their initial, parallel reviews of the invoices and further investigation of unresolved questions.  In the final analysis, they ascertained that there were two instances of "early" billings (not overbillings) -- a timing issue; several instances of underbillings; and one instance of billing the correct charge under the wrong CLIN.  *Id.* ¶¶ 24-25.  None of Brach's emails included anything that could be construed as a warning to CKC that it had or was likely to violate the FCA.  The entire process merely identified billing errors.

Further, the audit did not disclose anything to suggest that the errors potentially involved fraud.  Although it revealed that one invoice had been submitted in November 2014 for services at two Navy locations that CKC had not yet performed, the prices were correct.  *Id.* ¶ 24-25.  Both Brach and Alison Rubin agreed that the early billing amounts had not been authorized or approved; they had been included by Kathy Henderson in error.  *Id.* ¶¶ 20, 24.  By the time they were discovered CKC had already performed the work under one of the early-billed CLINs, and was scheduled to complete performance of the other the following month.  *Id.* ¶ 28.  Finally,

CKC promptly notified the government of the erroneous billings, and supplemented that notice with a year-end audit summary in December 2015.  *Id.*

Simply put, none of Brach's May 8 communications were "in furtherance of" an FCA action because they did not occur in a context in which CKC's conduct reasonably could lead to a viable FCA action, or where litigation was a reasonable possibility.  *Nifong*, *supra,* at *10 (citing *Mann*, *supra,* at 344).  Although CKC had billed for services not yet provided, Brach understood that CKC's billing was unintentional (SMF ¶ 20), and that CKC always intended to and ultimately did provide the services in question (*id*. ¶ 28).  Accordingly, no FCA violation had occurred.  *United States ex rel. Wilson v. Kellogg Brown & Root, Inc.*, 525 F.3d 370, 380 (4th Cir. 2008) (no fraud unless requisite intent not to perform is coupled with actual nonperformance).  Furthermore, Brach's communications on May 8 were part of a review, confirmation and analysis of the billing issues that was conducted jointly with Alison Rubin pursuant to a prior management decision.  This clearly falls short of activity "in furtherance of" an FCA action.  *Zahodnick*, *supra* at 914 (reporting a concern of mischarging the government to a supervisor does not establish that a plaintiff was acting "in furtherance of" a FCA action).

Nor were Brach's May 8 communications "efforts to stop one or more" violations of the FCA.  *Nifong*, *supra* at *10.  Brach did not protest what had happened or the remedial steps that were adopted after the errors were identified.  He could not reasonably believe that CKC's early billings constituted a violation of the FCA because he knew that the CKC invoice in question had been submitted in error, and that CKC intended to provide the services.  SMF ¶¶ 20, 24-25, 28.  Further, as a result of his communications CKC made Brach a major participant in new billing procedures intended to improve and streamline the NATICK invoicing process to prevent any further billing errors; and shortly thereafter he was given the additional responsibility to submit

the invoices to WAWF.  SMF ¶26.  Under these circumstances, Brach could not reasonably

believe that CKC had violated or was going to violate the FCA.

### b. Brach Cannot Establish That He Was Terminated As A Result Of Any Protected Activity

Even if Brach could show that his May 8, 2015, communications were protected activity,

the undisputed facts establish that he was not subject to retaliation as a result.  31 U.S.C.

§ 3730(h)(1); *Mann*, 630 F.3d at 343.  Brach alleges that CKC terminated his "employment"

because of the May 8 communications.  However, he cannot identify any contemporaneous or

closely-related adverse employment action, criticism or threat.  CKC did not terminate the ICSA

until August 9, 2015, more than three months after Brach allegedly engaged in protected activity.

SMF ¶ 32.  This is too long a period to support a conclusion of retaliatory conduct.  *Nifong,*

*supra,* at *12 ("It is axiomatic in this circuit that a gap of three months . . . between a protected

activity and adverse action is too long to infer a causal nexus.") (citing *Perry v. Kappos*, 489 F.

App'x 637, 643 (4th Cir. 2012)).  Further, as discussed *supra*, during the intervening three

months CKC supported the Brach/Rubin review of the NATICK invoices and enlisted Brach in a

new billing process to prevent future mischarges.  SMF ¶ 26. That action belies any claim of

retaliatory intent, and forecloses any reasonable conclusion that Brach's termination was the

result of Brach's May 8 communications.  *Nifong, supra,* at *13.

### 2. The Undisputed Facts Establish That CKC Had Legitimate, Non-Retaliatory Reasons To Terminate The ICSA.

Even if Brach could satisfy all three elements of a prima facie case, he cannot raise a

genuine issue of material fact to overcome CKC's legitimate basis for terminating its ICSA with

IRC.  *See Nifong*, 2017 WL 590290, at * 14; *Dillon*, 2013 WL 324062, at *9.  He cannot carry

his burden to come forward with evidence that CKC's justification is a pretext for retaliation.

The record amply shows that CKC had legitimate, non-retaliatory reasons to end its relationship with IRC.  SMF ¶¶ 29-32.  During the late spring and summer of 2015, Brach was responsible for multiple errors in the performance of IRC's responsibilities, including mismanagement of weapons inventory at Navy facilities that delayed training and infuriated the customer; directing CKC employees to carry weapons parts through Customs in Germany without proper documentation, potentially in violation of ITAR and in direct contravention to the advice of CKC management; and bungling travel arrangements for CKC employees and consultants.  *Id.* ¶ 29(a)-(d).  Key employees of CKC testified that they found Brach arrogant, aggressive and sometimes threatening in their interactions with him.  *Id.* ¶ 30.

Significantly, CKC terminated the ICSA in the immediate wake of the debacle involving Joe Trippodo's security background, which is the subject of CKC's counterclaim for constructive fraud.  *Id.* ¶ 31.  Conduct giving rise to a claim (and, as argued in Section D, *infra*, liability as a matter of law) for constructive fraud also justified termination of the IRC agreement.  Indeed, it was clear to Brach at the time that the Trippodo incident, and not his anything related to the May "disclosures," was the reason that the ICSA was terminated.  *Id.* ¶ 32.

These facts, which are not in dispute, establish that CKC had a legitimate, non-retaliatory and non-pretextural reason to terminate the ICSA with IRC.

### C.      Even If Brach Were An Employee, He Cannot Establish A Violation of the FLSA Because He Was Exempt

Even if Brach had been employed by CKC, he was exempt from FLSA overtime requirements because he was employed in a bona fide administrative capacity.  29 U.S.C. § 213(a).  During the period of the IRC contract  in 2014-2015 the Labor Department defined an "employee employed in a bona fide administrative capacity," as one:

(1)      Who is compensated on a salary or fee basis at a rate of not less than $455 per week;

(2)     Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3)     Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200.[10]

The record clearly establishes the first two elements of the definition.  CKC's offer proposed to pay IRC/Brach $3,653 bi-weekly, well above the minimum weekly salary required for exempt status.  SMF ¶ 7; CKC 29, at 2.  Further, there is no dispute that Brach's duties involved non-manual work directly related to CKC's management and business operations. SMF ¶ 13.  As set forth in the offer letter and accompanying job description, Brach was responsible for developing budgets for CKC's contract deliverables; logistical management of CKC technicians and trainers, including development and execution of standard operating procedures for all deliverables; managing inventory; and ordering, purchasing, disturbing, and deploying of business equipment. CKC 29; SMF 13.   His position, as further evidenced by the multiple emails in the exhibits submitted in support of this motion, clearly involved '[w]ork directly related to management or general business operations," including "functional areas such as . . . accounting; budgeting; . . . quality control; . . . and similar activities."  29 C.F.R. § 541.201(b).

Brach's primary duties in accounting, logistics and program coordination also involved the exercise of discretion and independent judgment with respect to matters of significance.  The exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have

---

[10]     Amended effective December 1, 2016, to increase the minimum salary requirement. Defining and Delimiting the Exemptions for Executive, Administrative, Professional, Outside Sales and Computer Employees, 81 Fed. Reg. 32,391 (May 23, 2016).

been considered.  "Matters of significance" refers to the level of importance or consequence of the work performed.  29 C.F.R. § 541.202(a).

The position description, emails and other exhibits relating to Brach's work, as well as related deposition testimony, establish that Brach:

- had authority to formulate, affect, interpret, or implement management policies or operating practices relating to logistics and program coordination;

- carried out major assignments in conducting the operations of the business;

- performed work that affected business operations of CKC to a substantial degree, even though it was related to operation of a particular segment of the business;

- provided consultation or expert advice to management;

- planned long- or short-term business objectives; and

- investigated and participated in the resolution of matters of significance on behalf of management.

*Id*. § 541.202(b); *see Mock v. Fed. Home Loan Mortg. Corp.*, No. 1:13CV01292 LMB/JFA, 2014 WL 3545096, (E.D. Va. July 15, 2014), *aff'd*, 589 F. App'x 127 (4th Cir. 2014).

Accordingly, Brach was exempt from the FLSA overtime pay requirements.  Notably, the facts on which he bases his retaliation claims provide the strongest evidence that he was exempt: he had a central role in investigating and resolving matters of significance relating to CKC's billing of its largest customer, as well as in the new invoicing procedures implemented to prevent such issues from recurring.

### D.      Brach Constructively Defrauded CKC

CKC is entitled to judgment as a matter of law on Count III of its Counterclaim, for constructive fraud.  To prove constructive fraud a plaintiff must show "by clear and convincing evidence that a false representation of a material fact was made innocently or negligently, and the injured party was damaged as a result of his reliance upon the misrepresentation."  *Datastaff*

29

*Tech. Grp., Inc. v. Centex Const. Co.*, 528 F. Supp. 2d 587, 597 (E.D. Va. 2007) (citing *Prospect Dev. Co. v. Bershader*, 258 Va. 75, 86 (1999)).  In addition to affirmative misrepresentations, the concealment of material facts is also actionable in Virginia.  *Diaz Vicente v. Obenauer*, 736 F. Supp. 679, 690 (E.D. Va. 1990) (citing *Allen Realty Corp. v. Holbert,* 227 Va. 441, 450 (1984)).  A fact is material when it induces a person to act, or when without it a transaction would not have occurred.  *Diaz Vicente* at 691 (citing *Packard Norfolk v. Miller,* 198 Va. 557, 563 (1956)).

Concealment of a material fact constitutes constructive fraud when the concealing party had a duty to disclose, thereby causing damage to one reasonably relying on the omission.  *Noell Crane Sys. GmbH v. Noell Crane & Serv., Inc.*, 677 F. Supp. 2d 852, 871 (E.D. Va. 2009) (citing *Cohn v. Knowledge Connections, Inc.,* 266 Va. 362, 369 (2003)).  A duty to disclose arises where a party has superior knowledge of a fact and knows the other is acting upon the assumption that the fact does not exist, or if a party "takes actions which divert the other party from making prudent investigations (e.g., by making a partial disclosure)."  *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 829 (4th Cir. 1999).  Thus, constructive fraud does not require scienter or intent to mislead; it can be established whether the concealment is innocently or knowingly made.  *Diaz Vicente, supra* at 690 (citing *Chandler v. Satchell,* 160 Va. 160, 172 (1933)).

The undisputed facts clearly and convincingly establish that Brach defrauded CKC in connection with its hiring of Joe Trippodo.  Brach recommended that CKC hire Trippodo for its Army JMTC contract in Germany, knowing that he would need a "secret" clearance to be eligible for sponsorship under the DoD's TASS program, but <u>also</u> knowing that Trippodo's JPAS security history was flagged.  SMF ¶ 31(a)-(b).  Indeed, Brach knew—because Trippodo told him in December 2014—that the "flag" had prevented Trippodo from being hired for a position

30

with the Marine Corps in New Orleans, and that Trippodo was concerned it would render him ineligible to work for CKC. *Id.* ¶ 31(a). Specifically, Trippodo advised Brach that although his "secret" clearance was valid, no SSO (special security officer) would accept him as long as the flag on his "top secret" remained unresolved. *Id.* The record also shows that Trippodo restated his concern on May 21, 2015, when he wrote that he was "troubled" about responding to inquiries relating to his potential position supporting CKC's Army contract in Germany; although the unresolved issue with his "flag" appeared finally to be moving toward adjudication, he did not know when it would be resolved. *Id.* ¶ 31(c).

The fact that Trippodo's clearance was flagged was clearly material to CKC's decision to hire him. Having the qualifications to receive TASS approval was essential to his ability to work on the contract. As Trippodo told Brach, and as ultimately was born out in the performance of the Germany contract, the "flag" precluded his eligibility. *Id.* ¶ 31(f)-(g). Further, Brach knew this information was material; he had advocated to CKC's management in May 2015 the importance of having individuals with clean backgrounds who would not raise concerns among government personnel. *Id.* ¶ 31(d). Clearly, Brach understood that CKC would not have hired Trippodo if it had known he would not be eligible to access the base. *Id.* ¶ 31(g).

Despite his superior knowledge of Trippodo's clearance issues, Brach never disclosed that information to CKC; instead, the record establishes that Brach actually concealed that information. Prior to having employees depart for Germany, CKC held a meeting attended by Brach, Alison Rubin, and Stanley, at which each party was asked whether there was any issue in the background or employees that could affect their eligibility for access to the base. Each person, other than Brach, disclosed the issues that could be a problem. Brach, speaking for Trippodo, stated that Trippodo was "clean." *Id.* ¶ 31(e).

These facts clearly and convincingly establish that Brach had a duty to disclose to CKC his knowledge concerning Trippodo's flagged security summary, that he failed to do so, and that CKC was damaged as a result.  Brach had superior knowledge of Trippodo's flagged JPAS status, knew that it could render him ineligible to work on the Germany Contract, and knew that CKC was unaware of this information and was acting on the assumption it did not exist.  Further, Brach misled CKC by affirmatively stating that Trippodo's clearance was clean without disclosing the existence of the unresolved flag.  Brach's superior knowledge and partial disclosure clearly gave rise to a duty to disclose, and the undisputed facts establish that he failed to do so.  Accordingly, liability is established as a matter of law.

## V.    CONCLUSION

For these reasons, the motion of CKC, Stanley and Henderson should be granted, and summary judgment entered in their favor as requested.

CONFLICT KINETICS CORPORATION
BRIAN STANLEY, and
KATHLEEN HENDERSON
By Counsel

            /s/  Russell J. Gaspar
Russell J. Gaspar, Va. Bar No. 15020
rgaspar@cohenmohr.com
Andrew K. Wible, Va. Bar No. 78168
awible@cohenmohr.com
Victor G. Klingelhofer, Va. Bar No. 22609
vklingelhofer@cohenmohr.com

COHEN MOHR LLP
1055 Thomas Jefferson St., N.W., Suite 504
Washington, D.C.  20007
Telephone:  (202) 342-2550
Facsimile:  (202) 342-6147