**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **CAMERON BRACH,** ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| **v.** ) | |
| ) | |
| **CONFLICT KINETICS CORPORATION,** *et al.,*) | |
| ) | **Case No. 1:16-cv-978-TSE/JFA** |
| *Defendants*. ) | |
| ) | |
| **CONFLICT KINETICS CORPORATION,** ) | |
| ) | |
| *Counterclaim Plaintiff*, ) | |
| ) | |
| **v.** ) | |
| ) | |
| **CAMERON BRACH & INDEPENDENT** ) | |
| **RECRUITING CONSULTANTS, LLC,** ) | |
| ) | |
| *Counterclaim Defendants*. ) | |

**PLAINTIFF'S OPPOSITION
TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

R. Scott Oswald, VA Bar No. 41770
Nicholas Woodfield, VA Bar No. 48938
Kellee Boulais Kruse, VA Bar. No. 78710
The Employment Law Group, P.C.
888 17th Street, N.W., 9th floor
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com
kkruse@employmentlawgroup.com
*Counsel for Plaintiff*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................... ii

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ....................................................1

II.    STATEMENT OF MATERIAL FACTS IN DISPUTE.......................................................2

III.   STANDARD OF REVIEW ..............................................................................................14

IV.    ARGUMENT....................................................................................................................15

      A.    Brach Has Standing to Bring All Claims Because the Evidence
          Demonstrates That He Was an Employee of CKC .....................................................15

      B.    There Are Facts Sufficient for a Reasonable Jury to Determine that
          Brach Could Prevail on His Whistleblower Claims. ..................................................19

          1.    Brach has successfully established a prima facie claim of
               retaliation ......................................................................................................19

               a.    Brach clearly engaged in protected activity...........................................19

               b.    Brach can establish that his protected disclosures were a
                    contributing factor for his termination.....................................................22

          2.    Defendants' supposed legitimate and non-retaliatory reasons
               for Brach's termination are pretextual ...........................................................23

      C.    There Are Facts Sufficient for a Reasonable Jury to Determine that
          Brach Could Prevail on His FLSA Claims ................................................................24

      D.    As Brach Argues in His Cross Motion for Summary Judgment, The
          Undisputed Evidence Demonstrates that Brach Did Not Constructively
          Defraud CKC ............................................................................................................25

      CONCLUSION.................................................................................................................26


# TABLE OF AUTHORITIES

## CASES

*Allen v. Administrative Review Board,*
514 F.3d 468 (5th Cir. 2008) ..................................................................19, 20

*Anderson v. Liberty Lobby, Incorporated,*
477 U.S. 242 (1986)..................................................................................14, 15

*Carlson v. DynCorp International, LLC,*
657 F. App'x 168 (4th Cir. 2016) ....................................................................19

*Clark County School District v. Breeden*
532 U.S. 268 (2001)........................................................................................22

*Darveau v. Detecon, Incorporated,*
515 F.3d 334 (4th Cir. 2008) ..........................................................................24

*Eberhardt v. Integrated Design and Construction, Incorporated,*
167 F.3d 861 (4th Cir. 2013) ..........................................................................19

*Feldman v. Law Enforcement Associates Corporation,*
752 F.3d 339 (4th Cir. 2014) ..........................................................................22

*Glynn v. EDO Corporation,*
710 F.3d 209 ...................................................................................................19

*Heath v. Perdue Farms, Incorporated,*
87 F. Supp. 2d 452 (D. Md. 2000)..................................................................17

*Jaudon v. Elder Health, Incorporated,*
125 F. Supp. 2d 153 (D. Md. 2000).................................................................22

*Lorenz v. Federal Express Corporation,*
No. 7:10-cv-00487, 2012 WL 4459570 (W.D. Va. Aug. 17, 2012).........................22, 23

*Manion v. Nitelines Kuhana JV LLC,*
No. 7:12-CV-247-BO, 2014 WL 1800318 (E.D.N.C. May 6, 2014) .........................16, 17

*Matsushita Electric Industrial Company, Limited v. Zenith Radio Corporation,*
475 U.S. 574 (1986)........................................................................................15

*Nifong v. SOC, LLC*
No. 1:16-CV-63, 2017 WL 590290 (ED. Va. Feb. 13, 2017) .........................................20

*Puffenbarger v. Engility Corporation,*
　　7151 F. Supp. 3d 651 (E.D. Va. 2015) ...........................................................................22

*Tolan v. Cotton,*
　　134 S. Ct. 1861 (2014) ...................................................................................................15

*United States v. Empire Educational Corporation,*
　　959 F. Supp. 2d 428 (N.D.N.Y. 2013) ...........................................................................19

*United States v. Kiewit Pacific Company,*
　　41 F. Supp. 3d 796 (N.D. Cal. 2014) ..............................................................................16

*United States v. Northern Adult Daily Health Care Center,*
　　205 F. Supp. 3d 276 (E.D.N.Y. 2016) ............................................................................19

*United States ex. rel. Bias v. Tangipahoa Parish School Board,*
　　816 F.3d 315 (5th Cir. 2016) ..........................................................................................16

*United States ex. rel. Cody v. Mantech International Corporation,*
　　207 F. Supp. 3d 610 (E.D. Va. 2016) ....................................................19, 20, 22, 23, 24

*United States ex. rel. Wilson v. Graham County Soil & Water Conservation District,*
　　367 F.3d 245 (4th Cir. 2004) ..........................................................................................19

## STATUTES

10 U.S.C. § 2709, *et seq*..................................................................................... passim

29 U.S.C. § 201, *et seq*....................................................................................... passim

31 U.S.C. § 3730, *et seq*..................................................................................... passim

Fed. R. Civ. P. 56(c) ................................................................................................14

## <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Conflict Kinetic Corporation's ("CKC"), Brian Stanley's, and Kathleen Henderson's (collectively, "Defendants") motion for summary judgment should be denied.  With the disputed material facts viewed in the light most favorable to him, Cameron Brach has established a strong *prima facie* case of retaliation under the False Claims Act, 31 U.S.C. § 3730(h) ("FCA"), the National Defense Authorization Act also known as the Defense Contractor's Whistleblower Protection Act, 10 U.S.C. § 2709, *et seq.* ("DCWPA"), and the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*

CKC attempts to establish that there was no employment relationship between CKC and Brach in order to escape liability.  However, the evidence demonstrates that Brach was the Director of Operations and Logistics for the company.  CKC provided equipment, an office, and business cards to Brach, and CKC gave Brach supervisory authority over other CKC employees. CKC also attempts to paint Brach as a poor performer, although those facts are in dispute and there is no evidence to demonstrate that CKC put Brach on notice of any poor performance.

After Brach filed a lawsuit, CKC claimed that the real reason for Brach's termination were the issues with Joe Trippodo's security clearance. However, CKC did not mention this reason to Brach at the time of his termination. Rather, the documents demonstrate that Brach engaged in protected conduct by notifying Brian Stanley and Alison Rubin of overbillings to the government made in error by Henderson and that Henderson had input in Brach's termination. Even though CKC alleges that it is not possible to overbill the government on a price fixed contract, CKC changed its billing procedures, established internal controls, and disclosed the results of Brach's protected disclosures to the government after it terminated Brach.

In emails dated August 5 and 6, 2015, the Army advised CKC that the problems with Trippodo's security background were unresolved and he was therefore ineligible to work on the contract. However an email dated August 3, 2015 shows that Stanley <u>already</u> had made the decision to terminate Brach prior to learning from the Army that Trippodo could not perform on the contract.  These emails demonstrate that CKC's alleged reason for Brach's termination is pretextual. After Brach filed this lawsuit, CKC decided to file counterclaims which were purely retaliatory, as Stanley testified in his deposition.

### STATEMENT OF MATERIAL FACTS IN DISPUTE

### Undisputed Facts Listed in CKC's Statement of Undisputed Material Facts

Of the facts listed in CKC's Statement of Material Facts to Which There is No Dispute (SUMF), Brach agrees that only the following are undisputed: SUMF Nos. 1, 2, 3, 4, 5, 10, 14, 15, 17, 31(a), 31(d). Brach disputes and denies all other facts asserted by Defendants.

### Disputed Material Facts

| Brach's Disputed Facts[1] | Defendants' Statements of Fact |
|---|---|
| 1.  CKC President Brian Stanley interviewed Brach three times and made the final decision to hire Brach for the program coordinator position. Stanley Dep. Tr. (attached as Ex. 1) at 18:05-18:22. Stanley testified that Alison Rubin and Captain Schultz felt that Brach was overstating his credentials and lost his composure during the interview. *Id.* at 21:06-22:07; 26:13-28:04. But Rubin testified that Brach behaved appropriately, did not raise his voice in the interview, and she did not tell | 1.  Ms. Rubin and Captain Schultz concluded that Brach had insufficient relevant experience for the responsibilities of the position, and was temperamentally not well-suited to work at CKC. They recommended to Stanley that CKC not engage Brach. Stanley, however, decided otherwise based on his belief that CKC needed to obtain Brach's services because a prior candidate, whom CKC had preferred, had declined the position. Stanley also believed, based on Brach's representations, |

---

[1]     Brach's numbered disputed facts below correspond to the same numbered facts in Defendants' Statements of Fact, which in turn include a citation to the corresponding number used by Defendants in its SUMF.

Stanley that Brach overstated his credentials. Rubin Dep. Tr. (attached as Ex. 2) at 27:04-28:04. Stanley hired Brach because Stanley liked him. *Id.* at 28:09-12. Brach never discussed his small business Independent Recruiting Consultants ("IRC") with Stanley or Rubin during the interview process. Brach Dep. Tr. (attached as Ex. 3) at 132:07-18.

that Brach and IRC could supply additional management support services that CKC needed.[2] SUMF ¶ 6.

2. On September 23, 2014, Defendant CKC offered the position of Program Coordinator to Brach. *See* Exhibit 4 (Offer Letter). When Brach received the offer letter, he asked Stanley why the offer letter classified him as a 1099 recipient rather than a full time employee, to which Stanley responded that all CKC employees, including executive staff, are 1099 recipients. Brach Dep. Transcript at 143:17- 144:02.

2. On September 25, 2014, Stanley emailed Brach an offer letter for a position as an independent contractor to CKC to perform specified services as a program coordinator. Brach signed and returned the letter that day. SUMF ¶ 7.

3. Brach, as an individual, signed an employment agreement with CKC on September 29, 2014. Brach Dep. Tr. at 27:02-28:11. This employment agreement did not list IRC as a party. *Id.* Brach then returned the agreement to Henderson, keeping only a copy of the cover sheet. *Id.* at 27:02-28:11, 147:07-148:04; Ex. 5 (Cover pages for Brach and CKC agreement). When Brach signed the contract, it was his understanding that Brach, as an individual, would be an independent contractor for CKC and that he would bill through IRC, at Kathleen Henderson's recommendation. *Id.* at 57:12-58:05. However, Brach believed he was an employee of CKC. *Id.* at 165:15-166:11.

3. Brach met with Henderson at the CKC offices on September 29, 2014, to formalize the parties' relationship. Prior to the meeting Henderson was unaware of IRC and had prepared a draft Independent Contractor Services Agreement ("ICSA") for Brach on the assumption that he would be entering into an agreement in his individual capacity. However, Brach advised Henderson that he wanted the agreement to be between CKC and IRC. Henderson therefore revised the agreement to reflect that IRC was the contracting party. SUMF ¶ 8.

4. Brach testified that he believes that the agreement produced in discovery between IRC and CKC (attached as Ex. 6), which is lacking a signature on behalf of CKC, is a

4. Brach signed the ICSA with Conflict Kinetics on September 29, 2014, in his capacity as the "Principal Agent" of the "Contractor." He also made handwritten

---

[2]      Defendants' record citations for its asserted undisputed material facts have been omitted.

<table>
<tr>
<td>

falsified document. Brach Dep. Tr. at 34:09-18, 160:17-20.

</td>
<td>

entries in two locations on the document. The agreement identifies the "Contractor" to be Independent Recruiting Consultants, LLC ("IRC"). It is governed by Virginia law. SUMF ¶ 9.

</td>
</tr>
<tr>
<td>

5. Brach testified that the agreement between Brach and CKC produced by Brach in discovery and the agreement between IRC and CKC produced by CKC in discovery contain discrepancies which lead him to believe that the agreement between IRC and CKC is not a true and correct copy of the document signed. Brach Dep. Tr. at 157:15-159:11, 164:05-165:01.

</td>
<td>

5. Although Brach disputes that the cover page of the ICSA he signed identified IRC as the "Contractor," he admits that the ICSA attached as CKC 31A is otherwise a true and accurate copy of the document. Brach did not retain a complete copy of the ICSA he signed. SUMF ¶ 11.

</td>
</tr>
<tr>
<td>

6. Henderson suggested that CKC and IRC should sign a subcontract because it would be in Brach's best interest in order to take advantage of certain tax exemptions. Brach Dep. Tr. at 37:15-38:19, 57:12-58:05.

</td>
<td>

6. At the time Brach signed the ICSA he read and understood its contents. He was solely responsible for the decision to execute the ICSA as IRC's Principal Agent. Brach made this decision to avail himself of the tax advantages of performing the contract through an LLC, something that he was already familiar with at the time he and Ms. Henderson met. SUMF ¶ 12.

</td>
</tr>
<tr>
<td>

7. Brach's responsibilities under the job description in the Program Coordinator offer letter that was sent to him on September 23, 2014 included: (a) accounting and budgeting support; (b) logistics, including developing procedures for contract deliverables, handling equipment tracking, ordering and movement, personnel analysis and workflow documentation, and (c) client deliveries of demos, equipment and training, as well as program coordination. *See* Ex. 4.

</td>
<td>

7. IRC's responsibilities under the ICSA were three-fold: (a) accounting and budgeting support; (b) logistics, including developing procedures for contract deliverables, handling equipment tracking, ordering and movement, personnel analysis and workflow documentation, and (c) client deliveries of demos, equipment and training, as well as program coordination. SUMF ¶ 13.

</td>
</tr>
<tr>
<td>

8. After Brach started working at CKC, Henderson and CKC asked Brach to staff a couple of positions at CKC through IRC. Brach Dep. Tr. at 197:09-199:02. Brach used a pseudonym (Cameron Franklin) so

</td>
<td>

8. During 2014-2016 IRC regularly conducted business other than the performance of its contract with CKC, soliciting prospective customers and entering into contracts with customers for

</td>
</tr>
</table>

4

there would not be any confusion as to the separation between Brach and IRC. *Id.* at 80:05-17.

9.  After Henderson, CKC's Controller in charge of Finance, Human Resources, and Administration, resigned suddenly in May 2015 for a couple of weeks prior to returning to CKC, Brach took over Henderson's billing responsibilities. Henderson Dep. Tr. (attached as Ex. 7) at 11:16-15:20, 67:05-20, 74:05-75:03.

10. Rubin approved all invoices for contracts and Henderson transmitted invoices to Sandi Beinke to submit to the Wide Area Work Flow (WAWF) system for government payment. Rubin Dep. Tr. at 55:17-58:06; Henderson Dep. Tr. at 13:01-13:02. CKC's procedure for billing changed in May 2015 when Brach took over billing responsibilities because of early billings made in error by Henderson. Henderson Dep. Tr. at 14:04-15:08. After CKC terminated Brach, CKC's billing procedure changed again with an established formal policy and procedures and hiring of a COO. *Id.* at 16:09-18:02.

11. After Henderson's return to CKC, she told Brach that she made errors in billing the government, which Brach had identified to Stanley and Rubin as overbillings. Brach Dep. Tr. at 237:02-15. Although Henderson was aware of her billing errors, no one at CKC ever spoke to her about overbilling, only underbilling. Henderson Dep. Tr. at 77:06-81:07.

recruiting services. Brach signed these communications as the "Principal Agent" of IRC. SUMF ¶ 16.

9.  During 2014 and early 2015 Henderson was responsible for preparing and issuing bills under CKC's ACC-APG-NATICK Contract No. W911QY14P0278 with the Naval Expeditionary Combat Command ("NECC") to supply electronic firearms training products and services at multiple Navy facilities. The contract was performed on a firm fixed-price basis; CKC was entitled to charge specified amounts upon the completion of specified elements of performance know as Contract Line Item Numbers ("CLINs"). SUMF ¶ 18.

10. CKC's procedure for submitting invoices under the contract began with Alison Rubin advising Henderson that CKC had completed specified CLINS and was entitled to bill for them. Henderson would then create an invoice for the products and services performed, which would be transmitted to Sandi Beinke to be uploaded electronically through the Defense Department's Wide Area Work Flow (WAWF) system for government review, approval and payment. SUMF ¶ 19.

11. During the first quarter of 2015 Ms. Henderson asked Brach to assist her in reviewing invoices issued under the NATICK contract. During their discussion Brach informed Henderson that an invoice to the Navy included charges for something that CKC had not yet been entitled to bill. Henderson then she realized that she had made a mistake. She acknowledged that it was a total error on her part; she had not been under the mistaken understanding that

|  |  |
|---|---|
|  | the premature charges should be submitted at that time. However, the mistake did not involve an overbilling or a double billing, nor could there have been on a firm fixed-price contract. SUMF ¶ 20. |
| 12. The sudden departure of Henderson and Henderson expressing concern to Brach regarding CKC's financial viability led Brach to conduct an audit (review of the invoices) submitted by CKC to the Navy. Brach asked Stanley if it would be in CKC's best interest to conduct this audit. As a result, Brach informed Stanley and Rubin that they had overbilled the government. Brach Dep. Tr. at 228:22-235:15. | 12. In late April 2015 Ms. Henderson became concerned about the increasing complexity of the invoicing process for the NATICK contract and the possibility that other errors might occur. At an evening meeting at the CKC offices with Mr. Stanley, Ms. Rubin and Mr. Brach, the participants decided to conduct an audit of all NATICK invoices. SUMF ¶ 21. |
| 13. Henderson testified that she resigned on May 6, 2015 because she believed someone had "hacked" her personal email, but Stanley convinced her to return to CKC within a week. Henderson Dep. Tr. at 67:05-75:03. However, immediately before Henderson's resignation, she expressed detailed concerns about CKC's financial viability to Brach. Brach Dep. Tr. at 230:17-234:06; *see also*, May 7, 2015 Email re: Henderson Resignation (attached as Ex. 8). | 13. On May 6, 2015, shortly after the evening meeting at CKC, Ms. Henderson observed changes to her CKC email account that suggested to her that someone had "hacked" her email. She communicated her concerns to Brach and Clay Schultz, CKC's information technology manager. Mr. Schultz told Ms. Henderson that he didn't believe that anyone could have hacked her email account. Ms. Henderson thought this response was unacceptable and that Mr. Schultz might have had something to do with the "hack." Therefore, she resigned in protest. SUMF ¶ 22. |
| 14. The sudden departure of Henderson and Henderson expressing concern to Brach regarding CKC's financial viability led Brach to conduct an audit (review of the invoices) submitted by CKC to the Navy. Brach asked Stanley if it would be in CKC's best interest to conduct this audit. As a result, Brach informed Stanley and Rubin that they had overbilled the government. Brach Dep. Tr. at 228:22-237:15. On May 7, 2015, Brach emailed Stanley the results of his audit of the NATICK contract, identifying "Major | 14. The next day, May 7, 2015, Brach, Ms. Rubin and Ms. Beinke communicated for the purpose of assuming Ms. Henderson's responsibilities in light of her resignation. Part of this included reviewing the NATICK invoices. Ms. Beinke forwarded the invoices to Brach, who in turn sent them on to Ms. Rubin. Brach and Ms. Rubin agreed that they would independently review the invoices and compare results. SUMF ¶ 23. |

| | |
|---|---|
| Issues" of overbilling the government in which CKC "charged for services, installation, products that had not been delivered to the client site". Brach Dep. Tr. at 234:09-236:05, 239:12-242:22; May 7, 2015 Email and Attachment (attached as Ex. 9). Rubin characterized these as "early billings," because "you can't bill for installation until the installation is performed". Rubin Dep. Tr. at 63:07-64:17. Stanley did not see the overbillings identified in Brach's email as major issues and was not concerned about these issues because they did not have any negative effect or impact on the customer. Stanley Dep. Tr. at 136:12-140:10; 142:02-143:16; 146:05-147:07. | |
| 15. After Brach notified Stanley and Rubin of the findings of his audit, the three exchanged several emails on May 8, 2015 concerning the results and Henderson's billing errors. *See* May 8, 2015 Emails (attached as Exhibits 10 and 11). Brach Dep. Tr. at 248:04-253:05. Rubin's only concern at the time was to bill where [CKC] had underbilled." *Id.* at 251:07-13. Rubin responded to Brach's audit of the NATIK contract invoices saying "the underbills and overbills don't make sense to me" and her "biggest question" was for the underbill. *See* Exhibits 10 and 11. | 15. On May 8, 2015, Ms. Rubin and Brach exchanged multiple emails concerning the results of their review. Both noted that an invoice from the fall of 2014 included charges for support and installation work at Navy facilities in Guam and Imperial Beach, California, that had not yet been performed as of the date of the invoice. However, the fixed-fee amount that had been billed was correct. They confirmed that neither had authorized Kathy Henderson to bill for these items. They also identified several invoices that apparently had not billed for all of the CLINs that CKC had completed, and therefore agreed to confirm whether CKC was entitled to invoice for those funds. Brach also identified one charge that had been billed to the incorrect CLIN. Finally, although Brach identified what he thought was a double-billing error, it was determined that the billing was correct. SUMF ¶ 24. |
| 16. After May 8, 2015, CKC made no further corrections to the overbills during Brach's employment, but Rubin was adamant about correcting the underbill. Brach Dep. Tr. at 255:05-257:02. | 16. Because Ms. Rubin and Brach did not have all of the information they needed to resolve these matters as of May 8, 2015, they continued the review and conferred further during the following week. |

|  | Ultimately they resolved all of the issues identified in their review. SUMF ¶ 25. |
|---|---|
| 17. After Brach reported these billing errors to Stanley and Rubin, Stanley sought Brach and Rubin's recommendations on how to improve the billing process and followed Rubin's recommendations. Brach Dep. Tr. at 257:15-258:12. "Instead of outsourcing billing through WAWF, [CKC] had Cameron take it over directly." March 29, 2016 Email (attached as Ex. 12). | 17. As part of this review, on May 8, 2015, Stanley directed Ms. Rubin and Brach to implement a revised process for handling NATICK invoices. Brach had an increased role in this process along with Ms. Rubin; Ms. Henderson was not involved. Subsequently, on May 20, 2015, Brach's role increased even further, in that he became responsible for preparing and uploading invoices to the WAWF system, replacing Sandi Beinke. SUMF ¶ 26. |
| 18.  Brach found Henderson's billing errors and reported them to Rubin and Stanley, and as a result, Henderson recommended Brach's termination and had input in the decision to terminate Brach. Brach Dep. Tr. at 19:03-20:09; 227:05-228:21; Rubin Dep. Tr. at 89:06-21. | 18. Brach was not disciplined, criticized or threatened in any way as a result of his role in the NATICK invoice review. His only concern was that Alison Rubin said on several occasions that she did not have faith in his ability to handle the contracts, an opinion she had expressed beginning several months prior to the May invoice review. SUMF ¶ 27. |
| 19. Brach reported overbillings because CKC had "charged for services, installation, products that had not been delivered to the client site." Brach Dep. Tr. at 234:09-236:05, 239:12-242:22. Rubin admitted that CKC cannot bill for installation until it is performed. Rubin Dep. Tr. at 63:07-64:17. After Brach identified the billing errors, no further corrections were made to the overbills during Brach's employment. Brach Dep. Tr. at 255:05-257:02. On December 5, 2015, after CKC terminated Brach, CKC disclosed a summary of the errors identified in the May 2015 audit. *See* Report to Government (attached as Exhibit 13). The NATICK contract and modifications at issue provides invoicing instructions for "invoices for goods received or services rendered under this contract." Contract at 26 and Modification at 6 (attached as Exhibits 14 and 15). | 19. At the time the NATICK invoice errors were identified, CKC had already completed its support and installation work for one of the erroneously-billed CLINs. In CKC's firm fixed-price contract the period of support starts after installation and is active for 365 days. CKC was scheduled to perform supply and installation work for the other prematurely billed CLIN in June. About a week after the early billing was identified, Alison Rubin advised CKC's Inspector/Acceptor at NECC, Eric Olson, that the two installation and support CLINS had been billed prematurely. CKC supplemented this disclosure in December 2015 with a written year-end summary of its audit of all invoices under Contract No. W911QY14P0278CKC in December 2015. CKC did not experience any adverse consequences due to the billing errors. SUMF ¶ 28. |

| | |
|---|---|
| 20. In August 2015, the week prior to Brach's termination, several issues arose relating to the contract: | 20. During the late spring and summer of 2015 IRC, through Brach, made a number of errors in the performance of its responsibilities under the ICSA. Specifically: |
| a) On August 3, 2015, Rubin was notified that there was no functioning inventory in Gulfport. *See* August 3, 2015 Email (attached as Ex. 16). Stanley admits in this email chain with Rubin that Stanley directed the weapons to be returned based on Rubin's direction. Ex. 16; Brach Dep. Tr. at 264:12-265:11. In this email on August 3, 2015, Stanley states that "we need to replace Cameron" and "the Cameron event has come to an end," indicating he made the decision to terminate Brach at that point in time. Ex. 16. | a) In July 2015 Brach erroneously directed that all of the CKC electronic training pistols be returned from the Navy facility at Gulfport, Mississippi, leaving the facility unable to conduct scheduled training and triggering angry reactions from Navy personnel and CKC's Inspector/Acceptor at NECC. Brach admitted that this was a "fail." |
| b) On August 5, 2015, Rubin text messaged Brach informing him that there was a lack of inventory at Port Hueneme, California. *See* August 5, 2015 text message (attached as Ex. 17). Rubin blamed Brach even though Stanley testified that five people updated the Excel inventory sheet and that it was a "team effort." Stanley Dep. Tr. at 112:08-115:19. Brach told Stanley that CKC never allowed Brach the access for him to complete a proper inventory. Brach Dep. Tr. at 261:03-263:18. | b) Brach failed to confirm that proper quantities of electronic weapons were in inventory at the Navy facility in Port Hueneme, California, leaving that facility short of weapons and requiring that CKC deliver additional weapons by Federal Express. In connection with this, he had reported incorrect weapons inventory data to Alison Rubin and Stanley, which was passed on to the customer, triggering additional customer dissatisfaction. |
| c) Stanley testified that he did not know what an International Traffic in Arms Regulations (ITAR) violation and he did not know if Brach's actions were a violation or not. CKC was never fined for a violation. Stanley Dep. Tr. at 257:02-15. | c) In July 2015, in connection with CKC's performance of contract requirements for synthetic weapons training for the Army Joint Military Training Command ("JMTC") in Germany, Brach had CKC personnel hand-carry lasers and other weapons parts through Customs in Germany, without proper paperwork required to comply with the International Traffic in Arms Regulations ("ITAR"). This was contrary to an express warning that Alison Rubin had |

communicated to Brach on May 12, 2015. As a result, the CKC personnel were detained in the airport by German authorities, requiring CKC to enlist the assistance of its Army customer to resolve the situation and obtain their release, causing substantial embarrassment to CKC on the eve of its contract performance.

d) Stanley placed blame on Brach for making travel arrangements when Vashti Robinson, the purchasing agent, was responsible for managing the travel process. Robinson specifically requested that Brach allow her to handle all travel. Robin Dep. Tr. (attached as Ex. 18) at 23:06-24:22.

d) Later in July 2015, in connection with arranging for CKC personnel to travel to Germany to install CKC weapons training equipment and begin the training program, Brach made travel arrangements that sent CKC personnel and a training consultant to the wrong airports, far from the Army bases where they were expected, requiring them to make lengthy trips by car and delaying their arrivals. SUMF ¶ 29.

21. Stanley never saw Brach act in a violent, intimidating, or aggressive way but Stanley was afraid of Brach because veterans commit suicide. Stanley Dep. Tr. at 241:15-245:20. Contrary to Stanley and Rubin's testimony, Henderson said she got along with Cameron and he never raised his voice to her. Henderson Dep. Tr. at 36:06-13. Several employees complained about Rubin to Henderson, who was in charge of Human Resources. *Id.* at 48:06-15.

21. During this period Stanley became increasingly concerned about the manner in which Brach dealt with CKC personnel. Stanley had received multiple complaints about Brach going back to the fall of 2014, stating that Brach was arrogant, aggressive and sometimes threatening in his communications with others. Stanley had counselled Brach on multiple occasions, but although Brach acknowledged that he had acted incorrectly, the problems persisted. Alison Rubin, Henderson, and others also witnessed or were the victims of Brach's improper conduct. SUMF ¶ 30.

22. Brach was unaware that Joseph Trippodo might be unable to perform on one of its contracts and Trippodo himself kept CKC informed of security clearance issues. Brach Dep. Tr. at 205:14-206:18, 217:01-19; Trippodo Declaration (attached as Ex. 19) at ¶ 13.

22. Finally, and most significantly, Brach failed to disclose to CKC that Joseph Trippodo, whom he had recommended that CKC hire to serve as a systems technician in support of the JMTC Army contract in Germany, had "red flags" on his security background:

b) Trippodo started work for CKC in or about December 2014, on an as-needed basis. Trippodo Declaration at ¶ 7. In July 2015,

b) In December 2014, Mr. Trippodo sent Brach an email forwarding a copy of his Joint Personnel Adjudication System (JPAS)

Trippodo accepted to work long-term for CKC on a government contract in Germany. Trippodo was aware that this position required a secret level security clearance. *Id.* at ¶ 8. Trippodo was aware that the SCI portion of his security clearance had been "flagged" in 2012.  However, he was also aware that the TS access portion of his security clearance remained unaffected and that his Secret and Top Secret clearances were still active.  Thus he believed he was qualified for the position with CKC.  *Id.* at ¶¶ 11-12, 20-22. Trippodo kept CKC apprised of the status of the security clearance investigation during his employment. *Id.* at ¶ 13.

Person Summary. He stated that because of unresolved problems in the summary he was likely to be denied employment for a position with the Marine Corps; his security summary had a "flag" on it, and "nothing can be done" despite having hired counsel. He also expressed his concern that the problem would prevent his from satisfying security requirements for the CKC Army contract in Germany. Trippodo wrote: "My point is...are you 100% sure that this wont happen with Conflict K? If the contract requires a secret, even though my secret is valid, so far no SSO has agreed to pass me while Kingfisher has an open RFI or something to that effect. . . .Here is my jpas summary, I just dont want you to be caught in a trick bag of me not being eligible to work." Although Brach understood the nature of Trippodo's concerns, he did not advise anyone at CKC of this communication.

c) Between 2014 and the end of July 2015, Brach, based on Trippodo's assurances, believed that any problems relating to Trippodo's security clearance had been "cleared up" because the Navy had requested a new secret clearance for Trippodo. Brach Dep. Tr. at 205:14-206:18; 219:05-220:10. On May 12, 2015, Trippodo told Brach that the Department of the Navy was issuing him a security clearance. *Id.* at 211:04-212:20.

c) Brach and Trippodo had several additional communications concerning the "flag" issue during May 2015. On May 20, 2015, Trippodo advised Brach that he believed progress was being made to resolve the problems, but acknowledged they were not actually resolved. He said, in response to a request from the Army for information about his clearance that Brach had forwarded to him: I have all this info of course, but I'm troubled about the clearance question. My Secret is being processed by the Navy and apparently my TS/SCI is being finally handled by DODCAF, but not yet. I can't supply the date for the clearance. How should I proceed? Brach failed to advise CKC of these communications.

e) Stanley does not remember if CKC performed any background check on Trippodo or verified that he held a security clearance.  Stanley Dep. Tr. at 81:21-82:01. Stanley did not ask Brach to identify any

e) On June 24, 2015, CKC offered and Trippodo accepted employment as a systems technician to support the CKC Army contract in Germany. CKC also hired three other individuals for the contract. At a

blemishes in Trippodo's background. *Id.* at 88:01-21. Even after learning of a potential problem with Trippodo's security clearance, Stanley did not ask Trippodo for any details about the problem. *Id.* at 88:22-89:10.

meeting that included Mr. Stanley, Alison Rubin and Brach, the participants went through disclosures regarding anything in their backgrounds, or those of the new employees, that might present an issue for satisfying security requirements. Several individuals had made disclosures, and these were identified. However, Brach failed to disclose anything about Trippodo's security red flags; instead, he repeatedly assured the participants that Trippodo was "clean."

f) Brach only learned from Stanley on July 28, 2015, that Trippodo could not access the base in Germany. Brach Dep. Tr. at 216:03-22; July 28, 2015 Emails (attached as Ex. 20). In email communications on July 28, 2015, Brach encouraged Trippodo to be truthful with CKC regarding any problems with his security clearance. Brach Dep. Tr. at 220:11-221:04; Ex. 20.

f) When Trippodo arrived in Germany, the problems in his security background were identified almost immediately by Army security personnel. On July 28, 2015, Stanley informed Brach, who had remained in the United States, that the Army's security officer advised that Trippodo's access was a "non-starter" due to the flags in his record. In an email to Trippodo, copied to Stanley, Brach finally forwarded to Stanley the JPAS information Trippodo had provided in December 2014, claiming that Trippodo said that the "flag" on his record was a "non-issue." Trippodo replied, asking how he could "shield" Brach from the consequences of this issue.

g) Even after learning of a potential problem with Trippodo's security clearance, Stanley did not ask Trippodo for any details about the problem.  Stanley Dep. Tr. at 88:22-89:10. CKC did not lose its contract with the government client, Joint Multinational Training Center (JMTC), as a result of the problems with Trippodo's security clearance. Stanley Dep. Tr. at 233:09-21; Rubin Dep. Tr. at 87:03-17. CKC did not and has not lost any business opportunities as a result of the problems with Trippodo's security clearance. Rubin Dep. Tr. at 87:03-17. CKC replaced Trippodo with an employee who was already living in Germany and who was able to perform all of the tasks that the client requested.  Rubin Dep. Tr. at 84:09-87:02.

g) CKC tried unsuccessfully to resolve the matter over the next ten days. During this period Brach provided Stanley incorrect or incomplete information that had a negative impact on Stanley's efforts. In emails dated August 5-6, 2015, the Army advised CKC that the problems with Trippodo's security background were unresolved and he was therefore ineligible to work on the contract. Brach then admitted to Stanley and Clay Schultz that he knew Trippodo did not have a clean security background, but that he thought it was a "minor thing" that "was all going to work out," and apologized. SUMF ¶ 31.

| | |
|---|---|
| 23. Stanley terminated Brach on August 9, 2015 without giving a reason as to the termination. Notice of Termination (attached as Ex. 21). When Brach asked for an explanation, Stanley wrote "legal council [sic] has advised me to avoid chit chatting over the issues." *Id.* Brach testified that he believed that he was terminated because of the misbillings to the government that he identified. Brach Dep. Tr. at 227:05-228:21. | 23. As a result, Stanley consulted with other senior CKC management and concluded that Trippodo had to be replaced, and that CKC's contract with IRC should be terminated immediately. He sent Brach an email to that effect on August 9, 2015. Brach's response revealed that he believed the decision was the product of the Trippodo problem. He also implied that to Kathy Henderson in a telephone call later that day. SUMF ¶ 32. |

**Plaintiff's Statement of Undisputed Material Facts**

In addition to the stipulated undisputed material facts above, Brach asserts the below material facts, which the Defendant does not address in its motion are also undisputed.

1. On or around February 2015, CKC changed Brach's title to Director of Operations and Logistics for CKC. Brach Dep. Tr. at 260:10-13; Rubin Dep. Transcript at 32:02-04.

2. "CKC has no formal written policies, procedures, and protocols relating to the prevention of incorrect billing of CKC services or products to the government." Answer to Interrogatory No. 14 (attached as Ex. 22).

3. CKC admits in its discovery responses that it terminated Brach because "Brach was responsible for the very billing problems he alleged to be the subject of his protected disclosure." Ex. 22, Answer to Interrogatory No. 1.

4. After Brach filed this lawsuit against CKC and Stanley, Stanley sent Brach text messages stating "you'll eat it all up in the counter lawsuits" and "[w]arm up your savings for the counter suit. Don't run out." Brach0030650; Brach0030649 (attached as Exhibits 23 and 24).

5. Stanley sent Brach these text messages because Brach's counsel served Stanley with the

complaint in this suit. Stanley Dep. Tr. at 249:13-250:15.

6.   Stanley testified that he would not have filed counterclaims against Brach for allegedly accessing CKC computer systems or for the situation with Trippodo's security clearance if Brach had not filed claims against CKC and Stanley. Stanley Dep. Tr. at 250:16-20.

7.   After Brach was hired, CKC changed its Corporate Policy regarding Employment Classifications on June 1, 2015, identifying each employee as either "exempt" or "non-exempt". *Compare* Employment Classification Policies (attached as Exhibits 25 and 26).

8.   Brach worked in an office physically located in CKC's corporate headquarters. Henderson Dep. Tr. at 28:05-29:06.

9.   CKC provided Brach with IT equipment, including a server, monitors, and use of printers. Henderson Dep. Tr. at 29:07-19.

10. CKC provided Brach with business cards identifying him as its Director of Operations and Logistics. Rubin Dep. Tr. at 32:19-32:04.

11. CKC treated Brach as a supervisor over other CKC employees managing inventory and as a supervisor to approve several of CKC employee's timesheets. Rubin Dep. Tr. at 138:07-19; May 2015 Email (attached as Ex. 27).

12. CKC's contract with Trippodo required Trippodo to reimburse CKC for expenses related to his training and for relocating him to Germany.  Stanley Dep. Tr. at 98:09-21.

13. CKC did not enforce the clause in Trippodo's contract requiring reimbursement because Stanley testified that he and CKC "just [doesn't] do that kind of thing." *Id.*

## **STANDARD OF REVIEW**

Summary judgment is proper only when there are no genuine issues as to any material facts and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c);

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Facts are material when proof of their existence or nonexistence would affect the case's outcome. *Anderson*, 477 U.S. at 248.  An issue is genuine if a reasonable decision-maker might return a verdict in favor of the nonmoving party on the basis of such issues. *Id*. at 248.  In evaluating the motion, the fact finder must view facts and reasonable inferences drawn from such facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). The fact finder "may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014).

In this case, there are numerous disputes regarding material facts.  Rather than allowing the factfinder to view the facts and inferences in the light most favorable to Brach, Defendants present a skewed version of the facts with incomplete deposition testimony and withholding key documents, inviting the factfinder instead to view the facts in the light most favorable to Defendants.

## ARGUMENT AND ANALYSIS

### A.      Brach Has Standing to Bring All Claims Because the Evidence Demonstrates that He Was an Employee of CKC.

The facts in this case demonstrate that there was an employment relationship between Brach and CKC.  Brach, as CKC's former Director of Operations and Logistics, is not estopped from bringing these claims against CKC because he has always maintained the position that CKC employed him. However, if the Court determines that the relationship should instead be classified as an independent contractor or relationship, case law dictates that Brach is still covered under the FCA and DCWPA.

The FCA provides that:

> Any <u>employee, contractor, or agent</u> shall be entitled to all relief necessary to make that employee, contractor, or agent whole, if that employee, contractor, or agent is discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h) (emphasis added). The DCWPA provides that "an employee of a contractor, subcontractor, grantee, or subgrantee may not ... discharge, demote, or otherwise discriminate against [its employees] as a reprisal for disclosing . . . [g]ross mismanagement," "gross waste of funds," "abuse of authority," or "violation[s] of law". 10 U.S.C. § 2409.

In *United States ex rel. Bias v. Tangipahoa Parish School Board*, 816 F.3d 315 (5th Cir. 2016), the Fifth Circuit reversed the district court's dismissal of relator's retaliation claim because the defendant had not been his employer. In its decision, the panel recognized that the 2009 amendments to the FCA's anti-retaliation provision, 31 U.S.C. § 3730(h), expanded the class of defendants who can be sued beyond employers, and established a framework for how to determine what other kinds of "employer-like" relationships can bring a defendant within the scope of the provision. *Id.* at 324. "[T]he legislative history [of the FCA] concerning the addition of the 'contractor, or agent' makes clear that Congress added 'contractor, or agent' to the statute in response to court decisions limiting retaliation plaintiffs to employees and not independent contractors" *United States v. Kiewit Pac. Co*., 41 F. Supp. 3d 796, 812 (N.D. Cal. 2014).  While there is minimal law interpreting the DCWPA, independent contractors as well has employees have standing to bring an action under 10 U.S.C. § 2409. *Manion v. Nitelines Kuhana JV LLC*, No. 7:12-CV-247-BO, 2014 WL 1800318, at *1 (E.D.N.C. May 6, 2014) (explaining that since

the court previously denied defendant's motion to dismiss, the court had determined that the

plaintiff, an independent contractor of defense contractors had standing).

Here, it is clear that Brach considered himself to be an employee of CKC and CKC

treated Brach as an employee of CKC.  Courts have used an "economic realities" test to

determine whether an individual is an employee or independent contractor under the FLSA

context. Courts apply a six factor test:

> 1) the degree of control which the putative employer has over the manner in
> which the work is performed; 2) the opportunities for profit or loss dependent
> upon the managerial skill of the worker; 3) the putative employee's investment in
> equipment or material; 4) the degree of skill required for the work; 5) the
> permanence of the working relationship; and 6) whether the service rendered is an
> integral part of the putative employer's business.

*Heath v. Perdue Farms, Inc.*, 87 F. Supp. 2d 452,457 (D. Md. 2000).

As the Director of Operations, Brach's role at CKC was an "integral part" of the

business.  The relationship had a permanent nature given Brach's job responsibilities. CKC

invested and provided Brach with all of the necessary equipment to perform his job, and CKC

controlled Brach's schedule and work hours. Brach physically had an office at CKC's corporate

headquarters. Henderson Dep. Tr. at 28:05-29:06. In addition, CKC provided Brach with IT

equipment, including a server, monitors, and use of printers. *Id.* at 29:07-19. CKC provided

Brach with business cards as its Director of Operations and Logistics and treated Brach as a

supervisor over other CKC employees managing inventory and as a supervisor to approve

several of CKC employee's timesheets.. Rubin Dep. Tr. at 32:19-32:04; 138:07-19; Ex. 27.

CKC's assertion that there was no employment or independent contractor relationship

rests entirely on a document that is itself disputed. Brach testifies that he never discussed his

small business, IRC, with Stanley or Rubin during the interview process. Brach Dep. Tr. at

132:07-18. On September 23, 2014, CKC offered the position of Program Coordinator to Brach,

not IRC. *See* Exhibit 4. When Brach received the offer letter, he asked Stanley why the offer letter classified him as a 1099 recipient rather than a full time employee, to which Stanley responded that all CKC employees, including executive staff, are 1099 recipients. Brach Dep. Transcript at 143:17- 144:02.

Brach, as an individual, signed an employment agreement with CKC on September 29, 2014. *Id.* at 27:02-28:11. This employment agreement did not list IRC as a party. *Id.* Brach then returned the agreement to Henderson, keeping only a copy of the cover sheet. *Id.* at 27:02-28:11, 147:07-148:04; *see also,* Ex. 5. When Brach signed the contract, it was his understanding that Brach, as an individual, would be an independent contractor for CKC, and that he would bill through IRC, at Kathleen Henderson's recommendation. *Id.* at 57:12-58:05. Henderson suggested making the contract between CKC and IRC because it would be in Brach's best interest in order to take advantage of certain tax exemptions. *Id.* at 37:15-38:19, 57:12-58:05

Brach believed he was an employee of CKC. *Id*. at 165:15-166:11. Brach testified that he believes that the agreement produced in discovery between IRC and CKC (attached as Ex. 6), which is lacking a signature on behalf of CKC, is a falsified document. Brach Dep. Tr. at 34:09-18, 160:17-20.  Brach explained in his deposition that the agreement between Brach and CKC produced by Brach in discovery and the agreement between IRC and CKC produced by CKC in discovery contain discrepancies which lead him to believe that the agreement between IRC and CKC is not a true and correct copy of the document signed. *Id.* at 157:15-159:11, 164:05-165:01.

After Brach was hired, CKC changed its Corporate Policy regarding Employment Classifications on June 1, 2015, identifying each employee as either "exempt" or "non-exempt". *Compare* Employment Classification Policies (*Compare* Exhibits 25 and 26). When viewing the

evidence in the light most favorable to Brach and taking into consideration the purpose of the

FCA and DCWPA, it is clear that Brach has standing to bring these claims.

**B.      There Are Facts Sufficient for a Reasonable Jury to Determine that Brach Could Prevail on His Whistleblower Claims.**

In order to establish a *prima facie* case of unlawful retaliation, a plaintiff must establish

that (1) he engaged in protected activity; (2) his employer knew or was reasonably on notice that

he was engaged in protected activity; and (3) his employer took adverse action against him as a

result of his protected activity. *See Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013);

*Eberhardt v. Integrated Design & Const., Inc.*, 167 F.3d 861, 866 (4th Cir. 1999); *Carlson v.

DynCorp Int'l LLC*, 657 F. App'x 168, 170 (4th Cir. 2016). Importantly, a plaintiff "need not

prevail on his underlying FCA claims" to succeed in a retaliation claim. *United States v. N. Adult

Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 298 (E.D.N.Y. 2016) (citing *United States v.

Empire Educ. Corp.,* 959 F. Supp. 2d 428, 256 (N.D.N.Y. 2013)). In other words, an employee

does not need to be right about the alleged FCA or DCWPA violation to establish a *prima facie*

case.

**1.      Brach has successfully established a *prima facie* claim of retaliation.**

**a.      Brach clearly engaged in protected activity.**

Protected activity is established when the plaintiff "had a good faith belief that the

employer was engaging in unlawful conduct. In making that assessment, a court will consider

whether (1) the employee in good faith believes, and (2) a reasonable employee in the same

circumstances would believe, that the employer is committing fraud against the Government."

*See U.S. ex rel. Wilson v. Graham Cnty Soil & Water Conser. Dist.*, 367 F.3d 245, 255 (4th Cir.

2004), *rev'd on other grounds*, 545 U.S. 409 (2005); *see also Allen v. Admin. Review Bd.*, 514

F.3d 468, 477 (5th Cir. 2008) ("[t]he objective reasonableness of a belief is evaluated based on

the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee"). *United States ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp. 3d 610, 621 (E.D. Va. 2016). An effort to stop one or more violations is protected activity when "those efforts are motivated by an objectively reasonable belief that the employee's employer is violating, or will soon violate, the FCA." *Id.*

Similarly, protected activity under the DCWPA includes a disclosure "that places an employer on objectively reasonable notice that what is being disclosed is a 'violation of a law, rule, or regulation related to a Department [of Defense] contract (including the competition for or negotiation of a contract) or grant.'" 10 U.S.C. § 2409(a)(l); *Cody*, 207 F. Supp. 3d at 622.

This case differs from the case consistently cited by Defendants, *Nifong v. SOC*, because here Brach discovered through his audit that CKC already had charged for services and installations that had not been delivered or provided. *Nifong* is easily distinguishable, wherein the employee notified his employer of potential overcharging which had not yet occurred. *See Nifong v. SOC, LLC,* No. 1:16-CV-63, 2017 WL 590290, at *10 (E.D. Va. Feb. 13, 2017).

It was objectively reasonable for Brach to suspect and believe that CKC was overbilling the government as a result of his May 7, 2015 audit. CKC's defense is that both Rubin and Brach conducted an audit; however, there are no emails or evidence which show that Rubin independently audited any invoices. After Henderson's sudden departure, Brach asked Stanley himself if it would be in CKC's best interest to conduct this audit. As a result, Brach informed Stanley and Rubin that they had overbilled the government. Brach Dep. Tr. at 228:22-235:15. Brach reported overbillings because CKC had "charged for services, installation, products that had not been delivered to the client site". *Id.* at 234:09-236:05, 239:12-242:22.

On May 7, 2015, Brach emailed Stanley the results of his audit of the NATICK contract, identifying "Major Issues" of overbilling the government in which CKC "charged for services, installation, products that had not been delivered to the client site". Brach Dep. Tr. at 234:09-236:05, 239:12-242:22; Ex. 9. The NATICK contract and modifications at issue provides invoicing instructions for "invoices for goods received or services rendered under this contract". Exhibits 14 and 15.

After Brach notified Stanley and Rubin of the findings of his audit, Rubin's only concern at the time was to bill where [CKC] had underbilled." Brach Dep. Tr. at 251:07-13; Exhibits 10, 11. Rubin responded to Brach's audit of the NATICK contract invoices, stating that "the underbills and overbills don't make sense to me" and that her "biggest question" was for the underbill. *See* Exhibits 10 and 11.

It is Stanley's (President of CKC) and Rubin's (individual responsible for reviewing invoices) understanding that there is no way to overbill the government on a fixed price contract. Stanley Dep. Tr. at 175:10-176:05; Rubin Dep. Tr. at 128:16-129:11. However, Rubin admitted that "you can't bill for installation until the installation is performed." Rubin Dep. Tr. at 63:07-64:17. Stanley did not see the overbillings identified in Brach's email as major issues and was not concerned about these issues because they did not have any negative effect or impact on the customer. Stanley Dep. Tr. at 136:12-140:10; 142:02-143:16; 146:05-147:07. Just because Stanley and Rubin do not understand how overbilling works (billing for services not provided or billing twice for the same service performed), does not mean that it could not occur.

CKC's actions after Brach's disclosure to Stanley and Rubin and Brach's termination indicate that Brach had a reasonable belief of an FCA violation. After May 8, 2015, no further corrections were made to the overbills during Brach's employment but Rubin was adamant about

21

correcting the underbill. Brach Dep. Tr. at 255:05-257:02. Prior to Brach's termination, "CKC ha[d] no formal written policies, procedures, and protocols relating to the prevention of incorrect billing of CKC services or products to the government." Exhibit 22, Answer to Interrogatory No. 14. CKC changed its billing procedures in May 2015, when Brach took over billing responsibilities because of the early billings made in error by Henderson. Henderson Dep. Tr. at 14:04-15:08. After CKC terminated Brach August 2015, CKC changed its billing procedures again, with an established formal policy and procedures and hiring of a COO. *Id.* at 16:09-18:02. On December 5, 2015, CKC disclosed a summary of the errors identified in the May 2015 audit. *See* Exhibit 13.  In light of the evidence above, Brach has established that he had a good faith, reasonable belief that CKC was engaging in overbilling the government, which is unlawful conduct.

> **b.      Brach can establish that his protected disclosures were a contributing factor for his termination.**

To establish the element of causation for a claim of retaliation, a plaintiff must prove "by a preponderance of the evidence that the alleged protected activity was a 'contributing factor' in the adverse employment action taken against him or her." 5 U.S.C. § 1221(e)(1); *Feldman v. Law Enforcement Assocs. Corp.*, 752 F.3d 339, 344 (4th Cir. 2014); *Puffenbarger v. Engility Corp.*, 151 F. Supp. 3d 651, 658 (E.D. Va. 2015). Under this broad standard, a plaintiff has "a rather light burden of showing by a *preponderance of the evidence* that the [protected] activities *tended to affect his termination in at least some way*" *Cody*, 207 F. Supp. 3d at 624 (emphasis added).

Temporal proximity need be very close only in cases in which it is the only evidence of causation. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001). Causation may also be shown when there is "'an intervening pattern of retaliatory conduct, inconsistent reasons by the

employer for the adverse action taken, and differential treatment of other employees.'" *Lorenz v. Fed. Exp. Corp.*, No. 7:10-cv-00487, 2012 WL 4459570, at * 10 (W.D. Va. Aug. 17, 2012) (quoting *Jaudon v. Elder Health, Inc.*, 125 F.Supp.2d 153, 165 (D. Md. 2000)).

CKC has proffered inconsistent reasons for terminating Brach. Stanley terminated Brach on August 9, 2015, without giving a reason as to the termination. *See* Ex. 21. When Brach asked for an explanation, Stanley replied by stating "legal council [sic] has advised me to avoid chit chatting over the issues." *Id.* CKC admits in its discovery responses that the billing errors Brach disclosed were a reason for Brach's termination. Specifically, in the response to an interrogatory requesting the reason for Brach's termination, CKC writes "Brach was responsible for the very billing problems he alleged to be the subject of his protected disclosure." Ex. 22, Answer to Interrogatory No. 1. However, through discovery it was established by Henderson and Rubin that it was, in fact, Henderson who made those billing errors which Brach found and disclosed. Henderson Dep. Tr. at 14:04-15:08; Brach Dep. Tr. at 237:02-15.

CKC stated that the real reason for Brach's termination were the issues with Joe Trippodo's security clearance after Brach filed this lawsuit. CKC did not give this reason to Brach at the time of his termination when Brach asked for the reason. Ex. 21. Brach found Henderson's billing errors and reported them to Rubin and Stanley, and as a result, Henderson recommended Brach's termination and had input in the decision to terminate Brach. Brach Dep. Tr. at 19:03-20:09; 227:05-228:21; Rubin Dep. Tr. at 89:06-21. It is evident that Brach's disclosure to Stanley and Rubin of Henderson's billing errors, an individual who had input in Stanley's decision, was a contributing factor for his termination.

## 2. Defendants' alleged legitimate and non-retaliatory reasons for Brach's termination are pretextual.

If a plaintiff establishes a *prima facie* case of retaliation, "the defendant may prevail only

23

if it rebuts the employee's *prima facie* case by demonstrating by *clear and convincing evidence* that the employer would have taken the same personnel action in the absence of the protected activity". *Cody*, 207 F. Supp. 3d at 626 (emphasis added).

In emails dated August 5 and 6, 2015, the Army advised CKC that the problems with Trippodo's security background were unresolved and he was therefore ineligible to work on the contract. CKC SUMF ¶ 31. An email dated August 3, 2015 demonstrates that Stanley had already made the decision to terminate Brach *prior* to learning from the Army that Trippodo could not perform on the contract. *See* Ex. 16. Stanley was not even aware that he would have to bring Trippodo back from Germany until after he had already made up his mind to terminate Brach. Thus, Stanley's post-hac justification for Brach's termination is pretextual.

**C.    There Are Facts Sufficient for a Reasonable Jury to Determine that Brach Could Prevail on His FLSA Claims.**

In support of its motion for summary judgment on Brach's FLSA claims, CKC's argues only that even if Brach was an employee of CKC, he was exempt under the FLSA. In ruling on the motion to dismiss, this Court noted that the "Fourth Circuit has held that an FLSA retaliation claim may lie for retaliatory acts committed against an ex-employee." [Dkt. 30]; citing *Darveau v. Detecon, Inc.,* 515 F.3d 334, 343 (4th Cir. 2008). Moreover, a counterclaim can be retaliatory if the counterclaim lacks "reasonable basis in law" and was filed with "retaliatory motive." *Darveau,* 515 F.3d at 341.

Here, the undisputed facts and Stanley's own deposition testimony clearly demonstrate that the counterclaims were filed with retaliatory intent. After Brach filed this lawsuit against CKC and Stanley, Stanley sent Brach text messages stating "you'll eat it all up in the counter lawsuits" and "[w]arm up your savings for the counter suit. Don't run out." Exhibits 23 and 24. Stanley sent Brach these text messages because Brach's counsel served Stanley with the

complaint in this suit. Stanley Dep. Tr. at 249:13-250:15. Stanley testified that he would not have filed claims against Brach for allegedly accessing CKC computer systems or for the situation with Trippodo but for the fact that Brach had filed claims against CKC and Stanley. Stanley Dep. Tr. at 250:16-20.

As set forth in Brach's motion for summary judgment on the counterclaims [Dkt. 99], the counterclaims lack "reasonable basis in law" and were filed purely out of "retaliatory motive." As a result, Brach has established a *prima facie* case of FLSA retaliation.

**D.      As Brach Argues in His Cross Motion for Summary Judgment, The Undisputed Evidence Demonstrates that Brach Did Not Constructively Defraud CKC.**

Brach incorporates the facts, law, and arguments set forth in his motion for summary judgment on the counterclaims [Dkt. 99]. The evidence demonstrates that Brach was unaware that Trippodo would be unable to perform on the contract in Germany, Trippodo himself kept CKC informed of security clearance issues, and CKC suffered no damages attributable to Brach, because it did not lose any contract or business opportunities as a result of Trippodo. Even if the court decides that CKC has met the high burden to prove that Brach constructively defrauded CKC, CKC failed to mitigate any damages by requiring reimbursement from Trippodo.

Trippodo kept CKC apprised of the status of the security clearance investigation during his employment. Ex. 19 at ¶ 13. Between 2014 and the end of July 2015, Brach, based on Trippodo's assurances, believed that any problems relating to Trippodo's security clearance had been "cleared up" because the Navy had requested a new secret clearance for Trippodo. Brach Dep. Tr. at 205:14-206:18; 219:05-220:10. On May 12, 2015, Trippodo told Brach that the Department of the Navy was issuing him a security clearance. *Id.* at 211:04-212:20. Brach only learned from Stanley on July 28, 2015 that Trippodo could not access the base in Germany. *Id.* at

216:03-22; Ex. 20. In fact, Brach encouraged Trippodo to be truthful with CKC regarding any problems with his security clearance. Brach Dep. Tr. at 220:11-221:04; Ex. 20.

Stanley does not even remember if CKC performed any background check on Trippodo or verified that he held a security clearance.  Stanley Dep. Tr. at 81:21-82:01. Further, Stanley did not ask Brach to identify any blemishes in Trippodo's background. *Id.* at 88:01-21. Even after learning of a potential problem with Trippodo's security clearance, Stanley did not ask Trippodo for any details about the problem. *Id.* at 88:22-89:10. CKC simply wants to hold Brach liable for CKC's failure to perform due diligence in its hiring process. Further, CKC could have sought to enforce its contract with Trippodo and mitigate its damages, but they chose not to do so. CKC's contract with Trippodo required Trippodo to reimburse CKC for expenses related to his training and for relocating him to Germany.  Stanley Dep. Tr. at 98:09-21.CKC did not enforce the clause in Trippodo's contract requiring reimbursement because Stanley testified that he and CKC "just [doesn't] do that kind of thing." *Id.*  Therefore, CKC did not mitigate its damages and are barred from now seeking damages from Brach.

## CONCLUSION

For the foregoing reasons, Plaintiff Cameron Brach respectfully requests that the Court deny Defendants' motion for summary judgment and allow Plaintiff's claims to proceed to trial.

Respectfully submitted,


/s/ Nicholas Woodfield
R. Scott Oswald, VA Bar No. 41770
Nicholas Woodfield, VA Bar No. 48938
Kellee Boulais Kruse, VA Bar. No. 78710
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com
kkruse@employmentlawgroup.com
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that the foregoing Plaintiff's Opposition to Defendant's Motion

for Summary Judgment was served via electronic filing on June 5, 2017, upon:

Russell J. Gaspar, Esq.
Victor G. Klingelhofer, Esq.
Andrew K. Wible, Esq.
COHEN MOHR LLP
1055 Thomas Jefferson Street, N.W.
Suite 504
Washington, D.C. 20007
*Attorneys for Defendants*


/s/ Nicholas Woodfield
Nicholas Woodfield

28