UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| CAMERON BRACH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  Case No. 1:16-cv-978-TSE/JFA |
| | ) |
| CONFLICT KINETICS | ) |
| CORPORATION, *et al.*, | ) |
| | ) |
| Defendants. | ) |
| | ) |
| CONFLICT KINETICS CORPORATION, | ) |
| | ) |
| Counterclaim Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| CAMERON BRACH and INDEPENDENT | ) |
| RECRUITING CONSULTANTS, LLC, | ) |
| | ) |
| Counterclaim Defendants. | ) |

**REPLY MEMORANDUM IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT BY CONFLICT KINETICS CORPORATION,
<u>BRIAN STANLEY AND KATHLEEN HENDERSON</u>**

Russell J. Gaspar
Andrew K. Wible
Victor G. Klingelhofer
Cohen Mohr, LLP
1055 Thomas Jefferson St., N.W.
Suite 504
Washington, D.C. 20007
(202) 342-2550 (telephone)
(202) 342-6147 (facsimile)

*Attorneys for Conflict Kinetics Corporation*

## TABLE OF CONTENTS

| Section | | Page |
|---|---|---|
| I. | Summary | 1 |
| II. | Argument | 1 |
| | A. Brach Was Not An Employee Of CKC And Does Not Have Standing To Sue Under the FCA or the DCWPA. | 1 |
| | B. Brach Did Not Engage In Activity Protected By The FCA Or DCWPA. | 5 |
| | C. Brach Was Not Subjected To Retaliation. | 8 |
| | D. Even If Brach Were An Employee, He Was Exempt Under The FLSA. | 13 |
| | E. CKC Did Not Retaliate Under The FLSA. | 13 |
| | F. CKC Is Entitled to Judgment As A Matter Of Law As To Count III Of Its Counterclaim, Alleging Constructive Fraud. | 15 |
| III. | Conclusion | 16 |

# **TABLE OF AUTHORITIES**

**Page**

**Federal Cases**

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ............................................................. 1, 15

*Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731 (1983) ............................................. 14

*Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168 (4th Cir. 2016) ................................................ 7

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ............................................................................. 1

*Darveau v. Detecom, Inc.*, 515 F.3d 334 (4th Cir. 2008) ............................................................ 14

*Lee v. Computer Scis. Corp.*, No. 1:14CV581 JCC/TCB, 2015 WL 778995 (E.D.Va. Feb. 24, 2015) ........................................................................................................................................ 8

*Mann v. Heckler & Koch Def., Inc.,* 630 F.3d 338 (4th Cir. 2010) ............................................... 7

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) ......................................................... 12

*Nifong v. SOC, LLC*, --- F.Supp. 3d ---, No. 1:16-CV-63, 2017 WL 590290, at *9 (E.D. Va. Feb. 13, 2017) .......................................................................................................... 7, 8, 12

*United States ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp. 3d 610 (E.D. Va. 2016) ... 7, 8, 11

*United States ex rel. Garzione v. PAE Gov't Servs., Inc.*, 164 F. Supp. 3d 806 (E.D. Va. 2016), *aff'd,* 670 F. App'x. 126 (4th Cir. 2016) ............................................................................ 8

*Zahodnick v. Int'l Bus. Machs. Corp.*, 135 F.3d 911 (4th Cir. 1997) ............................................ 7

**State Cases**

*First Nat. Exch. Bank of Roanoke v. Roanoke Oil Co.*, 169 Va. 99 (1937) .................................... 4

*Knopf v. R., F. & P.R. Co.,* 85 Va. 769 (1889) ............................................................................. 4

**Federal Statutes**

31 U.S.C. § 3730 ............................................................................................................................ 7

**Federal Rules**

Fed. R. Civ. Proc. 56 ...................................................................................................................... 2

**I.  SUMMARY**

Cameron Brach and Independent Recruiting Consultants, LLC ("Brach" and "IRC", collectively, "Brach"), have failed to demonstrate that there is a genuine issue as to any material fact supporting the motion for summary judgment filed by Conflict Kinetics Corporation ("CKC"), Brian Stanley ("Stanley") and Kathleen Henderson ("Henderson") (collectively, "CKC").  The evidence on which Brach relies either does not support his factual position, or is immaterial and not "such that a reasonable jury could return a verdict" in their favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).  Accordingly, Brach cannot make a "showing sufficient to establish the existence of an element essential to [their] case, and on which [they] will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  The defendants' motion for summary judgment must therefore be granted.

**II.  ARGUMENT**

  **A.  Brach Was Not An Employee Of CKC And Does Not Have Standing To Sue Under the FCA or the DCWPA.**

To rebut CKC's argument that Brach is estopped to assert he was an employee because he elected to structure the business relationship through IRC, he attempts, but utterly fails, to identify disputed issues of material fact.  Paragraphs 1-8 of his Statement of Material Facts in Dispute ("SMFD") (ECF No. 105 at 6-9[1]), which address the parties' business relationship, consist primarily of a reiteration of the facts set out in ¶¶ 5-16 of CKC's Statement of Material Facts As to Which There Is No Dispute ("CKC SMF") (ECF No. 101 at 8-12), albeit with some differences in emphasis and/or detail.  Significantly, what is missing from Brach's SMFD ¶¶ 1-8 is a clear identification of the <u>material</u> facts that he disputes, and the record citations that support

---

[1]  Page references correspond to the ECF-generated pagination appearing in the upper-right corner of the document, and not the document's internal pagination.

the existence of a genuine dispute. Brach's Opposition simply does not satisfy Fed. R. Civ. Proc. 56(c).

At most, Brach reiterates his prior assertions about the cover page of the Independent Contractor Services Agreement ("ICSA") that he signed (SMFD ¶ 4), and his subjective "belief" that CKC's Exh. 32 (ECF No. 101-13) is "falsified" because of unspecified "discrepancies" in the document (SMFD ¶¶ 5-6). Because Brach did not retain a copy of the agreement, except for the cover page, he cannot come forward with any evidence of what he actually signed, and therefore he is unable to identify or prove any of the alleged "discrepancies" in the text of the document.[2] More fundamentally, any doubt regarding the existence of a genuinely disputed material fact relating to "discrepancies" must be resolved conclusively in CKC's favor by comparing CKC Exh. 32, which Brach signed, with CKC Exh. 31A (ECF No. 101-12), the initial draft of the ICSA (identifying Brach as the independent contractor) that was presented to him on September 29, 2014. Except for the cover page, the documents are identical.

Furthermore, Brach's assertion (SMFD ¶ 3) that he signed the ICSA "as an individual" is not supported by the undisputed record. The material facts set out in CKC SMF ¶¶ 8-12 and 14-15 <u>are not contradicted by Brach's SMFD</u>. They establish that:

- Brach inserted handwritten notations in the ICSA (CKC Exh. 32 (ECF No. 101-13) at CKC_024035_0033-34, CKC_024035_0037) identifying IRC as the contractor to CKC and himself as IRC's "Principal Agent," the title that he customarily used when executing documents on behalf of IRC;

---

[2] Brach claimed that differences in font size between CKC Exh. 32 and the document he signed led him to believe that the documents were different. However, that was explained at the deposition to be a function of the document production process that affixed document identification numbers to the exhibits. Brach Deposition, Brach Exh. 3 (ECF No. 105-3), at 158:9—160:4. Beyond that issue, he was unable to identify any substantive differences or "discrepancies." *Id*. at 160:5-11.

- At the time he signed the ICSA Brach had read and understood its contents;

- Brach made the voluntary decision to establish the business relationship with CKC though IRC, based on his independent understanding of the tax advantages of operating through an LLC;[3]

- Brach provided CKC with an IRS Form W-9 for IRC, and thereafter caused IRC to issue invoices to CKC for services rendered. CKC paid IRC for the invoices, and the payments were deposited into an IRC bank account. CKC issued IRS Forms 1099 to IRC, not Brach; and

- IRC invoiced CKC separately for employee recruiting services, and solicited CKC's business for other recruiting work.[4]

These facts, which govern the construction of the ICSA and render immaterial the dispute concerning the first page, are utterly inconsistent with Brach's claim that he signed the ICSA in his individual capacity, or that he was the independent contractor, simply billing through IRC.[5] His insistence that he signed the ICSA in an individual capacity is really nothing more than a bald denial, unsupported by any evidence; therefore, it cannot defeat CKC's motion.

Brach's legal argument is equally unpersuasive. He claims that he has standing to sue under the False Claims Act ("FCA") and the Defense Contractor Whistleblower Protection Act ("DCWPA") because he was either an employee or an individual independent contractor of

---

[3] This undisputed fact renders irrelevant Brach's claim (SMFD ¶ 1) that he did not discuss IRC with Mr. Stanley or Ms. Rubin during the interview process. He clearly discussed IRC with Kathy Henderson and chose to make IRC the contracting party.

[4] In further corroboration of these facts, Brach does not dispute that in 2014-15 IRC was an ongoing business that had other customer contracts, solicited other potential customers, and engaged and paid persons other than Brach to perform those services. *See* CKC SMF ¶¶ 16-17.

[5] Actually, Brach testified that one of his "concerns" about the ICSA was that he was not sure whether he signed the agreement in his individual capacity or on behalf of IRC. Brach Dep., Brach Exh. 3 (ECF No. 105-3), at 164:5-165:6.

CKC.  He asserts that he "believed" that he was an employee; that he actually was an employee under the "economic realities" test; and that, even if he were not an employee, an independent contractor has standing to sue under both statutes.  ECF No. 105 at 19-23.[6]

The fatal flaw in this argument is that it depends on Brach, <u>the individual</u>, having had a business relationship with CKC, whether of employment or independent contract.  The undisputed material facts provide no support for that conclusion.  Instead, they show unequivocally that Brach consciously and voluntarily structured the business relationship to be between IRC and CKC, and performed the business relationship exclusively on that basis.  Brach has come forward with nothing to dispute that IRC billed and was paid for services rendered under the ICSA; that CKC's payments were reported under Forms 1099 issued to IRC, using the IRC FEIN provided by Brach; and that IRC separately solicited and billed CKC for employee recruiting services in exactly the same way it invoiced for services rendered under the ICSA.  *See* ECF No. 105 at 6 (Brach does not dispute CKC SMF ¶¶ 14, 15).

Therefore, the relevant "economic reality" in this case is how Brach, through IRC, conducted the business relationship.  *First Nat. Exch. Bank of Roanoke v. Roanoke Oil Co.*, 169 Va. 99, 115 (1937) (best settled rule for the construction of written instruments is that which attaches great weight to the construction of the instrument by the parties themselves); *Knopf v. R., F. & P.R. Co.,* 85 Va. 769, 789 (1889) (practical construction put by the parties upon the terms of their own contract is not only to be regarded, but, where there is any doubt, must prevail).

---

[6] In fact, because Brach has based his claim <u>solely</u> on having been an employee of CKC, he is estopped to argue at this stage of the litigation that he was an independent contractor.  *See* CKC Memo. In Support of Motion for Summary Judgment, ECF No. 101, at 26-27.

4

Finally, these undisputed facts also estop Brach from claiming that his relationship was directly with CKC. *See* ECF No. 101 at 25-27. Brach argues (ECF No. 105 at 19) that he is not estopped "because he has always maintained the position that CKC employed him." In the summary judgment context, however, the issue is not what Brach claims, but what the undisputed evidence shows. The function of an estoppel is to prevent precisely what Brach is doing here: attempting to assert in litigation a position that is wholly inconsistent with his acceptance of a transaction and the benefits that it provides him.

**B.  Brach Did Not Engage In Activity Protected By The FCA Or DCWPA.**

Brach's attempt to identify disputed material facts relating to the alleged "protected activities" underlying his FCA and DCWPA claims (SMFD ¶¶ 9-17) is no more specific or successful than his attempt to dispute the facts of the IRC-CKC business relationship. In several cases his position is clearly inconsistent with the emails that evidence the parties' actions.[7] As a result, he has failed to show the existence of any disputed material factual issue on which he could prevail at trial.

Brach's argument is that he "reasonably believed" that CKC had overbilled the government in violation of the False Claims Act. ECF No. 105 at 23-25. In this regard, while Brach consistently characterizes his communications about the NATICK invoices as the product of "his" audit, the undisputed evidence actually shows that independent reviews of the NATICK invoices were conducted simultaneously by both Brach and Alison Rubin. CKC SMF ¶ 23; CKC Exhs. 65-67 (ECF Nos. 101-15, 101-16); Rubin Dep. (ECF No. 101-4) at 58:18-59:17. Nor does Brach dispute the key fact that the need for a review was identified by Kathleen

---

[7] For example, Brach's assertion that "there are no emails or evidence which show that Rubin independently audited any invoices" (ECF No. 105 at 24) is <u>untenable</u>; it is directly contradicted by emails (CKC Exh. 73 (ECF No. 101-16) at CKC_001794_0001-02), as well as Rubin's deposition testimony (Rubin Dep. (ECF No. 101-4) at 58:18-59:17).

5

Henderson and approved at a meeting in late April 2015 that included Brach, Brian Stanley and Alison Rubin. CKC SMF ¶ 21. Finally, it is undisputed that Brach and Ms. Rubin became involved in the review process because Ms. Henderson unexpectedly resigned on May 6, 2015. CKC SMF ¶ 22.

It is also undisputed that <u>both</u> Ms. Rubin and Brach independently ascertained that in November 2014 CKC invoiced the Navy for support and installation work at Navy facilities in Guam and Imperial Beach, California, that had not yet been performed as of the date of the invoice. Although the invoice was sent before CKC should have billed for these items, there is no dispute that the fixed-fee amount that was billed was correct. Brach and Ms. Rubin confirmed that neither had authorized Kathy Henderson to bill for these items. They also identified several invoices that apparently CKC had not billed for all of the CLINS that it had completed and was entitled to payment. *Id.* ¶ 24. In brief, their independent review found billing mistakes on both sides of the ledger.

Brach tries to make much of the fact that he referred to the Guam and Imperial Beach invoices as "overbillings," a term with which Ms. Rubin disagreed. In fact, it is undisputed that CKC did not "overbill" the Navy for Guam and Imperial Beach; it never charged more than once for the same services or more that it was entitled to receive under the terms of its fixed-price contract. The billing error was charging for those services before they had been completed.

For the purposes of this case, however, the key issue is not whether Brach had a reasonable belief that CKC had billed the Navy erroneously, but whether he had <u>a reasonable basis to believe that the early billing was a violation of the False Claims Act</u>. It is undisputed that although the multiple and detailed emails that passed among Brach, Ms. Rubin and Mr. Stanley during the period of May 7–11, 2015, discuss actual and potential billing errors, they

6

never mention fraud, illegality or the possibility of liability under the FCA. Instead, they focus on identifying the billing errors and implementing procedures to prevent their recurrence. *Id*. ¶¶ 24-26; CKC Exhs. 69-83 (ECF No. 101-16), 128-29 (ECF No. 101-17 at 76-86).

Even the email to Brian Stanley on which Brach primarily relies, Brach Exh. 9, does not mention fraud, illegality or potential wrongdoing. Instead, Brach wrote, reassuringly:

> Get a good night's sleep. The good news is now that we all see the process; we can fix the process and put in triggers to notify us when something is wrong in the future.

ECF No. 105-9 at 2.

In brief, Brach has not identified any disputed fact that could establish that he had an "objectively reasonable belief" that the errors that he and Ms. Rubin found meant that CKC was violating the FCA. Even if Brach believed those errors showed a violation of some applicable regulation, that by itself would be insufficient to establish that he had an objectively reasonable belief that the same conduct amounted to a violation of the FCA. *Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168, 174 (4th Cir. 2016). This is determinative of his claim, because "'without fraud, there can be no FCA action' or violation." *Id*. (quoting *Mann v. Heckler & Koch Def., Inc.,* 630 F.3d 338, 345-46 (4th Cir. 2010)); *Nifong v. SOC, LLC*, --- F.Supp. 3d ---, No. 1:16-CV-63, 2017 WL 590290, at *9 (E.D. Va. Feb. 13, 2017); *United States ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp. 3d 610, 621 (E.D. Va. 2016).

Further, the law is clear that a disclosure is not "protected activity" for the purposes of the FCA or the DCWPA without a nexus to furthering an action under the FCA, or trying to stop one or more violations of the FCA. 31 U.S.C. § 3730(h)(1); *Carlson, supra, at* 170; *Cody, supra; Nifong, supra*. To the contrary, mere "expressions of concern that do not raise the reasonable prospect of false or fraudulent claims under the FCA . . . do not constitute 'protected activity.'" *Nifong*, 2017 5902090, at *9, quoting *Cody, supra*; *Zahodnick v. Int'l Bus. Machs.*

7

*Corp.*, 135 F.3d 911, 914 (4th Cir. 1997). Simply reporting "a concern of a mischarging to the government to [an employee's] supervisor" does not suffice to establish that a plaintiff was engaging in "protected activity." *United States ex rel. Garzione v. PAE Gov't Servs., Inc.*, 164 F. Supp. 3d 806, 816–17 (E.D. Va. 2016), *aff'd*, 670 F. App'x. 126 (4th Cir. 2016); *Lee v. Computer Scis. Corp.*, No. 1:14CV581 JCC/TCB, 2015 WL 778995, at *6 (E.D. Va. Feb. 24, 2015).

Brach has not even attempted to show that his actions were either in furtherance of an action under the FCA or in an effort to stop CKC from violating the FCA. The record shows, without dispute, that Brach and Rubin reviewed CKC's NATICK invoices to determine whether they were correct. When they found errors, they communicated them to each other and to Brian Stanley and took steps to correct the invoicing process.[8] There is no evidence that Brach's communications were part of a course of conduct in furtherance of an FCA action. Nor is he able to point to evidence that would allow him to persuade a reasonable trier of fact that his communications were part of an effort to stop a violation of the FCA, because nothing in the record establishes that he held an objectively reasonable good faith belief that CKC "was committing fraud against the government." *Cody, supra; Nifong, supra.*

### C. Brach Was Not Subjected To Retaliation.

Brach does not dispute that he was not disciplined, criticized or threatened in any way as a result of his role in the NATICK invoice review. Nor does he dispute that, in the aftermath of

---

[8] Brach asserts (SMFD ¶¶ 15-16) that CKC was unconcerned about "overbillings" and failed to correct them. However, he does not dispute that when the invoice errors were identified, CKC had already completed its support and installation work for one of the erroneously-billed CLINs, and was scheduled to perform support and installation work for the other prematurely billed CLIN in June, the month following the discovery of the issues. He also does not dispute that about a week after the early billing was identified, Alison Rubin advised the Navy's Inspector/Acceptor at NECC, Eric Olson, that the two installation and support CLINS had been billed prematurely; and that CKC did not experience any adverse consequences due to the billing errors. CKC SMF ¶ 28. Instead, Brach erroneously contends that CKC's December 5, 2015, letter to NECC was the first and only communication with the government on the issue. SMFD ¶ 19.

that review, his role in a revised billing process was expanded and he became responsible for submitting invoices to the Navy through the WAWF system. CKC SMF ¶¶ 26, 27. In fact, he says that his role in the revised process was based on recommendations made by Alison Rubin. SMFD ¶ 17. Therefore, he concedes that in the immediate aftermath of the review he was not subjected to any adverse action; to the contrary, his authority over billing matters was increased.

Those facts conclusively establish that Brach was not subjected to retaliation, even if he had engaged in conduct protected by the FCA and DCWPA. Therefore, in an effort to avoid this claim-ending outcome, Brach's SMFD ¶¶ 18 and 20(a) attempt to raise issues of disputed material fact about his termination. Notably, these are the <u>only</u> instances in which Brach addresses potentially retaliatory conduct. In SMFD ¶ 18 Brach asserts that Kathy Henderson recommended that he be terminated because Brach had identified her "billing errors," and that she had "input into the decision to terminate." In SMFD ¶ 20(a) he cites to an email exchange dated August 3, 2015, between Alison Rubin and Brian Stanley (Brach Exh. 16) in which Stanley stated that CKC "needed to replace Cameron." ECF No. 105 at 3.

In fact, these events provide absolutely no factual support for Brach's claim. With respect to SMFD ¶ 18 Brach relies on Alison Rubin's testimony (Brach Exh. 2 (ECF No. 105-2) at 89:6-21) that she "believed" Ms. Henderson had input into the decision regarding IRC. This is not a statement of fact, but rather a statement of Ms. Rubin's subjective belief. Further, the foundation for Ms. Rubin's belief is not established; to the contrary, she stated she was not involved in the decision to terminate IRC:

> Q Okay. Did you have any input into the decision to terminate Mr. Brach's relationship with CKC?
>
> A No, I didn't.

Brach Exh. 2 (ECF No. 105-2) at 89:6-9.[9]

Ms. Henderson, who had actual knowledge, testified that, although she was informed about the decision to terminate IRC's contract on Friday, August 7, 2015, and was asked to help implement it, she did not participate in making the decision. Her role was limited to assisting in the development of a termination letter for IRC (quite possibly, the "input" to which Ms. Rubin referred). Mr. Stanley made the decision because of Brach's failure to disclose information about Joe Trippodo, the logistics problems involved in transporting personnel to Germany for the Army contract, and Brach's failure to progress sufficiently in handling inventory issues. **Henderson Dep. at 84:19-87:17**.

There is nothing in either Ms. Rubin's testimony or Ms. Henderson's testimony that could give rise to any reasonable inference that Ms. Henderson held any animus toward Brach, or that the IRC contract was being terminated as a result of the May 2015 invoice review. To the contrary, Ms. Henderson readily acknowledged that she made the errors. CKC SMF ¶ 20.

With respect to the Stanley email of August 3, 2015, referenced in SMFD ¶ 20(a), even a cursory review of Brach Exh. 16 shows that Stanley's statement that CKC needed to replace Brach was made in the context of the major problem with CKC weapons inventory at Gulfport. He said:

> We need to replace Cameron with someone you [Alison Rubin] have a good working relationship that can take full ownership of the delivery, stock and maintenance of these contracts. The Cameron event has to come to an end. There are too many moving parts and bad communication.

---

[9] An email exchange between Ms. Rubin and Ms. Henderson on August 7, 2015, establishes that both were aware of Mr. Stanley's extreme dissatisfaction with Brach over the Joe Trippodo problem, and that Ms. Rubin's knowledge was superior to that of Ms. Henderson. In a message at 5:56 p.m., Ms. Rubin informed Ms. Henderson that Mr. Trippodo's employment was terminated, he being sent home, and that "[a]s I hear more, I will let you know." CKC Exh. 124 (ECF 101-17) at CKC_003419_0002.

> When I get back I will focus him on inventory only until we can replace him with someone who can work together with you so that there is full ownership of these contracts. . . .

ECF No. 105-16 at 3. This exchange related to inventory control problems for which Brach had overall responsibility; Brach even admitted that the Gulfport problem was a "fail." CKC SMF ¶¶ 29(a), (b); CKC Exh. 94 (ECF No. 104 at 23). Furthermore, it was clear from Stanley's August 3 email that replacing Brach was not imminent; rather, it was something that would happen at some unspecified time in the future.

What is fatal to Brach's position is that there is nothing at all in this August 3, 2015 exchange, the August 7, 2015 Henderson-Rubin email exchange, or any other material evidence, to suggest that the May 2015 invoice review had anything to do with Stanley's belief that IRC and Brach needed to be replaced. The invoice review simply was not a "contributing factor" in the decision, nor has Brach shown that it "tended to affect his termination in at least some way." *Cody, supra*, at 624. To the contrary, the undisputed material facts show that there were other clear, significant and non-retaliatory reasons that CKC terminated its contract with IRC. CKC SMF ¶¶ 29-31.

In this regard, Brach quibbles with limited aspects of CKC's summary of the factors leading to termination of the IRC contract (SMFD ¶¶ 20-21), but he never identifies a genuine dispute as to any material fact. The weapons inventory problems at Gulfport and Port Hueneme; the detention of CKC personnel in Germany because Brach had them hand-carry weapons parts through customs without paperwork required by ITAR; and the poor travel arrangements for CKC personnel working on the Germany contract all occurred, and Brach does not–and cannot

11

dispute them. There is no dispute that Brach was responsible for these matters in whole or substantial part. At most, he contends that others may have been responsible as well.[10]

Of most significance, Brach has failed to come forward with <u>any</u> genuinely disputed material fact that would allow him to prove at trial that CKC's reasons were pretextural, and that the real reason the IRC contract ended was in retaliation for the May 2015 invoice review. *Nifong*, *supra*, at *9, citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Without such evidence, Brach's claim must fail.

The final straw in CKC's decision, of course, was the Joe Trippodo debacle. Here again, Brach cannot identify any genuinely disputed material fact that would allow him to prove that the Trippodo problem was a pretext for retaliation. Brach claims (SMFD ¶ 22 (b), (c)) that he believed, based on Trippodo's assurances, that problems relating to his security background had been "cleared up;" and that Trippodo had "kept CKC apprised of the status of his security clearance investigation." CKC has demonstrated in its Opposition to Brach's Motion for Summary Judgment (ECF No. 106 at 15-17) that these assertions have no basis in reality, and incorporates that argument by reference here.

In this regard, <u>four key undisputed facts stand out</u>: (1) Trippodo's communications with Brach (and <u>Brach alone</u>, not anyone else at CKC) put Brach on notice that Trippodo was very concerned that the unresolved "flag" in his security history would prevent him from being able to work on the Germany contract; (2) nothing in Trippodo's communications to Brach informed

---

[10] For example, he contends that Stanley was responsible for directing that all of the weapons at Gulfport be returned to CKC, and that Vashti Robinson was responsible for making travel arrangements. As to the first point, Stanley stated that "You [Rubin] told us to take them [the weapons] back." The "us" he refers to is himself and Brach, to whom Ms. Rubin complained. Furthermore, he immediately went on to say that Brach needed to be replaced, recognizing that Brach had failed to meet expectations. Brach Exh. 16. As to the second, Ms. Robinson testified that Brach inappropriately involved himself in making travel arrangements (Brach Exh. 18 (ECF No. 105-18) at 23:14-24:5). Notably, Brach does not identify any factual dispute relating to his role in the specific Germany travel arrangements at issue.

12

him that the problem had been "cleared up", at most they expressed hope that it would be "cleared up" at some point in the future; (3) in June 2015, when Stanley asked for any negative information about the employees scheduled to travel to Germany for the Army contract, Brach assured him that Trippodo was "clean;" and (4) it was not until July 28, 2015, after Trippodo's ability to perform on the Germany contract had been deemed a "non-starter" by Army security personnel, that Brach forwarded Stanley Trippodo's JPAS history—<u>a document that he had in his possession since December 2014</u>. CKC SMF ¶¶ 31(b)-(f).

Even without the other factors, the Trippodo incident provided a clear, sufficient and non-retaliatory basis for CKC's decision to terminate the IRC contract. Nothing in the record, whether disputed or undisputed, supports the notion that it was a pretext. Brach simply has not shown that he could carry his ultimate burden of proof at trial.

### D. Even If Brach Were An Employee, He Was Exempt Under The FLSA.

Brach does not identify any genuine dispute of material fact relating to his claim for overtime pay under the Fair Labor Standards Act ("FLSA"), or CKC's argument that if he were an employee, he was exempt from the overtime requirements in FLSA. *See* CKC SMF ¶ 13; ECF No. 101 at 27-29. Nor does Brach's opposition address or otherwise rebut this argument (ECF No. 105 at 28). Accordingly, the Court should treat CKC's motion as to Count IV of the Second Amended Complaint (ECF No. 11) to be conceded, and enter judgment in favor of the defendants.

### E. CKC Did Not Retaliate Under The FLSA.

Because Brach was not a CKC employee, as a matter of law he cannot prevail on his FLSA retaliation claim. Notwithstanding that, Brach has not and cannot come forward with any evidence establishing that Brian Stanley's text messages threatening a counterclaim, or the filing of the counterclaims themselves, were materially adverse or retaliatory. In order to prevail on

his claim, Brach must prove that CKC's actions were "materially adverse," meaning that they would "dissuade a reasonable worker from making or supporting a charge of discrimination." *Darveau v. Detecom, Inc.*, 515 F.3d 334, 343 (4th Cir. 2008).

In this case, Brian Stanley's August 2016 text messages, which were sent after this action was commenced, are the sole action alleged to be retaliatory (ECF No. 11, ¶¶ 177, 180), though Brach now asserts in his opposition that CKC's filing of counterclaims was also retaliatory (ECF No. 105 at 28-29). Brach has produced no evidence whatsoever that Mr. Stanley's text messages had a materially adverse effect on Brach's ability to prosecute his claim for unpaid overtime, or would otherwise dissuade a reasonable worker from securing enforcement of the FLSA's remedies. The text messages to Brach—which were filed only after Brach had filed suit—warned that if pursued, the litigation would result in counterclaims being asserted, both parties incurring significant legal costs, and Brach potentially walking away with nothing. They were not motivated by retaliatory intent. Instead, they were a candid and prescient statement of the realities of this case, made in an effort to avoid litigation. Brach Exhs. 23, 24 (ECF Nos. 105-23, 105-24); **Stanley Dep. at 230:3-5, 231:1-7, 248:14-249:20**. Further, the text messages are protected under the First Amendment, and by themselves could not reasonably support a claim for retaliation.

The counterclaims also implicate First Amendment considerations, including the right of access to the courts. *Cf. Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 732 (1983). In *Darveau,* the court's holding that a counterclaim brought against an ex-employee could support a claim for retaliation was based on a recognized exception to the First Amendment right of access to the courts where a "lawsuit is filed with a retaliatory motive <u>and</u> lacking a

14

reasonable basis in fact or law." 515 F.3d at 341 (citing *Bill Johnson*, *supra*). In this case, Brach simply has not and cannot make that showing with respect to CKC counterclaims.

The sole evidence of retaliatory intent on which Brach relies to establish a factual dispute is Brian Stanley's testimony that CKC would not have brought the counterclaims if Brach had not sued CKC. However, Stanley's statement does not show a retaliatory motive, it simply explains that Stanley did not believe the potential recovery from Brach justified the cost of a suit. *Cf.* **Stanley Dep. at 248:14-249:20**; Brach Exhs. 23, 24. Once Brach sued CKC, however, that rationale was moot. Stanley also testified that the principal reason for filing the counterclaims was because of the financial and reputational harm Brach had caused CKC. **Stanley Dep. at 230:3-5, 231:1-7.** At a minimum, Fed. R. Civ. Proc. 13(a) required that Count III of the Counterclaim (constructive fraud) be asserted because it was a compulsory counterclaim, and almost certainly required that Counts I and II (federal and Virginia computer crimes) be asserted as well (both arguably arose out of the transaction or occurrence that was the subject matter of Brach's claims).

More significantly, Brach cannot prove that CKC's counterclaims, which easily survived his motion to dismiss, are not reasonably based in fact and law. CKC's Opposition to Brach's motion for Summary Judgment, ECF No. 106 at 13-23, which is incorporated here by reference, further demonstrates that the counterclaims are well-grounded. There is simply no evidence from which a reasonable factfinder "could return a verdict" in Brach's favor. *Anderson, supra*.

### F. CKC Is Entitled to Judgment As A Matter Of Law As To Count III Of Its Counterclaim, Alleging Constructive Fraud.

CKC has established, and Brach has not rebutted, that the undisputed material facts relating to Brach's concealment of material information regarding Joe Trippodo's security history establish Brach's and IRC's liability to CKC for constructive fraud. ECF No. 101 at 17-

15

20, 35-38; ECF No. 106 at 18-23; Part II.C., *supra* at 12-13.  CKC incorporates these arguments by reference here.

### III. CONCLUSION

For these reasons, defendants' motion for summary judgment should be granted.  The Court should enter judgment in favor of CKC, Stanley and Henderson as to all remaining Counts in Brach's Complaint, and CKC should be awarded judgment as to liability with respect to Count III of its counterclaim.

                                                  CONFLICT KINETICS CORPORATION
BRIAN STANLEY, and
KATHLEEN HENDERSON
By Counsel

      /s/  Russell J. Gaspar
Russell J. Gaspar, Va. Bar No. 15020
rgaspar@cohenmohr.com
Andrew K. Wible, Va. Bar No. 78168
awible@cohenmohr.com
Victor G. Klingelhofer, Va. Bar No. 22609
vklingelhofer@cohenmohr.com

COHEN MOHR LLP
1055 Thomas Jefferson St., N.W., Suite 504
Washington, D.C.  20007
Telephone:  (202) 342-2550
Facsimile:  (202) 342-6147

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 8th day of June, 2017, the foregoing Reply Memorandum in Support of Motion for Summary Judgment, with attachments, was electronically filed with the Clerk of the Court for the United States District Court for the Eastern District of Virginia and served on all parties of record through the CM/ECF system.

I further certify that a true copy of the foregoing Memorandum and supporting documents was also served by electronic mail on the following counsel of record for the plaintiff:

>R. Scott Oswald
>SOswald@employmentlawgroup.com
>Nicholas Woodfield
>nwoodfield@employmentlawgroup.com
>Kellee Boulais Kruse
>kkruse@employmentlawgroup.com
>The Employment Law Group
>888 17th Street, N.W., Suite 900
>Washington, D.C.  20006

        /s/  Russell J. Gaspar

17