# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF VIRGINIA
# Alexandria Division

| | |
|---|---|
| CAMERON BRACH, | ) |
| *Plaintiff*, | ) |
| v. | ) |
| CONFLICT KINETICS CORPORATION, *et al.*, | ) Case No. 1:16-cv-978-TSE/JFA |
| *Defendants*. | ) |
| CONFLICT KINETICS CORPORATION, | ) |
| *Counterclaim Plaintiff*, | ) |
| v. | ) |
| CAMERON BRACH & INDEPENDENT RECRUITING CONSULTANTS, LLC, | ) |
| *Counterclaim Defendants*. | ) |

**COUNTERCLAIM DEFENDANTS' REPLY IN
SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

R. Scott Oswald, VA Bar No. 41770
Nicholas Woodfield, VA Bar No. 48938
Kellee Boulais Kruse, VA Bar. No. 78710
The Employment Law Group, P.C.
888 17th Street, N.W., 9th floor
Washington, D.C. 20006
(202) 261-2812
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
nwoodfield@employmentlawgroup.com
kkruse@employmentlawgroup.com
*Counsel for Counterclaim Defendants*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................... ii

INTRODUCTION .....................................................................................................................1

ARGUMENT .............................................................................................................................2

    A.    CKC Did Not and Cannot Establish a Violation of the CFAA.....................................2

          1.    CKC Does Not Have Any Evidence, Direct or Indirect, of
Unauthorized Access Attributable to Brach .....................................................3

          2.    The Evidence Demonstrates That Any Damage or Loss
Suffered Was Not Attributable to Brach...........................................................4

    B.    CKC Did Not and Cannot Establish a Violation of the VCAA ...................................6

    C.    CKC Did Not and Cannot Establish a Constructive Fraud Claim ...............................9

          1.    Email Evidence Speaks for Itself and Shows that Brach was
Unaware that Trippodo's Clearance Issue Would not be
Eventually Resolved ........................................................................................10

          2.    Trippodo's Declaration Speaks for Itself and CKC has not
Contradicted Trippodo's Statement that he Kept CKC Apprised
of his Clearance Issues.....................................................................................11

          3.    Any Damage Suffered by CKC is Attributable to CKC's
Failure to Screen Employees and Failure to Mitigate its
Damages...........................................................................................................12

CONCLUSION........................................................................................................................13

# **TABLE OF AUTHORITIES**

**CASES**

*Bank of Montreal v. Signet Bank,*
    193 F.3d 818 (4th Cir. 1999) ...................................................................................................9

*Cohn v. Knowledge Connections, Incorporated,*
    585 S.E.2d 578 (Va. 2003)........................................................................................................9

*Expert Business Systems, LLC v. BI4CE, Incorporated*,
    233 F. App'x 251 (4th Cir. 2007) .............................................................................................3

*Evaluation Research Corporation v. Alequin*
    439 S.E.2d 387 (Va. 1994)........................................................................................................9

*Norris v. Mitchell,*
    495 S.E.2d 809 (Va. 1998).................................................................................................9, 10

**STATUTES**

18 U.S.C. § 1030.............................................................................................................................2

Va. Code § 18.2-152.4 ...................................................................................................................6

## INTRODUCTION

Cameron Brach and Independent Recruiting Consulting's (IRC) motion for summary judgment on the counterclaims brought by Conflict Kinetic Corporations (CKC) should be granted. CKC has not and cannot establish a violation of the Computer Fraud and Abuses Act (CFAA), a violation of the Virginia Computer Crimes Act (VCAA), or a constructive fraud claim and CKC has not established genuine issues of material fact with respect to these claims.

CKC's arguments rest on assertions that the CFAA does not require direct evidence of unauthorized access, the VCAA does not require the identification of specific computer files, deposition testimony is overstated, CKC suffered damage and loss, and CKC is not obligated to sue Joe Trippodo before asserting a claim against Brach. However, as shown below, the deposition testimony, undisputed declarations, emails, and CKC's own expert report speak for themselves.

There is no evidence, direct or otherwise, that Brach or IRC intentionally accessed or disabled a CKC computer or altered or deleted any files after Brach's termination. Deposition testimony, Brach's declaration, and CKC's own expert report demonstrate that CKC cannot show by a preponderance of the evidence that Brach or IRC accessed a CKC computer after his termination or even had access to any of CKC's computers or networks after his termination. CKC also cannot show by a preponderance of the evidence that Brach altered or deleted any CKC files after his termination because CKC's own IT professional expert and forensic expert could not determine if files had been removed, let alone who removed them. Brach's denial of these actions in conjunction with CKC employee and expert testimony evidences that CKC's CFFAA and VCAA allegations are speculation.

CKC's argument that Brach has no evidence to support the assertion that Trippodo told CKC that his security clearance was flagged is unconvincing, as Trippodo signed a declaration stating that he kept CKC apprised of the status of his security clearance which was produced in discovery. CKC presented no evidence to dispute to this declaration because it chose not to depose Trippodo during discovery.

CKC asserts that its duty to mitigate damages does not force CKC to sue Trippodo before bringing counterclaims against Brach. However, Stanley informed the employees of the company that both Trippodo and Brach (not IRC) had sued CKC. Thus, CKC could have logically brought counterclaims against Trippodo for damages associated with Trippodo's employment but instead chose to file retaliatory counterclaims against Brach. Now, as a result of CKC's decision to not screen employees before offering employment and to not enforce its contract with Trippodo for damages, it instead has chosen assert damages against Brach.

## ARGUMENT

**A.    CKC Did Not and Cannot Establish a Violation of the CFAA.**

There are no genuine issues of material fact regarding whether Brach intentionally accessed CKC's computer after his termination. *See* 18 U.S.C. § 1030(a)(5)(C) (requiring intentional access that causes damage and loss). Brach definitively denied these accusations stating: "After CKC terminated my employment on August 9, 2015, I no longer had access to CKC's IT systems, including CKC's shared servers"; "I did not have access to my former CKC computer through a program called TeamViewer after CKC terminated my employment… because I did not have a TeamViewer license and did not have access to TeamViewer passwords"; "While I was still employed at CKC, I logged onto the computer in the conference

room using my own Microsoft360 credentials. I did not disable the computer room computer."

Dkt. 99-7 at ¶¶ 2-4.

### 1. CKC Does Not Have Any Evidence, Direct or Indirect, of Unauthorized Access Attributable to Brach.

CKC is unable to establish by any evidence, direct or evidence, that Brach intentionally authorized a CKC computer after his termination. Defendant's cited case, *Expert Bus. Sys., LLC v. BI4CE, Inc.,* acknowledges that CKC does not need to have direct evidence. However, in this case the court granted summary judgment because there was an "utter lack of any substantial probative evidence…and any expert opinion evidence supporting the speculative assertions…" *Expert Bus. Sys., LLC v. BI4CE, Inc.*, 233 F. App'x 251, 254 (4th Cir. 2007). Canali's (CKC's forensic expert) testimony and report in addition to Myrick's (CKC's Installation and Repair Technician) testimony speak for themselves and show that there is a lack of any evidence supporting CKC's speculative assertions.

CKC revoked Brach's email account and log in credentials immediately upon termination. Dkt. 99-5 at 12:21-13:17; 24:08-18. After Brach's termination, he did not have access to CKC's shared servers and no physical access to the building. *Id.* at 14:07-15:02, 15:13-16:17, 22:16-23:11. Moreover, Brach did not have of CKC's Team Viewer licenses or access to CKC's passwords. *Id.* at 16:18-17:17, 17:21-19:07; Dkt. 99-7 at ¶ 4.

> Q: What is Teamviewer?
> A: It's a remote access program.
> Q: Okay. Does CK own licenses of TeamViewer?
> A: Yes, Ma'am, we do.
> Q: How many licenses does CK own?
> A: Single three partner license, ma'am.
> Q: What does that mean?
> A: Means that we can have three active connections at one time.
> Q: Okay. So if I understand this correctly--and please do correct me if I'm wrong--it could be any three employees, it just couldn't be more than three employees using TeamViewer at a time?

3

> A: Any three employees who have access to the license, which would only be on the tech side, ma'am.
> Q: Would Mr. Brach have been one of the employees who had access to the license?
> A: No, ma'am.

Dkt. 99-5 at 16:21-17:20.

In CKC's forensic expert's report, Canali writes "Mr. Brach apparently had access to his workstation through the remote access program TeamViewer, which was installed on both computers and which appears to have not disabled Mr. Brach's remote access capabilities after his exit." Dkt. 99-9 at 2. Canali was questioned in his deposition about this sentence in his report and testified that he did not independently verify that Brach had access to his CKC workstation through a program called TeamViewer after his termination—instead he relied on Stanley's statement to him that Brach had access to his former computer:

> Q: How do you know that this did not disable Mr. Brach's remote access capabilities after his exit?
> A: That's what I was told.
> Q: Okay. Were you able to independently verify that from your evaluation.
> A: No.

Dkt. 99-8 at 38:02-47.

Both CKC's own IT employee and retained forensic expert confirmed that there was not any evidence that Brach accessed his former computer at CKC after his termination. This allegation rests entirely on Stanley's assertion that Brach remotely accessed his computer after Stanley terminated Brach.

    **2.    The Evidence Demonstrates That Any Damage or Loss Suffered Was Not Attributable to Brach.**

With regards to the conference room computer, Brach had logged onto the conference room using his own credentials when he was employed by CKC. Dkt. 99-8 at 29:11-30:14. Myrick could have simply deleted Brach's Microsoft profile on the conference room computer to

4

make it useable for any other CKC employee, but Brian Stanley instructed him not to do so. Dkt. 99-5 at 41:12-42:04.

> Q: What did you do when you saw it?
> A: Pulled it off line and set it to the side.
> Q: Why did you do that?
> A: Well, did not have his [Brach] login information, so we were going to look for a way to get around that and log in to--create our own account and log in to it, and then delete his profile off.
> Q: Okay. And as an administrator did you have a means of doing that?
> A: Yes, ma'am I do, but I did not do that.
> Q: Why not?
> A: At the time there was a suit in the works, a lawsuit in the works, between CK and Mr. Brach, and we held it for any kind of litigation.
> Q: Who told you that there was a lawsuit in the works?
> A: Mr. Stanley.

*Id.*

CKC argues that Brach "damaged" CKC because CKC opted to sequester the shared workstation computer in the conference room to conduct a forensic analysis and preserve electronic files because Brach filed a lawsuit. Dkt. 106 at 12. In essence CKC claims it was forced to purchase a new conference room computer (totaling $6,426.11) because Brach filed a lawsuit against CKC. In response CKC filed a counterclaim for damages. However, it is important to remember that Stanley sent text messages to Brach after Brach filed this suit stating "[w]arm up your saving for the counter suit". Dkt 99-12; 99-13. Stanley also admitted in his deposition that the only reason he decided to file counterclaims against Brach was because Brach had filed this lawsuit. Dkt 99-2 at 249:21-250:20.

> Q: If Mr. Brach had not sued you--
> A: May I ask a question?
> Q: Certainly.
> A: I think the timeline--I think maybe you all served me at my home on the 17th…And then in my opinion, totally unethical to serve somebody at their home in front of their wife and children when you know they have legal counsel..So maybe an unethical response triggered a more emotive test.

5

> **Q: Okay. If Mr. Brach hadn't sued you, would you still have sued him for allegedly assessing your computer systems and for the situation with Joe Trippodo?**
> **A: No, ma'am.**

*Id.* (emphasis added).

As the undisputed testimony above demonstrates, there is no evidence that Brach intentionally accessed or damaged CKC's computer after his termination. There is only evidence that Stanley filed meritless counterclaims in pure retaliation.

**B.      CKC Did Not and Cannot Establish a Violation of the VCAA.**

There are no genuine issues of material fact regarding whether Brach altered or disabled any CKC data, files, or computer programs after his termination with malicious intent. *See* Va. Code § 18.2-152.4 (requiring malicious intent since it is a criminal and civil statute). Again, Brach has definitively denied these accusations stating: "I did not have access to my former CKC email account after CKC terminated my employment on August 9, 2015" and "I did not access, alter, or delete any files located on my former CKC computer after CKC terminated my employment…" Dkt. 99-7 at ¶¶ 5-6.

Brach enabled an option in his web browser to save certain usernames and password while still employed at CKC, and this allowed Robinson to open his Gmail after CKC terminated Brach. Dkt. 99-5 at 33:03.-17; Dkt. 99-7 at ¶ 1. After Brach's termination, CKC allowed another employee, Vashti Robinson, to use the computer in Brach's former office. Dkt. 99-5 at 23:15-24:07; Dkt. No. 99-10. Robinson accessed the computer using Brach's login and a new password that Myrick created. Dkt. 99-5 at 23:15-24:18.

> Q: On the occasion when Ms. Robinson showed you the WAWF login screen, was it logged in under Mr. Brach's account?
> A: No, ma'am, it was not.
> Q: So what did you see?
> A: I saw the login page open where it appeared that someone had tried to login

> unsuccessfully.
> Q: How did you know that?
> A: It said that. It said that username and password were incorrect.
> Q: And then did it list Mr. Brach's name?
> A: I honestly could not say at this time, ma'am.
> Q: It just said login was unsuccessful or something similar to that?
> A: Yes, ma'am.
> Q: How did you know that it was an attempt to log in under Mr. Brach's credentials?
> A: What I saw was the Gmail under Mr. Brach's credentials for that?
> …
> Q: On the occasion when you saw Mr. Brach's Gmail account, what did you see when Ms. Robinson asked you to come in?
> A: I just saw that the Gmail was open, open to his account.

*Id.* at 29:12-30:21.

When Robinson alerted Myrick about seeing the unsuccessful WAWF login and Brach's Gmail account open, Myrick mass deleted Brach's saved credentials. *Id.* at 34:15-18. Then CKC directed a contractor, TMI, come in and perform work on the computer, causing the computer to crash and not function properly. *Id.* at 34:22-36:22; 46:17-47:15. After the contractor caused the computer to crash, Myrick reformatted the hard drive on Brach's computer in order to make the computer functional. *Id.* at 34:22-37:04-38:10. However, reformatting the computer destroyed and damaged all the files on the hard drive before Canali was able to perform an analysis of the alleged deleted or altered files. *Id.;* Dkt. 99-8 at 11:12-12:13. Moreover, because Brach's computer did not have wireless internet capabilities, the computer could have simply been unplugged from the wall. Dkt. 99-8 at 12:14-13:14.

As a result of CKC's actions, Canali could not recover the contents of the files or determine when the remaining files were created and who accessed the files because there was almost no metadata intact. *Id.* at 14:16-16:03; 16:07-16; 20:04-15. Canali ultimately could not determine if there were any files deleted from Brach's computer. *Id.* at 27:21-28:08.

7

> Q: From your evaluation, were you able to determine any specific files that had been deleted during this time frame when Ms. Robinson was observing strange things happening?
> A: The actual file names that were deleted?
> Q: Correct.
> A. No.
> Q. Were you able to determine if any files were deleted during that time frame?
> A. No.

*Id.* Myrick also could not identify any files that were allegedly deleted. Dkt. 99-5 at 44:03-18.

> Q: Do you know if the expert was able to determine which documents, if any, had been moved or deleted from the office computer?
> A: Given that he--he and I looked at it after the reformatting and the reinstallation, it was hard to determine which one--which ones were deleted at the time Mr. Robinson saw them missing or saw them go missing.
> Q: Were the files that Ms. Robinson was working with still available on the hard drive of the computer?
> A: We weren't, at the time, looking for those, so I couldn't tell you if that were true or not.

*Id.*

The testimony above shows that there is no evidence and only pure conjecture on CKC's part that Brach altered, disable, or deleted any files. Importantly, if Canali had detected unauthorized access, CKC would have been required to inform the government under the Federal Information Security Management Act. Dkt. 99-8 at 42:14-44:20; Dkt. 99-9.

> Q: Your last paragraph under Section 2 says, "If the government is contacted, they can report this incident as unauthorized access to their system and may proceed with submitting this incident to their Computer Incident Response Team, as required by the Federal Information Security Management Act." Do you know if the government was contacted regarding this incident?
> A: No…
>
> If you know that there's an incident of assessing a system that's out of line with the federal regulations, you are supposed to report it. But since they're trying to figure out if he accessed it or not, you can't report something like I think somebody said it.

8

> Q. Okay.
> A. You'd have to have definitive proof before doing that.
> Q: So here the evidence is not definitive enough to report it to the government?
> A: That's their call, CKC's call, not mine.
> Q: You talk about in the next sentence your experience with other incidents similar to this. Have you been involved in similar investigations by the federal government?
> A: Yes…
> Q: Let me restate that. What was lacking here that led you to believe that this was not definitive enough that it needed to be reported to the federal government?
> A: Before--you have to have---you have to be pretty sure in your convictions that somebody accessed the system in a manner that they're not allowed to.
> Q: And you were not in this case?
> A. No.

The testimony above shows that both the forensic expert and CKC believed it did not have enough evidence to report this incident to the federal government, as required by law. Yet despite the forgoing CKC argues there is sufficient evidence that Brach altered or disabled with malicious intent CKC data, files, or computer programs after his termination.

**C.     CKC Did Not and Cannot Establish a Constructive Fraud Claim.**

Brach incorporates the arguments made in its opposition to CKC's motion for summary judgment by reference here (Dkt. 105). Notwithstanding, Brach will briefly reiterate why CKC's third counterclaim is also meritless and filed for retaliatory reasons.

A person asserting a claim of constructive fraud must prove that the misrepresentation forming the basis of the claim caused damage to the one relying on it. *Cohn v. Knowledge Connections, Inc.*, 585 S.E.2d 578, 582 (Va. 2003) (citing *Evaluation Research Corp. v. Alequin*, 439 S.E.2d 387, 390 (Va. 1994)). For CKC to succeed in a concealment of a material fact theory, "concealment requires a showing of intent to conceal a material fact; reckless nondisclosure is not actionable." *Bank of Montreal v. Signet Bank*, 193 F.3d 818, 827 (4th Cir. 1999); *see also, Norris v. Mitchell*, 495 S.E.2d 809, 812 (Va. 1998) ("Therefore, we have required either an allegation or evidence of a knowing and a deliberate decision not to disclose a material fact.")

The *Norris* case notes that the document at issue, a construction permit, was available for inspection by the public and there was no allegation that there was any action to divert the purchaser from inspecting the permit. Here, Trippodo's security clearance information and JPAS summary was available to CKC through the hiring process and there is no allegation of Brach diverting CKC or Stanley from inspecting Trippodo's background or JPAS summary. Further, there is no evidence in the record of a knowing and deliberate decision with intent to conceal a material fact.

    1.    **Email Evidence Speaks for Itself and Shows that Brach was Unaware that Trippodo's Clearance Issue Would not be Eventually Resolved.**

CKC hired Trippodo in 2014 and Trippodo started working for CKC in or about December 2014, on an as-needed basis. Dkt. 99-1 at ¶¶ 5-7. Brach was not part of the hiring process. *Id.* Stanley does not recall asking Trippodo about his background or if CKC performed any background check on Trippodo or even verified that he had a security clearance. Dkt. 99-2 at 81:21-82:01. On May 12, 2015, Trippodo told Brach that the Department of the Navy was issuing him a security clearance. Dkt. 99-3 at 211:04-212:20.

Over a year and half later, in July 2015, Trippodo accepted to work long-term for CKC on a government contract in Germany. Dkt. 99-1 at ¶ 8. Trippodo was aware that the SCI portion of his security clearance was "flagged" but he was also aware that the TS access portion of his clearance remained unaffected and that his Secret and Top Secret clearances were still active. Thus, Trippodo believed he was qualified for the position in Germany. *Id.* at ¶¶ 11-12, 20-22.

Brach learned from Stanley on July 28, 2015 that Trippodo could not access the base in Germany. Dkt. 99-3 at 216:03-22; Dkt. 99-4. The same day, July 28, 2015, Brach encouraged Trippodo to be truthful with CKC regarding any problems with his security clearance. Dkt. 99-3 at 220:11-221:04; Dkt. 99-4. Trippodo wrote to Brach on July 28, 2015, declaring:

10

> I have studied the attached JPAS report again and am still confused, as it shows that open investigations have been closed, and eligibility has been determined…It is also my understanding that the US Navy opened a brand new SECRET request based on DODCAF's lack of information. I was under the true impression that any pending investigation would have placed me months ahead of the employees just starting clearance requests. I was told an interim would be granted pending final adjudication.

Brach responded to Trippodo stating:

> Based on Brian [Stanley's] conversation this morning with Security, the SSO said your access as a "non-starter", due to the flags on your clearance from 2012. Based on conversations with you, this was a non-issue and you were cleared to obtain a Secret, moreover the flags only effected your Top Secret…It is equally confusing because the Navy recently processed you for a Secret Clearance, of which I don't think they would have if you were not eligible based on the previous incident."

Dkt. 99-4.

CKC argues that Brach had a duty to disclose because he had superior knowledge of a fact and knew CKC was acting upon the assumption that the fact does not exist. That argument assumes that Brach knew that CKC did not perform a background check on Trippodo, verify Trippodo had a security clearance, or ask Trippodo about his background or clearance during the hiring process in 2014. It is evident from the communications above that both Brach and Trippodo were under the impression that Trippodo was already cleared to obtain a security clearance prior to July 2015. In his role at CKC, Brach did not have an affirmative duty to make sure that CKC performed a background check and looked into Trippodo's security clearance and did not have a duty to flag Trippodo's JPAS summary for CKC.

### 2. Trippodo's Declaration Speaks for Itself and CKC has not Contradicted Trippodo's Statement that he Kept CKC Apprised of his Clearance Issues.

Trippodo wrote in his sworn declaration that he kept CKC apprised of the status of the security clearance investigation. Dkt. 99-1 at ¶ 13. Even though this declaration was produced to CKC and CKC had the opportunity to depose Trippodo (but chose not to), CKC argues that

Brach has no evidence to support Trippodo's assertion in Trippodo's declaration. However because of CKC's choices in discovery, CKC does not have any evidence to contradict Trippodo's statement in his declaration that he kept CKC aware of the investigation into his security clearance and, therefore, it is an undisputed fact.

### 3. Any Damage Suffered by CKC is Attributable to CKC's Failure to Mitigate its Damages.

CKC did not suffer any damage attributable to Brach, and even if it did, it failed to mitigate its damages. CKC did not lose its contract with the government client as a result of the problems with Trippodo's clearance and expects the government client to continue to extend its contract with CKC. Dkt. 99-2 at 233:09-22; Dkt. 99-14 at 87:03-17. CKC did not lose any business opportunities as a result of the problems with Trippodo's security clearance. *Id.* In addition, CKC was able to replace Trippodo with an employee who was already living in Germany who was able to perform all of the tasks the client requested. Dkt. 99-14 at 84:09-87:02.

CKC's contract with Trippodo required Trippodo to reimbursed CKC for expenses related to his training and for relocating him to Germany. Dkt. 99-2 at 98:09-21. CKC opted not to enforce the clause in Trippodo's contract requiring reimbursement because CKC "just [doesn't] do that kind of thing.". *Id.* In fact, CKC opted not to seek reimbursement from Trippodo even though Trippodo filed a lawsuit against CKC. *See* March 16, 2016 Email at CKC_003670 (attached hereto as Exhibit 1).

CKC argues that it does not have the obligation to sue Trippodo before suing Brach in order to properly mitigate. Even though Brach is not privy to details about Trippodo's lawsuit with CKC, it is evident that CKC failed to mitigate its damages when it chose not to enforce its

contract with Trippodo. Instead, Stanley chose to file retaliatory claims against Brach on the sole justification that Brach filed a lawsuit.

## CONCLUSION

For the foregoing reasons, Plaintiff-Counterclaim Defendants Cameron Brach respectfully requests that the Court grant his motion for summary judgment and not allow Defendants' counterclaims to proceed to trial.

                                            Respectfully submitted,

                                            /s/ Nicholas Woodfield
                                            R. Scott Oswald, VA Bar No. 41770
                                            Nicholas Woodfield, VA Bar No. 48938
                                            Kellee Boulais Kruse, VA Bar. No. 78710
                                            The Employment Law Group, P.C.
                                            888 17th Street, NW, 9th Floor
                                            Washington, D.C. 20006
                                            (202) 261-2812
                                            (202) 261-2835 (facsimile)
                                            soswald@employmentlawgroup.com
                                            nwoodfield@employmentlawgroup.com
                                            kkruse@employmentlawgroup.com
                                            *Attorneys for Plaintiff*

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that the foregoing Plaintiff-Counterclaim Defendants' Reply in Support of its Motion for Summary Judgment was served via electronic filing on June 12, 2017, upon:

Russell J. Gaspar, Esq.
Victor G. Klingelhofer, Esq.
Andrew K. Wible, Esq.
COHEN MOHR LLP
1055 Thomas Jefferson Street, N.W.
Suite 504
Washington, D.C. 20007
*Attorneys for Defendants*


                                              /s/ Nicholas Woodfield
                                              Nicholas Woodfield