### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF VIRGINIA
**Alexandria Division**

| | | |
|---|---|---|
| **CAMERON BRACH,** | ) | |
|     **Plaintiff,** | ) | |
| | ) | |
|     **v.** | ) | **Case No. 1:16-cv-978** |
| | ) | |
| **CONFLICT  KINETICS  CORPORATION** | ) | |
| *et al.*, | ) | |
|     **Defendants.** | ) | |
| | ) | |

| | |
|---|---|
| **CONFLICT  KINETICS  CORPORATION,** | ) |
|     **Counterclaim Plaintiff,** | ) |
| | ) |
|     **v.** | ) |
| | ) |
| **CAMERON BRACH** *et al.*, | ) |
|     **Counterclaim Defendants.** | ) |
| | ) |

### <u>MEMORANDUM OPINION</u>

This dispute arises from plaintiff's brief stint with defendant, a defense contractor, during which plaintiff claims he discovered that defendant had improperly and prematurely billed the federal government for services. Plaintiff asserts that he reported his findings to his superiors and was fired as a result. Plaintiff also alleges that defendant wrongfully denied plaintiff overtime pay and employment benefits. In response, defendant filed counterclaims, contending that plaintiff illegally accessed and tampered with defendant's computers, and that plaintiff committed constructive fraud when urging defendant to hire plaintiff's unqualified friend. Following motions to dismiss and full discovery, the parties moved for summary judgment.

**I.**

Plaintiff, Cameron Brach ("Brach"), is a Virginia resident and military veteran who now works as an operations director. He was at all relevant times the sole owner of counterclaim defendant, Independent Recruiting Consultants, LLC ("IRC"), a Virginia company offering staffing services to government contractors. From September 29, 2014 to August 9, 2015 Brach worked with defendant, Conflict Kinetics Corporation ("CKC"), a Virginia corporation that sells electronic firearms training devices and services to the United States military.

On December 11, 2015, Brach filed an Complaint of Reprisal against CKC with the Inspector General of the Department of Defense. On June 30, 2016, the Inspector General informed Brach that the department had closed its investigation into Brach's claims. Thereafter, on July 28, 2016, Brach filed a complaint in this district, alleging four counts against CKC and two CKC officers, namely (I) retaliation in violation of the False Claims Act ("FCA"), 31 U.S.C. § 3730(h), (II) reprisal in violation of the Defense Contractor Whistleblower Protection Act ("DCWPA"), 10 U.S.C § 2409, (III) wrongful denial of employment benefits in violation of the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1132(a), and (IV) wrongful denial of overtime pay in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 207(a)(1). Upon receiving the complaint, CKC's president sent Brach several text messages that, in Brach's view, constituted retaliation for Brach's administrative and federal complaints and were designed to discourage Brach from pursuing his claims. Brach thus filed the First Amended Complaint, amending his retaliation claims in Counts I and II to include allegations regarding the text messages. Shortly thereafter, plaintiff filed a Second Amended Complaint ("SAC"), adding two new retaliation counts stemming from the text messages. In this respect, the SAC alleged (V) retaliation in violation of the FLSA, 29 U.S.C. § 215, and (VI)

retaliation in violation of ERISA, 29 U.S.C. § 1140. Defendant successfully moved to dismiss several counts in the SAC.[1]

Of the claims raised in the SAC, four remain:

- Count I: FCA retaliation, arising from Brach's termination, his administrative and federal complaints, and the text messages sent by CKC's president, *see* 31 U.S.C. § 3730(h);

- Count II: DCWPA reprisal, also arising from Brach's termination, his complaints, and the text messages, *see* 10 U.S.C § 2409;

- Count IV: FLSA denial of overtime pay, *see* 29 U.S.C. § 207(a)(1); and

- Count V: FLSA retaliation, arising from the CKC president's allegedly threatening text messages.

In turn, CKC's counterclaim alleges that Brach accessed and tampered with defendant's computers in violation of federal and Virginia law, and that plaintiff committed constructive fraud. Specifically, the three counterclaims are:

- Counterclaim Count I: violation of the Computer Fraud and Abuses Act, 18 U.S.C. § 1030 (against Brach).

- Counterclaim Count II: violation of the Virginia Computer Crimes Act, Va. Code § 18.2-152.1 *et seq.* (against Brach); and

- Counterclaim Count III: constructive fraud (against Brach and IRC).[2]

---

[1] Brach's retaliation claims—Counts I, II, and VI—were dismissed against CKC's corporate officers. Brach's ERISA claims in Counts III and VI were dismissed with leave to amend because SAC never alleged the existence of a benefit plan triggering ERISA's protections. *See Brach v. Conflict Kinetics Corp.*, 221 F. Supp. 3d 743 (E.D. Va. 2016). Despite an opportunity to do so, Brach did not amend the SAC.

[2] Brach unsuccessfully moved to dismiss the counterclaims. *See Brach*, No. 1:16-cv-978 (E.D. Va. Feb. 17, 2017).

At issue here are the parties' motions for summary judgment. Specifically, Brach and IRC filed a motion for summary judgment on all of CKC's counterclaims, and CKC and its president filed a motion for summary judgment on all of Brach's claims and filed a cross motion on its constructive fraud counterclaim. As the parties' motions have been briefed and argued orally, they are ripe for resolution.[3]

## II.

The following pertinent undisputed material facts are derived from plaintiff's statement of undisputed facts ("PS"), defendant's statement of undisputed facts ("DS"), a "Joint Statement of Uncontested Facts" ("JS"), and the exhibits each party submitted. The voluminous summary judgment record has been carefully examined for purposes of identifying the undisputed material facts. Indeed, the parties felled a small forest of trees in their efforts to support or oppose the pending summary judgment motions. Any germane factual disputes are also identified below.[4]

---

[3] CKC, in its motion for summary judgment, challenges "all claims asserted" in the SAC. CKC's opening brief in support of its motion, however, does not address Count V, Brach's FLSA retaliation claim. Nevertheless, the FLSA retaliation claim is ripe for resolution because (1) CKC moved for summary judgment on this claim and raised its arguments in a reply brief, (2) Brach addressed this claim in *his* summary judgment briefs, (3) the undisputed factual record is adequate to resolve CKC's motion, and (4) the parties addressed this claim at oral argument.

[4] Contrary to the Rule 16(b) scheduling order in this case, Brach does not specifically state whether CKC's numbered factual paragraphs are admitted or disputed. *See Brach v. Conflict Kinetics Corp.*, No. 1:16-cv-978 (E.D. Va. Nov. 30, 2016) (Scheduling Order) (Doc. 27) ¶ 11(e) (ordering that "[a] brief in opposition to a motion for summary judgment must … indicat[e] whether the non-movant admits or disputes [each] fact" enumerated by the movant). Rather than comply with this simple instruction, Brach's response fails to address directly CKC's asserted facts. Brach instead inserted in his opposition brief a chart that compares, side-by-side, Brach's competing narrative to CKC's statement of facts. This circumlocutory—and likely deliberate— tactic is inappropriate because it flouts the Rule 16(b) scheduling order and obfuscates the factual record. Nevertheless, the summary judgment record has been painstakingly reviewed to identify the undisputed facts.

## A. Parties

- Plaintiff Brach, a Virginia resident, was at all relevant times here the sole member of counterclaim defendant IRC, a Virginia company Brach organized in 2013.

- During 2014 and 2015, IRC provided staffing services for government contractors, including persons holding security clearances.

- Defendant/counterclaim plaintiff CKC is a Virginia corporation headquartered in Sterling, Virginia.

- CKC provides training services and equipment to the federal government, including a cost-effective, computer-assisted shooting simulator using weapon-mounted lasers and target sensors in lieu of live ammunition.

- Brian Stanley ("Stanley") is the President of CKC.

- Alison Rubin ("Rubin") is the Executive Vice President of Business Development of CKC.

- Kathy Henderson ("Henderson") was at relevant times CKC's Controller.

## B. Facts Relating to the Parties' Business Relationship

- On September 25, 2014, Brach signed an offer letter for a position as a program coordinator with CKC.

- That offer letter specifically stated that CKC was "pleased to offer [Brach] a position as an Independent Contractor in Sterling Va." Doc. 101-11.

- The offer letter attached a list of Brach's job duties, which included (1) accounting and budgeting support; (2) logistics, including developing procedures for contract deliverables, handling equipment tracking, ordering and movement, personnel analysis, and workflow documentation, and (3) delivering to clients demonstrations, equipment and training, and program coordination.

- On September 29, 2014, Brach met with Henderson at CKC's offices to formalize the parties' relationship. Before this meeting Henderson was unaware of IRC and had prepared a contract for Brach assuming that Brach would enter an agreement in his individual capacity.

- The parties' contract, entitled the Independent Contractor Services Agreement (the "Agreement"), reflects that CKC agreed to pay $3,653 bi-weekly as compensation for services rendered.

- The Agreement reflects that IRC, not Brach, was the "Contractor" identified in the Agreement, and that Brach signed the Agreement on the signature line designated for the "Principal Agent" of the "Contractor." Furthermore, on page 10 of the Agreement, Brach made handwritten additions, noting that the "Company" identified as the "Contractor" in the Agreement was "IRC, LLC." *See* Doc. 101-13; 105-6.[5]

- By setting up the business relationship with CKC through IRC, Brach knew that he could avail himself of tax advantages and the protection of limited liability.

- From September 29, 2014 to August 9, 2015, Brach performed services for CKC.

- Throughout that period, Brach executed and delivered to CKC an IRS Form W-9 for IRC and thereafter caused IRC to issue invoices to CKC for services rendered.

- CKC paid IRC for these invoices, and IRC deposited these payments in a bank account that IRC maintained. CKC issued IRS Forms 1099 to IRC, but not to Brach, for 2014 and 2015.

### C. Facts Regarding CKC's Billing Errors

- In 2014 and early 2015, Henderson was responsible for preparing and issuing bills for CKC's services pursuant to a contract with the Naval Expeditionary Combat Command. That contract, ACC-APG-NATICK Contract No. W911QY14P0278 (the "NATICK contract"), obligated CKC to supply electronic firearms training products and services at several Navy facilities.

- CKC performed its contractual obligations on a firm fixed-price basis; that is, the NATICK contract contemplated that CKC would charge specified amounts upon the completion of itemized elements of performance known as "Contract Line Item Numbers."

- Pursuant to CKC's invoicing procedures, Rubin would first advise Henderson that CKC had completed specified Contract Line Item Numbers and was entitled to bill for them. Next, Henderson would create an invoice for the products and services performed. CKC would then transmit the invoice to another CKC employee, Sandi Beinke ("Beinke"), who would upload the invoice electronically through the Defense Department's Wide Area Work Flow system for government review, approval, and payment.

---

[5] Brach challenges the authenticity of the first page of the Agreement. He asserts that the Agreement he signed reflected that Brach entered the contract in his capacity as *CKC*'s contractor, not as an agent of IRC. There is no evidence in this record, however, to support Brach's claim that the Agreement in the summary judgment record is inauthentic. In any event, the dispute over which front page is accurate is immaterial to the summary judgment analysis because, as explained *infra*, even assuming *arguendo* Brach is correct, his claims would nevertheless fail.

- In April 2015, Henderson became concerned that billing errors might occur, given the increasing complexity of the invoicing process for the NATICK contract.

- That same month, at an evening meeting at the CKC offices involving Stanley, Rubin, and Brach, CKC decided to conduct an audit of all NATICK contract invoices.[6]

- On May 6, 2015, Henderson briefly resigned from CKC.

- The next day, May 7, 2015, Brach, Rubin, and Beinke discussed delegating Henderson's former responsibilities, including the task of reviewing NATICK contract invoices.

- Beinke forwarded the invoices to Brach, who, in turn, sent copies to Rubin.

- Brach and Rubin agreed that they would independently review the NATICK contract invoices and compare their findings.

- On May 7 and 8, 2015, Brach and Rubin exchanged multiple emails concerning their joint review of the NATICK contract invoices.

- On May 8, 2015 Rubin sent an email to Brach and Stanley, identifying billing issues in certain invoices and requesting additional information.

- That same day, May 8, Brach also sent an email to Rubin and Stanley, identifying potential billing issues.

- In their May 8, 2015 emails, both Rubin and Brach questioned the timing of several CKC firm fixed-price invoices for installation and support services. Specifically, both Brach and Rubin noted that an invoice from the fall of 2014 included charges for support and installation work at Navy facilities that had not yet been performed as of the date of the invoice. Although the fixed-fee amount that had been billed was correct, Brach and Rubin confirmed that Henderson had prematurely billed for these items.

- Brach also identified another premature invoice and found that Henderson had billed a separate invoice to the incorrect Contract Line Item Number.

- In addition to the premature billings, Brach and Rubin also identified several Contract Line Item Numbers that CKC had completed but neglected to bill.

---

[6] Brach does not genuinely dispute this fact; rather, in his opposition brief he adds tangential contentions that Ms. Henderson had expressed concern to Brach regarding CKC's financial viability and that Brach therefore asked Stanley if CKC should conduct an audit of CKC invoices. Those assertions do not create a material factual dispute concerning whether CKC decided to audit its invoices; Brach's claims simply present his preferred gloss on an undisputed fact and do not affect the summary judgment analysis.

- Finally, although Brach identified what he thought was a double-billing error, CKC discovered that the billing was in fact correct.

- On or about May 8 or 9, 2015—two or three days after Henderson's resignation—Henderson returned to work at CKC.[7]

- On May 8, 2015, Stanley, as part of CKC's invoice review, directed Brach and Rubin to implement a revised process for handling NATICK invoices.

- As a result, Brach had an increased role in this invoice review process; by contrast, Henderson was not involved in that review.

- Brach was not disciplined, criticized or threatened in any way as a result of his role in the NATICK invoice review. His only concern was that Rubin said on several occasions that she did not have faith in his ability to handle CKC's contracts, an opinion she had expressed beginning several months before the May invoice review.[8]

---

[7] Brach contends, incorrectly and incredibly, that Henderson left CKC "for a couple weeks." For that proposition, Brach cites Henderson's deposition testimony—namely, her statement that she was gone for "two or three *days*." Doc. 105-7 (Henderson Depo.) at 11:16 (emphasis added).

[8] Brach unsuccessfully attempts to dispute this fact by contending that Henderson recommended Brach's termination as a result of Brach's findings. Brach's contention cites two pieces of evidence, neither of which supports Brach. The first is Rubin's deposition, where Rubin testified that she "believe[d]" that Henderson had some "input" in CKC's August 2015 decision to terminate IRC's and Brach's relationship with CKC. Doc. 105-2 (Rubin Depo.) at 89:19-21. But because Rubin did not testify based on her personal knowledge, her belief is not competent evidence to support a factual dispute. *See* Rule 602, Fed. R. Evid. (requiring lay witnesses to have personal knowledge). More fundamentally, Rubin's testimony on its face does not support Brach's claim that Henderson "recommended" Brach's termination, nor does it create a dispute regarding the fact that Brach was never disciplined, criticized, or threatened for his role in the NATICK contract invoice review. Rather, the undisputed factual record clarifies that Henderson's sole "input" in IRC/Brach's discharge was her preparation of Brach's termination letter *after* Stanley had already decided to terminate IRC/Brach.

The second piece of evidence on which Brach relies to create a factual dispute is his own deposition testimony, in which he claims to remember seeing an email disclosed in discovery where Henderson told Stanley that Brach "must go." Doc. 105-3 (Brach Depo.) at 20:2-10. Yet, Brach's summary judgment opposition does not cite any such email in the record. Brach's omission is unsurprising because no such email exists. In fact, when Brach, in his deposition, reprised the topic about this supposed email, he clarified that the relevant email exchange involved *Rubin*, not Henderson. *Id.* at 228:8-21. And a review of that email chain concerning Stanley's desire to discharge Brach confirms that there was no mention of Brach's invoice analysis. *See* Doc. 105-16. Rather, the email that Brach referenced in his deposition lamented Brach's alleged failure to manage appropriately CKC's contracts; in other words, that email had

- About a week after CKC identified the early billing, Rubin advised CKC's Inspector/Acceptor at the Naval Expeditionary Combat Command, Eric Olson, that CKC had prematurely billed two Contract Line Item Numbers. In December 2015, CKC supplemented its disclosure to the Navy with a written, year-end summary of its audit of all invoices under the NATICK contract.[9]

- On May 20, 2015, CKC further increased Brach's role in the company's invoicing process. Specifically, Brach became responsible for preparing and uploading invoices to the Defense Department's Wide Area Work Flow system.

- At the time the NATICK invoice errors were identified in May 2015, CKC had already completed its work for one of the erroneously-billed Contract Line Item Numbers, and CKC was scheduled to perform on the other prematurely billed Contract Line Item Number in June 2015.

- CKC did not experience any adverse consequences from the Navy attributable to the billing errors.

- None of the emails Brach sent or received regarding the billing errors discussed fraud, illegality, or the potential of criminal or civil liability. To the contrary, Brach himself reassured CKC officers "[t]he good news is now that we all see the process; we can fix

---

nothing to do with the NATICK invoice review. *See id.* Thus, Brach fails to dispute the fact that he was never disciplined, criticized, or threatened for his role in the NATICK contract invoice review.

[9] Brach unsuccessfully attempts to dispute this fact by arguing that after he "identified the billing errors, no further corrections were made to the overbills during Brach's employment." But there is no support in the record for this assertion. To be sure, Brach cites his own deposition, Doc. 105-3 at 255:05-257:02, but the cited testimony simply reflects that Brach was not *told* whether CKC would make corrections, and that he thought he remembered seeing a document in discovery indicating that CKC spoke with the Navy in December 2015. That testimony does not support Brach's claims that CKC did not correct the billing errors.

    And insofar as Brach intended to rely on subsequent passages in his deposition where Brach testified that he was unaware of Ms. Rubin's communications with Eric Olson, *see id.* at 257:3-14, that evidence also fails to create a genuine factual dispute regarding CKC's prompt disclosures. In short, Brach's lack of awareness of CKC's disclosures to the Navy does not present a genuine dispute regarding whether CKC actually informed the Navy about the billing errors, particularly in light of Rubin's unambiguous deposition testimony and sworn declarations unequivocally establishing that Rubin *did* speak to the appropriate Navy representative. *See Doc.* 101-5 (Rubin Decl.) ¶ 2; Doc. 101-4 (Rubin Depo.) at 66:22-67:8. To conclude otherwise would lead to the anomalous result that a party could create factual disputes and avoid summary judgment simply by asserting a lack of personal knowledge of the movant's uncontroverted evidence.

the process and put in triggers to notify us when something is wrong in the future." Doc.
105-9.

### D. Facts Regarding Brach's Performance

- During the late spring and summer of 2015, Brach made a number of mistakes while
  performing services for CKC. Specifically, Brach failed to confirm that proper quantities
  of electronic weapons were in inventory at the Navy facility in Port Hueneme, California,
  leaving that facility short of weapons and requiring CKC to deliver additional weapons
  by Federal Express. Brach also reported incorrect weapons inventory data to Rubin and
  Stanley, and CKC passed on this misinformation to the customer, triggering customer
  dissatisfaction.[10]

- Moreover, in connection with a CKC contract to provide weapons training for the Army
  Joint Military Training Command in Germany (the "Germany contract"), Rubin warned
  Brach on May 12, 2015 that CKC had to ship any weapons to Germany, rather than have
  personnel carry weapons across the border. Specifically, Rubin informed Brach that CKC
  "CAN NOT bring anything over there that is not on the shipment. If we do, we are
  VIOLATING ITAR!!!!"[11] Doc. 101-17 (emphasis and punctuation in original).

- A month later, and despite this clear warning, Brach had CKC personnel carry lasers and
  other weapons parts through German Customs without proper paperwork. As a result,
  German authorities detained CKC personnel.

- In response, CKC had to enlist the assistance of its Army customer to obtain the
  personnel's release, causing substantial embarrassment to CKC  immediately before CKC
  began performance on the Germany contract.

---

[10] In his opposition brief, Brach attempts to create a factual dispute by pointing to Stanley's
deposition testimony for the proposition that updating the inventory spreadsheet was a "team
effort," and that Brach did not commit any errors. But Brach misrepresents Stanley's testimony.
In fact, Stanley testified that although "*translating* the numbers" was a team effort, it was
*Brach*'s duty to "*key*[] *in* numbers." *See* Doc. 105-1 (Stanley Depo.) at 115:4-12 (emphases
added). Brach's brief also invokes his own deposition testimony for the assertion that, at some
unspecified point, he complained to Stanley that Brach did not have adequate access to certain
training facilities to perform a full inventory. Yet, contrary to Brach's characterization of the
evidence, Brach actually testified that the relevant inventory system in Virginia was
"convoluted"; Brach also admitted in his deposition that he did, in fact, send erroneous inventory
data to Rubin. *See* Doc. 105-3 (Brach Depo.) at 262:1-263:18. Thus, there is no genuine dispute
(1) that Brach was responsible for inputting accurate data into the inventory spreadsheet, (2) that
he failed to do so, and (3) that CKC's client was dissatisfied as a result.

[11] "ITAR" stands for International Traffic in Arms Regulations. *See* 22 C.F.R. § 120 *et seq*.

- CKC was concerned that Brach's conduct may have resulted in an ITAR violation.[12]

- Also in July 2015, Brach made arrangements for other CKC personnel and a training consultant to travel to Germany. Brach, however, caused these individuals to arrive at the wrong airports, far from the Army bases where they were expected. These personnel therefore had to make lengthy trips by car, delaying their arrivals.[13]

- During this same period Stanley became increasingly concerned about Brach's behavior. Specifically, Stanley received multiple complaints that Brach was arrogant, aggressive, and sometimes threatening in his communications with other CKC employees. Stanley counselled Brach on multiple occasions, and although Brach acknowledged that he had acted incorrectly, the problems persisted. Rubin, Henderson, and others either witnessed or were the victims of Brach's improper conduct.[14]

---

[12] Once again, Brach unsuccessfully refutes this undisputed fact. Here, Brach argues that "Stanley testified that he did not know what an International Traffic in Arms Regulations (ITAR) violation [sic] and he did not know if Brach's actions were a violation or not." Doc. 105. Yet, Stanley testified that ITAR *did* apply to Brach's conduct, and when asked if Brach's conduct amounted to an ITAR violation, Stanley testified, "I'd like to plead the Fifth on that. I don't know. I don't want to say that it was or it wasn't." Doc. 105-1 (Stanley Depo.) at 257:7-11. Simply put, Stanley's desire to "plead the Fifth" does not create a material factual dispute regarding whether CKC was concerned that Brach may have violated ITAR.

[13] Brach fails to create a genuine dispute on this front, too. Brach argues in his brief that "Stanley placed blame on Brach for making travel arrangements when Vashti Robinson, the purchasing agent, was responsible for managing the travel process. Robinson specifically requested that Brach allow her to handle all travel." Doc. 105 at 10. This factual assertion is both immaterial and incorrect. To be sure, Robinson was generally responsible for arranging travel. But, contrary to Brach's representation, Ms. Robinson's testimony actually *confirms* that Brach made the July 2015 Germany travel arrangements, that he did so inappropriately, and that Ms. Robinson eventually became "fed up" and "ask[ed] [Brach] if he could … allow me to do my job and he do his." Doc. 105-18 (Robinson Depo.) at 23:06-24:22. And as Robinson's testimony makes clear, Brach did *not* permit Robinson to handle travel itineraries by herself. *See id.* at 24:16-22. In short, there is no dispute that Brach made sloppy travel arrangements in July 2015.

[14] In another futile attempt to create a factual dispute, Brach notes (1) that Stanley never *saw* Brach act violently or aggressively, (2) that Henderson said she personally got along with Brach, and (3) that several CKC employees complained to Henderson about another CKC employee, too. Needless to say, none of Brach's contentions, even if true, creates a dispute regarding the facts that CKC actually asserts. This is so because CKC has pointed to record evidence (1) that Stanley *received complaints* and *counselled* Brach about Brach's aggressive or threatening behavior, and (2) that Henderson *saw* Brach behave improperly. Brach has simply offered a nonresponsive narrative that fails to rebut CKC's undisputed statement of facts.

**E. Facts Regarding Brach's Recommendation of Joe Trippodo**

- Brach introduced Joe Trippodo ("Trippodo") to CKC in 2014.

- Brach and Trippodo had been friends since 1994, having met during their Army service. They also previously worked together for another employer.

- Trippodo previously held a Top Secret/sensitive compartmented information clearance for approximately twenty-five years.

- Shortly before he commenced working for CKC, Trippodo applied for a position with the Department of the Navy. The Navy's hiring officials informed Trippodo that the Navy needed to investigate Trippodo's security clearance.

- In a December 4, 2014 email, Trippodo advised Brach that Trippodo's security clearance had "a flag on it" preventing Trippodo from obtaining work. Doc. 101-14.

- Trippodo further expressed concern that the "flag" on his security clearance would make him ineligible to work on CKC's contracts.

- Although Brach understood the nature of Trippodo's security clearance concerns, he did not advise anyone at CKC of the "flag" on Trippodo's clearance.

- That same month, December 2014, CKC hired Trippodo on an "as needed" basis. Brach did not participate in CKC's hiring process.

- In his role at CKC, Trippodo traveled approximately three to four days at a time to assist with CKC projects.

- Thereafter, Brach recommended Trippodo for a position on CKC's Germany contract, which was scheduled to begin performance in August 2015.

- The Germany contract required all CKC employees performing services on site to be sponsored under the Department of Defense's Trusted Associate Sponsorship System.

- In recommending Trippodo, Brach knew it was important to propose employees who could satisfy the contract requirements.

- Specifically, on May 20, 2015, in an email to Stanley and Rubin, Brach advocated against ineligible candidates who would "raise concerns about 'spoiling the batch.'" Doc. 101-17.

- Although Brach and Trippodo had communicated several more times in May 2015 about Trippodo's security clearance "flag," Brach did not advise CKC of these communications.

12

- On May 20, 2015, Trippodo advised Brach that he believed the government was making progress on Trippodo's security clearance problems, but had not yet resolved the issue. Nevertheless, Trippodo told Brach that Trippodo was "troubled about the clearance question. My [clearance] is being processed by the Navy and apparently my [clearance] is being finally handled by DODCAF,[15] but not yet. I can't supply the date for the clearance. How should I proceed?" DS ¶ 31(c).

- On June 24, 2015, CKC offered, and Trippodo accepted, employment as a systems technician to support CKC's Germany contract.

- While awaiting the results of his security clearance inquiry, Trippodo may have kept CKC apprised of the status of that investigation.

- Subsequently, at a meeting that included Stanley, Rubin, and Brach, the participants went through disclosures regarding anything in the new employees' backgrounds that might present an issue for satisfying security requirements.

- During that meeting, Brach did not disclose anything about Trippodo's security clearance "flags"; instead, he repeatedly assured the participants that Trippodo was "clean."[16]

- Stanley does not remember if CKC performed any background check on Trippodo or verified that Trippodo held a security clearance.

- When Trippodo arrived in Germany, Army security personnel almost immediately identified the problems in Trippodo's security background.

- On July 28, 2015, Stanley informed Brach, who had remained in the United States, that the Army's security officer advised that Trippodo's access was a "non-starter" due to the flags in Trippodo's record.

---

[15] "DODCAF" refers to the Department of Defense Central Adjudication Facility.

[16] There is a genuine factual dispute concerning whether, in July 2015, Brach reasonably believed that Trippodo's security clearance issues had been resolved. Specifically, Brach testified that Trippodo had informed Brach that the Navy had "recognized [an] error" and "put [Trippodo] in for a new secret clearance" that would permit Trippodo to work on CKC's Germany contract. Doc. 99-3 (Brach Depo.) at 206:6-18. By contrast, CKC has pointed to record evidence that *after* Trippodo had applied for a new clearance with the Navy, Trippodo informed Brach that Trippodo was still "troubled" by the security clearance issue. Moreover, CKC has introduced a July 28, 2015 email in which Trippodo offered to "shield" and "help[]" Brach after Trippodo had been disqualified from working on the Germany contract for failure to have the requisite security clearance. *See* DS ¶ 31(c). Thus, there is a genuine dispute concerning whether Brach reasonably believed that Trippodo's security clearance issues had been resolved by July 2015.

- In a subsequent email, Brach forwarded to Stanley the security information Trippodo had provided in December 2014. Brach claimed that Trippodo said the "flag" on his record was a "non-issue." DS ¶ 31(f).

- Thereafter, Trippodo emailed Brach, asking how Trippodo could "shield" Brach from the consequences of Trippodo's security clearance problems. DS ¶ 31(f).[17]

- CKC tried unsuccessfully to resolve the matter over the next ten days.

- In emails dated August 5 and 6, 2015, the Army advised CKC that the problems with Trippodo's security background were unresolved and that Trippodo was therefore ineligible to work on the Germany contract.

- As a result, Stanley consulted with other senior CKC management and concluded that Trippodo had to be replaced, and that CKC's contract with IRC should be terminated immediately. DS ¶ 32.

- Although Henderson, based on instructions from her superiors, prepared the termination letter, she did not participate in the decision to terminate Brach's relationship with CKC.[18]

- Before terminating IRC/Brach, Stanley told Brach that Stanley was very angry about the Trippodo security clearance issue.

- Thereafter, on August 9, 2015, Stanley sent Brach an email, informing Brach that CKC had decided to terminate IRC/Brach. Brach's response to the August 9 email reflects that Brach believed CKC's decision to terminate IRC/Brach stemmed from Trippodo's security clearance problems. In this respect, Brach wrote that "[w]ithout an explanation of why" CKC was terminating the Agreement, Brach was "left to believe it is because of Trippodo's clearance." Doc. 105-21.

- Later that same day, August 9, Brach addressed several possible reasons CKC may have had for terminating IRC/Brach. Specifically, Brach mentioned (1) that the "weapons issue" was not his fault, and (2) that Trippodo's "clearance issue" would be resolved within three weeks. *See* Doc. 101-17 (August 9, 2015 email from Kathy Henderson regarding her phone conversation with Brach). Brach did not mention in the August 9,

---

[17] Brach does not genuinely dispute this fact. Instead, his opposition brief adds nonresponsive details, asserting that after Stanley informed Brach that Trippodo could not access the army base, Brach encouraged Trippodo to be truthful with CKC regarding any problems with Trippodo's security clearance. Of course, Brach's urging Trippodo to be truthful does not create a dispute regarding Trippodo's offer to "shield" Brach.

[18] *See supra* note 8.

2015 phone call the May 2015 invoice review or CKC's billing errors on the NATICK contract.[19]

- Thus, on August 9, 2015, IRC and Brach ceased performing services for the benefit of CKC.

- CKC terminated Trippodo's employment that same day.

- Although CKC's contract with Trippodo required Trippodo to reimburse CKC for expenses related to his training and relocation to Germany, CKC did not enforce that reimbursement clause.

### F. Facts Relating to the Counterclaims Regarding Brach's Alleged Unauthorized Access of CKC Computers

- During Brach's working relationship with CKC, the company's Chief Information Officer gave Brach remote access to CKC data using Brach's Outlook email account.

- After CKC's termination of IRC/Brach, Brach had no physical access to CKC's offices or building.

- At approximately 10:02 a.m. on August 9, 2015—the day CKC terminated IRC/Brach— CKC revoked Brach's official email account and log-in credentials.

- Brach did not have authorized access to CKC's shared servers after his termination, nor did Brach have one of CKC's licenses or passwords for the company's "TeamViewer" software.[20]

- The computer Brach used at CKC did not have wireless internet capabilities.[21]

---

[19] Brach unsuccessfully attempts to refute this fact by asserting (1) that on August 9, 2015, Stanley did not give Brach a reason for the termination, and (2) that Brach testified, several years later and during discovery in this case, that he believed CKC discharged him because of Brach's NATICK contract invoice review. Of course, neither of Brach's points creates a genuine factual dispute regarding Brach's beliefs at the time of his discharge, namely Brach's belief that CKC had terminated IRC/Brach because of the Trippodo clearance issues. In fact, Brach confirmed in his deposition that Stanley told Brach, *before* Stanley sent Brach a termination email, that Stanley was "very angry" about the Trippodo clearance issue. *See* Doc. 101-2 (Brach Depo.) at 200:12-15. Thus, there is no genuine dispute that Brach believed, at the time he was discharged, that CKC terminated IRC/Brach because of the Trippodo fiasco.

[20] TeamViewer is a software package available for download that permits users to share desktop screens, transfer files, and access computers remotely.

- While working at CKC Brach also had access to a computer in a CKC conference room. The conference room computer was not connected to any CKC servers or the internet.

- Sometime during Brach's tenure at CKC, he configured the conference room computer so that it could be accessed only with Brach's credentials.

- After Brach's termination, two CKC employees saw that Brach was still logged onto the conference room computer.

- Besides the fact that the computer was temporarily inaccessible—because only Brach knew the password to unlock it—there was no damage to the conference room computer.

- Given CKC's doubts about the integrity of the conference room computer that Brach had reconfigured, CKC replaced that computer in January 2016 at a cost of $6,426.11.

- CKC does not claim any lost business as a result of Brach's alleged unauthorized access to its information technology systems.

---

[21] There is a factual dispute, however, whether Brach, after his termination, had continued access to CKC's IT systems through an unauthorized copy of the TeamViewer software. Specifically, CKC's computer expert found evidence that someone installed an unauthorized version of the TeamViewer software on the computer Brach had used at CKC. Specifically, the expert found log files showing that the unauthorized software had been installed *and used* on Brach's work computer during the period that Brach worked at CKC.

In addition, two computer experts testified that although CKC changed Brach's password after his termination, Brach could have accessed his former computer if anyone were logged onto the TeamViewer software and the former computer were turned on. The record further indicates that Brach's former computer was not configured to lock automatically following a period of inactivity, and that therefore Brach could gain access to the system if the new employee assigned to that workstation failed to lock the computer. The record also reflects that after Brach's termination only two CKC employees had access to Brach's former computer; one of those employees, Vashti Robinson ("Robinson"), testified that she noticed (1) missing files (that she had not deleted) and (2) that her web browser was already logged into Brach's Gmail account. Nevertheless, Robinson could not specify any files that were allegedly missing or how many files were allegedly removed from Brach's computer. Indeed, no one at CKC can identify any files that were allegedly deleted because CKC subsequently permitted a contractor to use Brach's former computer, and that contractor damaged the hard drive by causing the computer to crash. Nevertheless, CKC's expert recovered from that computer several PST files that were modified on August 18, 2015—over a week after Brach had been discharged. The expert further discovered that those files were associated with Brach's password-protected email account, Cameron.Franklin@Next-Recruit.com.

16

### G. Facts Relating to Brach's Claims of Post-Termination Retaliation

- After Brach filed this lawsuit against CKC and Stanley, Stanley sent Brach three text messages.

- Stanley sent the first text message on August 7, 2016, just over a week after Brach filed the first complaint in this district. In that text message, Stanley wrote:

  - "C- I want to go on the record that I don't want to enter into a lawsuit war with you. I've done the math up and down and no matter who wins…. Only the lawyers actually win. If you win you'll eat it all up in the counter lawsuits. If I win all my proceeds will go to the lawyers and you won't be able to pay them anyway. I just want to be clear. I don't want to be involved in this."[22]

- Ten days later, on August 17, 2016, Stanley sent the following two text messages to Brach:

  - "Warm up your savings for the counter suit. Don't run out"; and

  - "I know your ego is crazy out of control but did you walk this through with Mandy?[23] It's a gnarly gamble. No upside with a downside potential of loosing [sic] 100,000.00."[24]

- Stanley sent Brach these text messages after Brach's counsel served Stanley with the initial complaint in this suit.

- Stanley testified that he would not have filed CKC's claims had Brach not filed a lawsuit against CKC and Stanley.

### III.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the burden to show the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the movant meets its burden, the

---

[22] Doc. 105-23.

[23] "Mandy" is Brach's spouse.

[24] Doc. 105-24.

opposing party, in order to defeat the motion, must set forth specific facts showing a genuine issue for trial. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Finally, "the facts, with reasonable inferences drawn," must be viewed "in the light most favorable" to the non-moving party. *Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007). And where, as here, the parties have filed cross motions for summary judgment on a claim, each motion must be reviewed "separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quotation marks omitted).

As stated above, CKC has moved for summary judgment on all of Brach's claims, Brach and IRC have moved for summary judgment on CKC's counterclaims, and the parties have filed cross motions for summary judgment on the counterclaim of constructive fraud. The motions are separately addressed below.

## IV.

Defendants have moved for summary judgment on all of Brach's remaining claims— Count I (FCA retaliation); Count II (DCWPA reprisal); Count IV (FLSA overtime); and Count V (FLSA retaliation). For the reasons that follow, this motion must be granted.

### A. Statutory Standing

Before addressing the merits of Brach's FCA, DCWPA, and FLSA claims, a threshold issue must be addressed, namely whether those statutes apply to Brach. In this regard, CKC argues that Brach's claims are nonstarters because Brach lacks statutory standing. In CKC's view, Brach cannot avail himself of the FCA, DCWPA, or FLSA because these statutes afford remedies to an "employee," "independent contractor," or "agent" of CKC, and Brach was none of these. According to CKC, Brach was an employee and agent of his own company, IRC.

Although this argument has some force—indeed, if Brach's claims proceeded to trial, this argument may well have convinced a trier of fact—it is unpersuasive at the summary judgment stage.

To be sure, Brach may not prevail on Count I, the FCA retaliation claim, unless he was an "employee, contractor, or agent" of CKC. 31 U.S.C. § 3730(h). Similarly, to recover on Count II, IV, or V—Brach's DCWPA and FLSA claims—Brach must have been CKC's "employee." *See* 10 U.S.C. § 2409 (DCWPA); 29 U.S.C. §§ 207, 215, 216 (FLSA).

The FCA does not define the terms, "employee," "contractor," or "agent." Nor does the DCWPA define "employee." Yet, the Supreme Court has held that where, as here, "Congress has used the term 'employee' without defining it," courts should look to the "conventional master-servant relationship as understood by common-law agency doctrine." *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 739-40 (1989). These factors include (1) "the hiring party's right to control the manner and means by which the product is accomplished," (2) "the skill required," (3) "the source of the instrumentalities and tools," (4) "the location of the work," (5) "the duration of the relationship between the parties," (6) "whether the hiring party has the right to assign additional projects to the hired party," (7) "the extent of the hired party's discretion over when and how long to work," (8) "the method of payment," (9) "the hired party's role in hiring and paying assistants," (10) "whether the work is part of the regular business of the hiring party," (11) "whether the hiring party is in business," (12) "the provision of employee benefits," and (13) "the tax treatment of the hired party." *Reid*, 490 U.S. at 751-52. Also important are "the parties' beliefs regarding the nature of the employment relationship[.]" *Farlow v. Wachovia Bank of N.C., N.A.*, 259 F.3d 309, 313 (4th Cir. 2001). Ultimately, the "touchstone" of this

analysis is "the degree of the hiring party's right to control the manner and means by which the product is accomplished." *Id.*

A similar standard applies in the FLSA context. To begin with, the FLSA tautologically defines "employee" as "any individual employed by an employer," and an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. §§ 203(d) & (e)(1). But as the Supreme Court has noted, the FLSA "defines the verb 'employ' expansively to mean 'suffer or permit to work.'" *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992) (quoting 29 U.S.C. § 203(g)). Thus, as Fourth Circuit precedent teaches, the FLSA "broaden[ed] the meaning of 'employee' to cover some [workers] who might not qualify as such under a strict application of traditional agency [or contract] law principles." *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 304 (4th Cir. 2006) (quotation marks omitted). In the Fourth Circuit, therefore, "determining whether a worker is an employee covered by the FLSA" turns on "the 'economic realities' of the relationship between the worker and the putative employer." *Id.* Put differently, "[t]he focal point is whether the worker is economically dependent on the business to which he renders service or is, as a matter of economic reality, in business for himself." *Id.* (quotation marks and alterations omitted). The Fourth Circuit therefore recognizes the following non-dispositive factors in the FLSA context:

(1) the degree of control that the putative employer has over the manner in which the work is performed;

(2) the worker's opportunities for profit or loss dependent on his managerial skill;

(3) the worker's investment in equipment or material, or his employment of other workers;

(4) the degree of skill required for the work;

(5) the permanence of the working relationship; and

20

(6) the degree to which the services rendered are an integral part of the putative employer's business.

*Id.* at 304-05.

Here, CKC's argument—that no reasonable trier of fact could conclude that Brach was an "employee" of CKC pursuant to the relevant statutes—fails on this factual record. To be sure, the Agreement identifies IRC, not Brach, as the "Contractor," and Brach appears to have nominally structured the parties' contractual relationship as a company-to-company arrangement. And, as CKC correctly points out, IRC, not Brach, issued invoices to CKC and received the requisite 1099 tax forms. Yet, it appears that several factors in the "economic realities"[25] and *Reid*[26] tests might permit a reasonable trier of fact to find that Brach was an "employee" pursuant to the FCA, DCWPA, and FLSA. In this respect, CKC provided Brach equipment and materials, including office space, a computer, and an email address. The Agreement also appears to have been an open-ended arrangement akin to an employer-employee relationship, as the contract lacks a specific termination date. And most importantly, the "touchstone" factor—CKC's degree of control over the manner in which Brach performed his work—permits a trier of fact reasonably to conclude that Brach was an employee. *See Farlow*, 259 F.3d at 313; *Schultz*, 466 F.3d at 304-05. In this respect, the record discloses that CKC had the right to assign additional projects to Brach and that CKC employees regularly directed Brach on how to perform his duties. For instance, CKC instructed Brach to help review CKC's invoice practices, and on May 8, 2015, CKC's president again directed Brach to implement a revised process for handling invoices.

---

[25] *See Schultz*, 466 F.3d 298.

[26] *See* 490 U.S. 730.

These facts, viewed in the light most favorable to Brach, defeat CKC's argument that no reasonable trier of fact could conclude that Brach was an "employee" as defined in the FCA, DCWPA, and FLSA.[27]

### B. Alleged Retaliation Arising From Brach's Termination

Although CKC's first salvo missed the mark, the company's subsequent volleys with respect to retaliation hit home. Specifically, summary judgment for CKC is warranted on Counts I and II insofar as Brach alleges that CKC retaliated against him by terminating Brach's employment.[28]

Because there is no direct evidence of retaliatory intent, the familiar and settled *McDonnell Douglas*[29] burden-shifting framework applies to the FCA and DCWPA retaliation counts. Although the Fourth Circuit has not directly held that the *McDonnell Douglas* framework operates in FCA and DCWPA retaliation or reprisal cases, that court has applied the *McDonnell Douglas* framework to Title VII retaliation claims. *See Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 249 (4th Cir. 2015); *see also Nifong v. SOC, LLC*, --- F. Supp. 3d ---, 2017 WL 590290, at *8-9 (E.D. Va. Feb. 13, 2017) (holding that the *McDonnell Douglas* framework applies to an FCA retaliation claim and collecting cases so holding). Given this, and given that neither party argues otherwise, it is appropriate to apply the *McDonnell Douglas* framework to Brach's retaliation claims.

---

[27] Accordingly, although it is far from clear that Brach was indeed a CKC employee, for the sake of convenience the summary judgment analysis proceeds by referring to Brach as though he were a CKC employee.

[28] Brach also alleged in the SAC that, after Brach filed his administrative and federal complaints, CKC and Stanley retaliated against Brach via text message. Those claims are addressed *infra* Part IV.C.

[29] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

In doing so, it is apparent that, to the extent Brach alleges retaliation based on his discharge, the FCA and DCWPA claims fail for three reasons, each of which is sufficient to defeat Brach's claims. Specifically, the undisputed factual record discloses (1) no protected activity with respect to Brach's termination, (2) no causal nexus between Brach's alleged protected act and his discharge, and (3) non-retaliatory and unrebutted justifications for CKC's decision to discharge Brach.

### 1. Protected Activity

To succeed on his FCA and DCWPA claims arising from his termination, Brach must first show a prima facie case comprising three elements: (1) that Brach engaged in protected activity, (2) that CKC employer knew about the activity, and (3) that CKC discharged Brach as a result. *See Smith v. Clark/Smoot/Russell*, 796 F.3d 424, 433 (4th Cir. 2015). As explained below, Brach cannot establish a prima facie case because the undisputed factual record confirms that Brach did not engage in protected activity, and that there is no causal nexus between Brach's putative protected acts and CKC's adverse action.

The FCA's anti-retaliation provision makes it unlawful to

> discharge[], demote[], suspend[], threaten[], harass[], or in any other manner discriminate[] against in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter.

31 U.S.C. § 3730(h)(1). In other words, the FCA protects two types of activities: (1) actions taken "in furtherance of an action" under the FCA, and (2) "efforts to stop [one] or more" FCA violations. *Id.*

Whether Brach engaged in the first category of protected activity—actions "in furtherance" of an FCA action—is evaluated under an objective, "distinct possibility" standard.

23

*See Mann v. Heckler & Koch Defense, Inc.*, 630 F.3d 338, 344 (4th Cir. 2010). Under this standard, protected activity occurs if the "employee's opposition to fraud takes place in a context where … the conduct reasonably could lead to a viable FCA action, or when … litigation is a reasonable possibility" from the employee's perspective at the time of his conduct. *Id.* (quotation marks omitted).

The second category of protected activity—"efforts to stop [one] or more" FCA violations—protects activities "motivated by an *objectively reasonable belief* that the employee's employer is violating, or soon will violate, the FCA." *Carlson v. DynCorp Int'l LLC*, 657 F. App'x 168, 172 (4th Cir. 2016) (emphasis added); *see also Nifong*, 2017 WL 590290, at *9 (applying the *Carlson* standard). Under the "reasonable belief" standard, a plaintiff must show that he "believed [defendant] was violating the FCA, that his belief was reasonable, that he took action based on that belief, and that his actions were designed to 'stop [one] or more violations of' the FCA[.]" *Carlson*, 657 F. App'x at 173 (quoting 31 U.S.C. § 3730(h)(1)).

Importantly, under either standard, the employee's conduct is protected only if it relates to stopping real or reasonably-suspected *fraud*. After all, the FCA prohibits "any person" from "knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment" to the federal government, 31 U.S.C. § 3729(a)(1)(A), and from "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B). Put differently, "'without fraud, there can be no FCA action' or violation." *Carlson*, 657 F. App'x at 174 (quoting *Mann*, 630 F.3d at 345-46).[30] And as the Fourth Circuit

---

[30] *See also Glynn v. EDO Corp.*, 710 F.3d 209, 214 (4th Cir. 2013) ("The employee's investigation must concern false or fraudulent claims or it is not protected activity under the FCA." (quotation marks omitted)); *United States ex rel. Owens v. First Kuwaiti Gen. Trading & Contracting Co.*, 612 F.3d 724, 735 (4th Cir. 2010) ("A protected activity need not indicate that

observed in *Carlson*, "it is axiomatic that fraud involves '[a] knowing misrepresentation or knowing concealment of a material fact made to induce another to act <u>to his or her detriment</u>.'" 657 F. App'x at 174 (quoting Black's Law Dictionary (10th ed. 2014)). In this respect, mere "expressions of concern that do not raise the reasonable prospect of false or fraudulent claims under the FCA ... do not constitute 'protected activity.'" *United States ex rel. Cody v. Mantech Int'l Corp.*, 207 F. Supp 3d 610, 622 (E.D. Va. 2016) (citing *Zahodnick v. Int'l Bus. Mach. Corp.,* 135 F.3d 911, 914 (4th Cir. 1997)).

Next, the DCWPA anti-reprisal section provides that "[a]n employee may not be discharged … or otherwise discriminated against as a reprisal for disclosing … information that the employee *reasonably believes* is evidence of," *inter alia*, "[g]ross mismanagement of a Department of Defense contract or grant, a gross waste of Department funds, … or a violation of law, rule, or regulation related to a Department contract … or grant." 10 U.S.C. § 2409(a)(1)(A) (emphasis added). The DCWPA protects such disclosures to, among others, "[a] management official or other employee of the contractor … who has a responsibility to investigate, discover, or address misconduct." *Id.* § 2409(a)(2)(G). Thus, protected activity under the DCWPA includes a disclosure that "places an employer on objectively reasonable notice that what is being disclosed is" a "[g]ross mismanagement of a Department of Defense contract or grant, a gross waste of Department funds, … or a violation of law, rule, or regulation related to a Department contract … or grant." *Cody*, 207 F. Supp. 3d at 623; 10 U.S.C. § 2409(a)(1)(A).

These principles, applied to the undisputed factual record, compel the conclusion that Brach did not engage in protected activity under the FCA or the DCWPA. Although Brach

---

an actual FCA suit was being contemplated, but it must evince some attempt to expose possible fraud.").

argues that he engaged in protected acts on May 7 and 8, 2015 by informing CKC that he believed the company had overbilled the Navy,[31] neither the FCA nor the DCWPA supports Brach's claims that his billing disclosures were protected activities.

Regarding the FCA, Brach's May 2015 communications were not "in furtherance of" an FCA action because his activity did not occur "in a context where ... the conduct reasonably could lead to a viable FCA action, or when ... litigation is a reasonable possibility." *Mann*, 630 F.3d at 344 (quotation marks omitted). As the Fourth Circuit in *Zahodnick* put it, "[s]imply reporting [a] concern of a mischarging to the government to his supervisor does not suffice to establish that [plaintiff] was acting 'in furtherance of' a [False Claims Act] action." *See Zahodnick*, 135 F.3d at 914. Thus, where, as here, the employee never "initiated, testified for, or assisted in the filing of a [False Claims Act] action during his employment," but instead "merely informed a supervisor of [a potential overcharging] problem and sought confirmation that a correction was made," that employee did not act "in furtherance" of an FCA action. *Id.*

Nor were Brach's May 2015 communications "efforts to stop [one] or more" FCA violations under the "reasonable belief" standard. *See Carlson* 657 F. App'x at 172. Brach could not have reasonably believed CKC was engaging—or was about to engage—in fraud precisely

---

[31] The SAC, also alleged two other protected actions: (1) Brach's filing a Complaint of Reprisal with the Department of Defense on December 11, 2015, and (2) Brach's sending, in August 2016, a copy of his federal complaint, request for waiver of service, and summons to CKC's counsel and to Stanley. *See* SAC ¶¶ 126, 128. But those two allegations fail insofar as Brach's retaliation claim focuses on his discharge. Both of these putative protected actions—Brach's filing administrative and federal complaints—occurred well after CKC terminated his employment. Specifically, Brach filed his Complaint of Reprisal on December 11, 2015, and he filed a complaint in this district on July 28, 2016. Thus, there can be no causal link between these two putative protected acts and Brach's discharge. *See Smith*, 796 F.3d at 433 (holding that a prima facie case under the FCA requires a plaintiff to show that "the employer took adverse action against him as a result" of a protected activity); 5 U.S.C. § 1221(e)(1) (requiring in the DCWPA context that the protected activity be a "contributing factor" in the "personnel action which was taken").

because CKC tasked *Brach himself* with performing an invoice review to catch any potential billing errors. *See, e.g.*, *Carlson*, 657 F. App'x at 174 ("[W]ithout fraud, there can be no FCA action or violation." (quotation marks omitted)). Moreover, CKC assigned that same task to Rubin, and the undisputed factual record discloses that both Brach and Rubin found many of the same errors, including a premature NATICK invoice. Notably, there is no indication in the emails between Brach and Rubin that Brach believed that CKC was engaging in fraud. Instead, the undisputed factual record discloses that Brach was informed that these were billing errors, and that CKC planned to rectify them. In fact, by the time Brach and Rubin discovered one of the errors, CKC had *already performed* the prematurely-billed services. In other words, the error was overtaken and remedied by subsequent events. And as to the second billing error, CKC was already poised to complete, and in fact did complete, performance on the prematurely-billed services within a month of Brach's discovery.

More important, the undisputed factual record discloses that within approximately one week of CKC's becoming aware of the billing errors, Rubin advised the Navy of the mistakes.[32] Not surprisingly, CKC suffered no adverse consequences attributable to its benign billing blunders. And although Brach claims he was unaware of Rubin's timely disclosure of the billing error to the government, it is undisputed that CKC instructed *Brach* to help implement new billing procedures to prevent any future billing errors. In fact, shortly after CKC gave Brach this new responsibility in preventing billing errors, CKC gave him additional authority over billing by tasking him with submitting invoices to the Defense Department's Wide Area Work Flow.

---

[32] In December 2015, CKC supplemented its disclosure to the Navy with a written year-end summary of its audit of all invoices under the relevant contract.

The undisputed facts, therefore, fatally undermine Brach's case. Brach could not have reasonably believed that CKC engaged, or was about to engage, in fraud because CKC responded to Brach's conduct by entrusting him with *more* responsibility and tasking him with *preventing* future mistakes. Thus, Brach's disclosures to his superiors do not amount to protected activity under the FCA.

These same undisputed facts verify that Brach's May 2015 communications were also not protected by the DCWPA. As stated *supra*, protected acts under the DCWPA include disclosures that "place[] an employer on objectively reasonable notice that what is being disclosed is" a "[g]ross mismanagement of a Department of Defense contract or grant, a gross waste of Department funds, … or a violation of law, rule, or regulation related to a Department contract … or grant." *Cody*, 207 F. Supp. 3d at 623; 10 U.S.C. § 2409(a)(1)(A). Here, however, the undisputed factual record reflects that there was no "gross mismanagement" or "waste" of government contracts or funds, nor was there any legal or regulatory violation. Quite the opposite: the undisputed factual record shows that CKC discovered that it had mistakenly and prematurely submitted invoices, quickly informed the Navy of the errors, and promptly rectified those mistakes by performing all the services contemplated in the relevant invoices. Accordingly, CKC is entitled to summary judgment on Count II, the DCWPA reprisal claim.

In sum, Brach cannot establish a prima facie case that his termination constituted unlawful retaliation or reprisal under the FCA and DCWPA because he is unable to show the requisite protected activity.

## 2. Causation

Moreover, even assuming, *arguendo*, Brach engaged in protected activity under the FCA or DCWPA, the undisputed factual record makes clear that there is no causal nexus between

28

Brach's May 2015 disclosures and his August 2015 discharge. Notably, pursuant to the FCA, the alleged "retaliation" is actionable only if CKC took "adverse action against [plaintiff] *as a result*" of Brach's protected activity. 31 U.S.C. § 3730(h)(1) (emphasis added). Similarly, there is no actionable reprisal under the DCWPA unless Brach's protected activity was a "contributing factor" to the "personnel action … taken." 5 U.S.C. § 1221(e)(1).[33]

No reasonable trier of fact could find by a preponderance of the evidence that CKC discharged Brach "as a result of" his alleged protected activities, or that the putative protected activities were a "contributing factor" to the discharge. *See* 31 U.S.C. § 3730(h)(1); 5 U.S.C. § 1221(e)(1). First, the length of time between Brach's alleged protected activity and his termination—May to August—is too long to infer a causal nexus based on timing, alone.[34] Second, the undisputed factual record confirms that Brach was not disciplined, criticized or threatened because of his role in reviewing the relevant CKC invoices. This is unsurprising because shortly after Brach and Rubin found the billing mistakes, CKC reported those errors to the government. Furthermore, the undisputed factual record reflects that CKC not only continued to employ Brach for several more months, but also took seriously his recommendations about travel arrangements, hiring, staffing, and invoicing; indeed, CKC terminated Brach only after Brach performed poorly on all of these fronts. Moreover, there is in fact no question that CKC,

---

[33] The DCWPA incorporates § 1221(e)(1)'s "contributing factor" standard. *See* 10 U.S.C. § 2409(c)(6) ("The legal burdens of proof specified in section 1221(e) of title 5 shall … control[] any ... judicial ... proceeding to determine whether discrimination prohibited under this section has occurred.").

[34] *See, e.g.*, *Perry v. Kappos*, 489 F. App'x 637, 643 (4th Cir. 2012) (holding that "a three-month lapse is too long to establish causation, without more"); *Pascaul v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) ("[T]hree to four months separat[ing] the [adverse action] and the claim protected activity ... is too long to establish a causal connection by temporal proximity alone.").

as a result of Brach's findings, gave Brach significant authority over CKC's billing procedures to prevent future billing problems. This flatly contradicts Brach's causation argument.

In opposition to this conclusion, Brach argues that the summary judgment record supports a prima facie showing of causation because CKC offered "inconsistent" justifications for Brach's firing. Specifically, Brach contends that he has shown causation (1) because on August 9, 2015, when Brach asked for an explanation for his termination, Stanley simply responded via email that legal counsel advised against "chit chatting" about the termination, (2) because during discovery in this matter, CKC stated in an interrogatory response that *one* of the several reasons it terminated Brach was because "Brach was responsible for the very billing problems he alleged to be the subject of his protected disclosure," Doc. 105-22, and (3) because Henderson, the person who made the relevant billing mistakes, had "input" in the decision to terminate Brach. None of these assertions creates a genuine factual dispute on causation sufficient to defeat summary judgment.

Brach's first contention—that on August 9, 2015 Stanley responded that counsel had advised CKC to avoid "chit chatting" over Brach's termination—does not create a material factual dispute suggesting that a redundant invoice review conducted three months earlier contributed to Brach's termination. Not even Brach believed, at the time he was fired, that an invoice review he helped conduct three months earlier had any role in CKC's decision to discharge him. Rather, in the same August 2015 email chain on which Brach now relies, Brach wrote that he believed CKC discharged him because of the problems with Trippodo's security clearance. And it is undisputed that on that same day, August 9, Brach made similar statements to Henderson. Nor is there any doubt that Stanley told Brach, *before* Stanley sent the termination email, that Stanley was angry about the Trippodo clearance problems.

Similarly, Brach's second point—that CKC stated in an interrogatory response that Brach "was responsible for the very billing problems he alleged to be the subject of his protected disclosure," Doc. 105-22 at 2—does not help Brach support a prima facie showing of causation. To begin with, Brach misrepresents the interrogatory response, which actually comprises *three pages* of reasons for Brach's termination, most of which did not relate to billing. Moreover, CKC's interrogatory response does not suggest any reasonable basis for concluding that Brach was terminated because of his alleged protected activity, namely the disclosure of billing errors in May 2015. Instead, CKC's interrogatory response makes clear that *after* Brach had discovered Henderson's billing errors, and *after* CKC tasked Brach with ensuring that future contract invoices were properly submitted, Brach *himself* made billing errors. Specifically, the interrogatory response contends that Brach failed to "utitiliz[e] effective invoicing procedures," which "resulted in errors in invoices on a number of CKC's contracts that had to be corrected prior to billing by other CKC staff," all of which happened after Brach's putative protected activity. *Id.* at 2. Thus, Brach's reliance on the interrogatory response is misguided.

Brach's last argument—that Henderson, the person responsible for two billing errors on the NATICK contract, had "input" in CKC's decision to terminate IRC and Brach—fares no better. The undisputed record belies Brach's contention in this regard, as the record reflects that Henderson's only "input" in CKC's decision was to prepare Brach's termination letter. In other words, it is undisputed that Henderson, apart from preparing the termination letter, was not otherwise involved in CKC's decision to discharge Brach. Thus, Brach has failed to show a factual dispute capable of forestalling summary judgment.

### 3. Non-Retaliatory Justifications For Brach's Termination

Even assuming, *arguendo*, Brach established a prima facie case of retaliation, CKC has met its burden to produce evidence of a legitimate, non-retaliatory reason for terminating the Agreement, which Brach has not shown to be pretextual. *See McDonnell Douglas*, 411 U.S. at 802; 5 U.S.C. § 1221(e)(1)(B)(2). Indeed, the lack of any causal nexus between Brach's putative protected activity and his discharge, *see supra* Part IV.B.2, is confirmed by the many non-retaliatory grounds for CKC's decision to discharge Brach. CKC has articulated five grounds, namely Brach's (1) failure to conduct appropriate inventories, (2) potential ITAR violations, (3) costly mistakes in creating travel itineraries, (4) inappropriate behavior towards coworkers, and (5) alleged fraud with respect to Brach's representations about Joe Trippodo. Notably, Brach has not pointed to any competent record evidence to rebut CKC's non-retaliatory explanations. This provides a third and independent ground for granting summary judgment to CKC on Brach's retaliation claims stemming from his termination.

To begin with, CKC has produced ample record evidence of legitimate, non-retaliatory grounds for discharging Brach. Specifically, during the late spring and summer of 2015, Brach made several significant mistakes in carrying out his responsibilities. For example, Brach failed to confirm whether proper quantities of electronic weapons were in inventory at the Navy facility in Port Hueneme, California. Brach subsequently reported incorrect weapons inventory data to CKC, triggering customer dissatisfaction. Thereafter, Brach, acting on CKC's behalf, may well have violated ITAR when he had CKC personnel carry lasers and other weapons parts through German customs without the required paperwork. Because of Brach's mistake, German authorities detained CKC personnel, spurring CKC to beseech its Army customer to help obtain the personnel's release. And in July 2015 Brach botched several travel arrangements, causing

significant delays. There is also undisputed record evidence that Stanley received several complaints about Brach's misbehavior and poor attitude. Finally, CKC has also cited evidence that Brach may have committed constructive fraud in concealing information regarding Trippodo's security clearance flag—a claim that, as explained *infra*, must proceed to trial. In short, CKC has met its burden of production to articulate legitimate explanations discharging Brach.

In response, Brach focuses on the Trippodo debacle, insisting that this alleged basis for discharging Brach is pretextual.[35] Specifically, Brach invokes an August 3, 2015 email where Stanley expressed to Rubin a desire to terminate Brach's relationship with CKC. This email, Brach asserts, demonstrates pretext because Stanley wrote it three days before CKC learned that Trippodo was officially disqualified from working on the Germany contract. Brach's argument fails for the obvious reason that nothing in the August 3 email suggests that a May invoice review—for which Brach was neither the sole participant nor the subject of any criticism or discipline—was the true reason for Brach's discharge. Rather, Stanley's email focused on yet another of Brach's inventory errors, and Stanley specifically stated that "[w]e need to replace [Brach] with someone" with whom Rubin "ha[s] a good working relationship [and] that can take full ownership of the delivery, stock and maintenance of these contracts." Doc. 105-16. In other words, Stanley identified Brach's poor performance. That statement squares perfectly with CKC's articulated reasons for terminating Brach's employment. And insofar as the Trippodo incident is concerned, the August 3 email does not undermine CKC's claim that the Trippodo disqualification was the last straw that impelled CKC to discharge Brach immediately. Instead,

---

[35] Brach's brief does not address whether the other four stated justifications for Brach's discharge are pretextual. As stated above, Brach failed to create a genuine dispute of material fact on these other stated reasons for his discharge. *See supra* Part II.D-E & notes 10-19.

the undisputed factual record shows that on August 3, 2015, Stanley was already prepared to replace Brach in the near future, and that, once CKC learned the full extent of the latest Brach-related fiasco, the company decided to cut bait. Put succinctly, nothing in the factual record supports a finding that the Trippodo incident was a pretense for unlawful retaliation or reprisal.

In sum, CKC has met its burden to articulate non-retaliatory reasons for its decision to discharge Brach, and Brach has failed to carry his burden to show that the stated justifications are pretextual. Thus, even if Brach had established a prima facie case of retaliation under the FCA or DCWPA arising from his termination—which he did not—summary judgment for CKC would still be warranted.

### C. Brach's Post-Employment Retaliation Claims

CKC (and Stanley) must also be awarded summary judgment on Count I (FCA), Count II (DCWPA), and Count V (FLSA) insofar as Brach alleges that CKC engaged in *post-employment* retaliation when Stanley sent Brach three text messages. Specifically, the SAC alleges that CKC retaliated via text message because Brach filed (1) a Complaint of Reprisal with the Defense Department, (2) FCA and DCWPA retaliation and reprisal claims in this district, and (3) an FLSA overtime claim. And although Brach did not make such an allegation in any of his complaints, he now argues at the summary judgment stage that CKC also retaliated against him by filing its counterclaims in this action.[36] For the reasons stated below, Brach's post-employment retaliation claims cannot survive summary judgment.

---

[36] The SAC predates the filing of CKC's counterclaims; thus, once CKC filed its counterclaims, Brach should have sought leave to amend the SAC. *See* Rule 15, Fed. R. Civ. P. In any event, it is clear, for the reasons stated *infra*, that CKC's counterclaims do not constitute actionable retaliation.

According to the Fourth Circuit, the FLSA permits an ex-employee to assert a post-employment retaliation claim.[37] *See Darveau v. Detecon, Inc.*, 515 F.3d 334, 343 (4th Cir. 2008). In so holding, the *Darveau* panel relied on (1) the Supreme Court's conclusion that Title VII[38] permits post-employment retaliation claims, *see id.* at 342-43 (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)) and (2) the "almost uniform practice of courts in considering the authoritative body of Title VII case law when interpreting the comparable provisions of other federal statutes," *id.* at 342. Whether the FCA[39] and DCWPA[40] also provide remedies for post-employment retaliation, however, is a less-settled question.[41] But even

---

[37] *See* 29 U.S.C. § 215(a)(3) (rendering it unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter").

[38] Title VII's anti-retaliation provision makes it unlawful "to discriminate against any … employees or applicants for employment ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a).

[39] *See* 31 U.S.C. § 3730(h) (prohibiting the "discharg[ing], demot[ing], suspend[ing], threaten[ing], harass[ing], or in any other manner discriminat[ing] … in the terms and conditions of employment because of lawful acts done by the employee, contractor, agent or associated others in furtherance of an action under this section or other efforts to stop 1 or more violations of this subchapter").

[40] *See* 10 U.S.C. § 2409(a)(1)(A) (providing that "[a]n employee of a contractor ... may not be discharged, demoted or otherwise discriminated against as a reprisal for disclosing … information that the employee reasonably believes is evidence of … [g]ross mismanagement of a Department of Defense contract or grant, a gross waste of Department funds, an abuse of authority relating to a Department contract or grant, or a violation of law, rule, or regulation related to a Department contract").

[41] The Fourth Circuit has not squarely addressed whether the FCA or DCWPA permit post-employment retaliation claims. Many district courts, including several in this circuit, have held that the FCA's anti-retaliation provision does *not* contemplate such claims. *See, e.g., Potts v. Ctr. for Excellence in Higher Educ., Inc.*, --- F. Supp. 3d —, 2017 WL 1243027, at *3 (D. Colo. Mar. 24, 2017) ("The overwhelming majority of courts that have considered the issue have found that [the FCA] does not apply to post-employment retaliation …." (collecting cases)); *Fitzsimmons v.*

assuming without deciding here that Brach's claims of post-employment retaliation are cognizable under the FCA and DCWPA, CKC would still be entitled to summary judgment on those claims.

The key inquiry in a post-employment retaliation claim is whether the defendant's actions were "materially adverse" and "could well dissuade a reasonable worker from making or supporting a charge" that their employer is violating, or has violated, the statute's substantive provisions. *Darveau*, 515 F.3d at 343. This is so because the purpose of the relevant retaliation provisions is "to secure" the statutes' "substantive protections" by preventing the relevant defendant "from interfering (through retaliation) with … efforts to secure or advance enforcement of the [statutes]' basic guarantees." *Id.* Thus, the Fourth Circuit in *Darveau* held that even a counterclaim could be retaliatory if it (1) lacks "reasonable basis in fact or law" and (2) is filed with "retaliatory motive." *Id.* at 341. Given these principles and this summary judgment record, CKC's motion for summary judgment on Brach's post-termination claims must be granted.

Here, it is undisputed that Stanley sent the first challenged text message on August 7, 2016—approximately a week after Brach filed his initial complaint in this district—stating:

> C- I want to go on the record that I don't want to enter into a lawsuit war with you. I've done the math up and down and no matter who wins…. Only the lawyers actually win. If you win you'll eat it all up in the counter lawsuits. If I win all my proceeds will go to the lawyers and you won't be able to pay them anyway. I just want to be clear. I don't want to be involved in this.

Doc. 105-23. Ten days later, on August 17, 2016, Stanley sent Brach the following messages:

- "Warm up your savings for the counter suit. Don't run out"; and

---

*Cardiology Assocs. of Fredericksburg, Ltd.*, No. 3:15cv72, 2015 WL 4937461, at * (E.D. Va. Aug. 18, 2015) (similar).

- "I know your ego is crazy out of control but did you walk this through with Mandy? It's a gnarly gamble. No upside with a downside potential of loosing [sic] 100,000.00."

Doc. 105-24. It is also undisputed that CKC asserted its legal claims against Brach only after Brach initiated this suit, and that CKC would not have pursued its claims had Brach not sued first. Nevertheless, it is clear on this undisputed factual record that no reasonable trier of fact could conclude that the text messages or CKC's counterclaim constituted actionable retaliation.

To begin with, the summary judgment record is devoid of any evidence that the text messages "could well dissuade a reasonable worker from making or supporting a" cause of action under the FCA, DCWPA, or FLSA. *See Darveau*, 515 F.3d at 343. To state the obvious, Brach himself was not dissuaded from pursuing his allegations in this case; he has stuck to his guns from day one in this litigation and steadfastly asserted his FCA, DCWPA, and FLSA claims. Nor is there a shred of evidence that an objectively reasonable person in a similar situation to Brach's would have been so dissuaded. The text messages, viewed in the context of the full factual record, are far from retaliatory or threatening; instead, they are pleas to avoid litigation and true statements warning that CKC had viable counterclaims, that attorneys' fees would swell as the case proceeded, and that Brach could potentially lose significant sums of money. These text messages are simply not actionable in light of this record. *See, e.g.*, *Ergo v. Int'l Merch. Servs., Inc.*, 519 F. Supp. 2d 765 (N.D. Ill. 2007) (expressing doubt at the summary judgment stage that the mere threat of countersuit "could ever constitute retaliation").

Similarly, even assuming Brach had amended the SAC to allege that CKC's counterclaims were retaliatory—which he did not—Brach's allegation would nonetheless fail. There is no evidence in this factual record that CKC filed its counterclaims with "retaliatory motive," nor is there any indication that CKC lacked a "reasonable basis in fact or law" for its

counterclaims. *See Darveau*, 515 F.3d at 341.[42] To the contrary, CKC did not file its counterclaims with "retaliatory motive" because the undisputed factual record confirms that some, if not all, of the counterclaims were *compulsory* under the Federal Rules of Civil Procedure. *See* Rule 13(a)(1)(A), Fed. R. Civ. P. ("A pleading *must* state as a counterclaim *any* claim that—at the time of its service—the pleader has against an opposing party if the claim … arises out of the transaction or occurrence that is the subject matter of the opposing party's claim …." (emphases added)). Indeed, the counterclaim of constructive fraud is certainly compulsory, as that claim arises out of the same transaction or occurrence underpinning Brach's claims. Furthermore, CKC's allegations regarding Brach's alleged misconduct involving computers are also likely compulsory, as they arise from the same factual circumstances and time period—i.e., during Brach's employment or immediately thereafter—undergirding Brach's claims. Thus, even though Stanley testified that CKC would not have filed standalone claims against Brach absent Brach's suit, that testimony simply reflects (1) that CKC did not believe its claims justified the cost of initiating a lawsuit, and (2) that once the Federal Rules of Civil Procedure required CKC to file or forfeit its claims, CKC astutely asserted its viable causes of action. Furthermore, no reasonable trier of fact could conclude that CKC lacked a "reasonable basis in fact or law" for its counterclaims. *See Darveau*, 515 F.3d at 341. Rather, the analysis set forth *infra* demonstrates that CKC's claims have sufficient factual and legal legs to withstand Brach's summary judgment motion.

---

[42] Of course, there are First Amendment implications to imposing liability on a party for filing a lawsuit. *See Darveau*, 515 F.3d at 341 (citing *BE & K Constr. Co. v. NLRB,* 536 U.S. 516, 528-37 (2002) (stressing that only those lawsuits that are retaliatory in intent *and* baseless in fact or law could form the basis of a retaliation claim without implicating First Amendment concerns)).

In sum, given the full factual record, no reasonable trier of fact, even viewing the evidence in the light most favorable to Brach, could conclude that Stanley's accurate text messages and CKC's compulsory, factually supported, and legally sound counterclaims constituted actionable retaliation. To conclude otherwise would needlessly put the Federal Rules of Civil Procedure—and perhaps the First Amendment—on a collision course with federal anti-retaliation law.

### D. Brach's FLSA Overtime Claim

CKC also moved for summary judgment on Count IV, which alleges a wrongful denial of overtime pay in violation of the FLSA. *See* 29 U.S.C. § 207(a)(1). CKC asserts that even if Brach were an "employee" under the FLSA, he would be exempt from the statute's overtime protections because Brach worked in an "administrative capacity." CKC is correct; Brach's overtime claim fails because he is exempt from the statute's overtime requirements.

The FLSA generally requires an employer to pay at least one-and-a-half times an employee's base pay if that employee works more than 40 hours in a week. Specifically, the statute provides that

> no employer shall employ any of his employees … for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C. § 207(a)(1). Importantly, however, the FLSA exempts from its overtime protections anyone "employed in a bona fide … administrative … capacity[.]" *Id.* § 213(a)(1). An "employee employed in a bonafide administrative capacity" is someone

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week …;[43]

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a).

The undisputed factual record confirms that CKC employed Brach in an administrative capacity. Indeed, it is undisputed that CKC paid Brach $3,653 bi-weekly, far more than the minimum weekly fee. Nor is there any question that Brach's duties involved non-manual work directly related to CKC's management and general business operations. Brach was responsible for, *inter alia*, accounting, developing budgets for CKC's contract deliverables, logistical management, and ensuring that CKC properly invoiced clients, all of which are management-related decisions. *See id.* § 541.201 ("Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as … budgeting; auditing; … quality control; … government relations; … legal and regulatory compliance; and similar activities."). And there is no dispute that Brach's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." *Id.* § 541.200(a)(3). In this regard, CKC assigned Brach to review CKC's billing policies and preventing future billing mistakes. Those are hallmark examples of exercising discretion and independent judgment on significant matters. *See id.* § 541.202(a) (defining "matters of significance" as "refer[ring] to the level of importance or consequence of the work performed");

---

[43] On December 1, 2016, this regulation was amended to increase the base compensation to $541.60 per week.

*id.* § 541.202(b) (noting that an employee exercises "discretion and independent judgment" if he "has authority to formulate, affect, interpret, or implement management policies or operating practices").[44]

Tellingly, Brach does not contest that he is exempt from the FLSA's overtime provisions in § 207. Instead, Brach offers a non-responsive argument, namely that even an ex-employee may raise an FLSA *retaliation* claim pursuant to 29 U.S.C. § 215. But Brach's point about § 215's retaliation provisions obviously has no bearing on § 207's overtime protections. Stated succinctly, the undisputed factual record confirms that CKC employed Brach in an "administrative capacity," and Brach has not pointed to any competent evidence to rebut this conclusion. The FLSA's overtime provisions in § 207 are therefore inapplicable here. Accordingly, CKC must be awarded summary judgment on Brach's FLSA overtime claim.

## V.

Analysis next turns to CKC's counterclaims. For the reasons that follow, Brach's motions on all three counterclaims must be denied,[45] and CKC's cross-motion on the constructive fraud counterclaim must also be denied. This matter will therefore proceed only on CKC's counterclaims.

---

[44] It is worth noting that this undisputed factual evidence, which confirms that Brach worked for CKC in an administrative capacity, bolsters the conclusion, reached *supra* Part IV.A, that Brach was an "employee" of CKC pursuant to the FLSA. *See, e.g.*, *Schultz*, 466 F.3d at 304-305 (noting that the degree to which the "worker's opportunities for profit or loss dependent on his managerial skill," the "degree of skill for the work," the "degree to which the services rendered are an integral part of the putative employer's business" are factors suggesting an employer-employment relationship under the FLSA).

[45] IRC joined Brach's motion for summary judgment on Count III of the counterclaims, constructive fraud. That motion will be denied for the same reasons stated below.

**A. CKC's Computer Fraud and Abuses Act Claim**

Count I of CKC's counterclaims alleges that Brach violated the federal Computer Fraud and Abuses Act, 18 U.S.C. § 1030. Brach's motion for summary judgment on this claim must be denied.

Section 1030 makes it unlawful, *inter alia*,

> intentionally [to] access[] a computer without authorization or [to] exceed[] authorized access,[46] and thereby obtain[] information from any department or agency of the United States … or … information from any protected computer,[47]

*id.* § 1030(a)(2)(B) & (C); or

> knowingly [to] cause the transmission of a program, information, code, or command, and as a result of such conduct, intentionally cause[] damage without authorization, … or intentionally [to] access[] a protected computer without authorization, and as a result of such conduct, cause[] damage and loss,

*id.* § 1030(a)(5)(A) & (C). Notably, the statute provides a private cause of action where the defendant's conduct involves:

> (I)   loss to 1 or more persons during any 1-year period … aggregating at least $5,000 in value;
>
> (II)  the modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of 1 or more individuals;
>
> (III) physical injury to any person;
>
> (IV)  a threat to public health or safety; [or]

---

[46] The term, "exceeds authorized access" means "to access a computer with authorization and to use such access to obtain or alter information in the computer that the accesser is not entitled so to obtain or alter[.]" 18 U.S.C. § 1030(e)(6).

[47] A "protected computer" is one "used in or affecting interstate or foreign commerce or communication[.]" 18 U.S.C. § 1030(e)(2)(B). There is no dispute that Brach's workstation at CKC affected interstate commerce through an internet connection.

(V) damage affecting a computer used by or for an entity of the United States Government in furtherance of the administration of justice, national defense, or national security; ….

*Id.* § 1030(c)(4)(A)(i); *see also id.* § 1030(g) (providing that "[a] civil action for a violation of this section may be brought only if the conduct involves 1 of the factors set forth in subclauses (I), (II), (III), (IV), or (V) of subsection (c)(4)(A)(i)"). And where, as here, only § 1030(c)(4)(A)(i)(I) applies, the statute limits a plaintiff's recovery to economic damages. *Id.* § 1030(g) ("Damages for a violation involving only conduct described in subsection (c)(4)(A)(i)(I) are limited to economic damages."). Importantly, however, "economic damages" under the statute include "consequential damages," such as "costs incurred as part of the response to a [§ 1030] violation, including the investigation of an offense." *A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 646 (4th Cir. 2009).

Here, CKC's counterclaim alleges that Brach exceeded his authorized access to CKC's computers during his employment by downloading unauthorized software and reconfiguring a computer in CKC's conference room to prevent anyone besides Brach from accessing it. CKC further contends that after his discharge, Brach violated § 1030 by accessing one of CKC's protected computers without authorization, and that Brach accessed the Department of Defense's Wide Area Work Flow system and thereby unlawfully obtained information from a government agency. Finally, CKC asserts that Brach's statutory violations caused CKC more than $5,000 in damages.

CKC's claim survives summary judgment because there are material factual disputes concerning whether Brach violated § 1030 and caused over $5,000 in damages. A reasonable trier of fact could conclude on this record that Brach installed and used unauthorized software to access CKC's data, which includes Department of Defense information. Specifically, a CKC

43

employee testified that he and CKC's computer expert discovered unapproved TeamViewer log files during a forensic examination of Brach's former workstation. Moreover, the metadata associated with the log files established that the TeamViewer program was installed and accessed during the period in which Brach regularly used the workstation, and an expert testified that the unauthorized software was probably a free version widely available on the internet, for which Brach would have set his own login credentials. CKC's expert also testified that Brach could access the computer through TeamViewer despite not having CKC credentials if another user was already logged into the machine. In fact, there is record evidence that Brach's former workstation was not configured to lock automatically after a period of inactivity, and that Robinson, the CKC employee who subsequently used that workstation, observed evidence that someone had accessed the computer after she had been away from her desk for some time. CKC's expert further found several files associated with an email account, "Cameron.Franklin@Next-Recruit.com," that Brach owned, operated, and protected with a password.[48] Importantly, those files were modified on August 18, 2015, nine days *after* Brach's discharge. There is also evidence that Brach reconfigured the shared workstation in the conference room so that only he could access it, and that, as a result, CKC had to replace that computer at a cost of $6,426.11. These facts, viewed in the light most favorable to CKC, could reasonably be construed to support a finding that Brach violated § 1030. Accordingly, Brach's summary judgment motion must be denied on this count.

Brach counters by arguing (1) that Brach could not have accessed CKC's computers after his termination because the company changed Brach's password and revoked his login credentials, (2) that Brach did not have CKC's TeamViewer password following his termination,

---

[48] *See supra* note 21.

(3) that Brach did not have access to CKC's building after his termination, (4) that Brach "definitively denied" violating the statute, (5) that CKC does not have "definitive proof" of Brach's unauthorized access, and (6) that CKC cannot show that it suffered $5,000 or more in damages. None of these arguments permits an award of summary judgment. Rather, Brach has turned the summary judgment standard on its head; Brach cannot obtain summary judgment merely by "definitively denying" a claim, nor does CKC need to set forth "definitive proof" to survive summary judgment. Rather, CKC need only show admissible record evidence that creates a genuine factual dispute from which a reasonable trier of fact could conclude that Brach did indeed violate § 1030. Here, CKC has met its burden.[49]

Accordingly, Brach's motion must be denied with respect to Count I of the counterclaim.

## B. CKC's Virginia Computer Crimes Act Claim

CKC's second counterclaim alleges that Brach violated the Virginia Computer Crimes Act, Va. Code § 18.2-152.1 *et seq.* For the same reasons stated *supra* Part V.A, Brach's motion for summary judgment on this claim must be denied.

---

[49] In support of his argument, Brach mistakenly relies on an unpublished Fourth Circuit case, *Expert Business Systems, LLC v. BI4CE, Inc.*, 233 F. App'x 2514 (4th Cir. 2007). Brach represents that "in this case the court granted summary judgment because there was an utter lack of any substantial probative evidence and any expert evidence supporting the speculative assertions." Doc. 108 at 6 (quotation marks and alterations omitted). But the Fourth Circuit affirmed the district court's grant of summary judgment because, as the district court concluded, there was an "utter lack" of *both* "any substantial probative evidence" *and* "any expert opinion evidence supporting the speculative assertions by plaintiffs ...." *BI4CE*, 233 F. App'x at 255. Specifically, in *BI4CE* the "evidence fail[ed] to demonstrate that [defendant] installed any software that allowed it remote access to [plaintiff]'s computers." That is a far cry from the instant case, where CKC has submitted evidence, including but not limited to sworn expert testimony, suggesting that Brach installed software without authorization or altered login credentials for CKC computers. Thus, CKC has submitted both substantial probative evidence *and* expert opinion evidence to support CKC's contentions, rendering *BI4CE* inapposite.

The Virginia Computer Crimes Act makes it a crime for any person, with malicious intent:

1. [t]emporarily or permanently [to] remove, halt, or otherwise disable any computer data, computer programs or computer software from a computer or computer network; . . .

3. [to] [a]lter, disable, or erase any computer data, computer programs or computer software; . . . or

6. [to] [u]se a computer or computer network to make or cause to be made an unauthorized copy, in any form, including, but not limited to, any printed or electronic form of computer data, computer programs or computer software residing in, communicated by, or produced by a computer or computer network ….

Va. Code § 18.2-152.4.A.

Before analysis turns to the merits, it is apparently necessary to clarify, once again, that the Virginia Code's plain language does not obligate a plaintiff in a *civil* action to prove the defendant's "malicious intent." Rather, the "malicious intent" requirement applies only to criminal prosecutions. In the context of *civil* actions, the Virginia Code pellucidly provides that "any person whose property is injured by reason of … any act of computer trespass set forth in subdivisions A 1 through A 8 of § 18.2-152.4 *regardless of whether such act is committed with malicious intent* may sue therefor …." *Id.* § 18.2-152.12 (emphasis added). Despite this unambiguous language, Brach asserted in a motion to dismiss that CKC's claim could not proceed because it lacked "allegation[s] that Brach intended to act maliciously." Doc. 54 at 2. And although that argument was squarely rejected at the threshold stage, Brach has doubled-down at summary judgment, contending once more that the Virginia Code "requir[es] malicious intent[.]" Doc. 108 at 6. This redundant contention—that the statute stands for its opposite

46

proposition—is not only frivolous, it is Orwellian. *See* George Orwell, *Nineteen Eighty–Four* 309 (Harcourt, Brace & Co. ed., 1949) ("War is Peace.").[50]

As to the merits, it is apparent that there are triable issues of fact that foreclose Brach's motion. As stated *supra*, there is sufficient evidence in the summary judgment record that Brach temporarily or permanently removed or disabled computer data, or that he altered or erased computer data. *See* Va. Code § 18.2-142.4.A.1 & 3. Specifically, there is record evidence that Robinson noticed on Brach's former workstation—the computer on which Brach may well have installed unauthorized software granting him remote access to the machine—that some files had disappeared even though Robinson had not deleted them. In addition, there is admissible record evidence that Brach temporarily disabled CKC's conference room computer. *See id.* § 18.2-152.4.A (making it unlawful to "disable any computer data, computer programs or computer software" even "temporarily"). And although Brach argues that there is no factual dispute regarding damages, CKC has set forth competent evidence that CKC incurred costs to retain a forensic expert to examine the damage to its computers, and that CKC had to replace the conference room computer altogether. *See id.* § 18.2-152.12A (expansively defining "damages").

In short, the factual record does not permit the award of summary judgment on Count II of CKC's counterclaims.

### C. CKC's Fraud Claim

Finally, the parties have filed cross motions for summary judgment on CKC's last counterclaim of constructive fraud and fraudulent concealment alleged against both Brach and

---

[50] *See also Tryco, Inc. v. U.S. Med. Source, L.L.C.*, 80 Va. Cir. 619, 2010 WL 7373703, at *6 (Aug. 3, 2010) ("In a civil suit, a violation of the [Virginia Computer Crimes Act] does not require a finding of malice.").

his company, IRC. As explained below, there are too many factual disputes on this claim to grant either motion. The constructive fraud claim must therefore proceed to trial.

Virginia law recognizes three sorts of fraud: actual fraud, constructive fraud, and fraud by omission. *See generally Bank of Montreal v. Signet Bank*, 193 F.3d 818, 826-27 (4th Cir. 1999) (surveying Virginia fraud law). To prevail on its constructive fraud claim, CKC must ultimately prove by clear and convincing evidence (1) that Brach and IRC innocently or negligently made a false representation of a material fact, (2) that Brach and IRC made the false representation with the intent that a reasonable person would believe it and act on it, and (3) that CKC suffered damage because the company relied on the misrepresentation. *See Signet*, 193 F.3d at 827; *Henderson v. Henderson*, 495 S.E.2d 496, 499 (Va. 1998). To show fraud by concealment, CKC must prove by clear and convincing evidence (1) that Brach and IRC deliberately concealed a material fact with intent to prevent CKC from learning the truth, (2) that Brach and IRC knew that CKC was acting upon the assumption that the fact does not exist, and (3) that Brach and IRC had a duty to disclose that fact. *See Signet*, 193 F.3d at 827; *Norris v. Mitchell*, 495 S.E.2d 809, 812-813 (Va. 1998); *Allen Realty Corp. v. Holbert*, 318 S.E.2d 592, 597 (Va. 1984).

Importantly, Virginia law is clear that "[i]n all cases of fraud the plaintiff must prove that it acted to its detriment in actual and justifiable reliance on the defendant's misrepresentation (or on the assumption that the concealed fact does not exist)." *Signet*, 193 F.3d at 827. Generally, the plaintiff cannot show fraud if the plaintiff made a partial inquiry or investigation. *Id.* To be sure, if the party "inducing the [plaintiff] to enter the contract throws the [plaintiff] off guard or diverts him from making the reasonable inquiries which usually would be made," then "Virginia law will forgive an incomplete investigation." *Id.* at 828. Otherwise, a plaintiff "cannot claim reliance" if, after making "a partial inquiry, with full opportunity of complete investigation," the

plaintiff "elects to act upon the knowledge obtained from the partial inquiry[.]" *Id.* at 827 (quoting *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 629 (4th Cir. 1999) (citing *Harris v. Dunham*, 127 S.E.2d 65, 71-72 (Va. 1962))). This sensible rule recognizes that a plaintiff who made a partial inquiry "did not actually rely upon the misrepresentation, but rather relied upon his own investigation into the matter, however incomplete." *Id.*

Distilled to its essence, CKC's constructive fraud count alleges that Brach and IRC (1) misrepresented to CKC that Trippodo's security clearance was "clean," (2) concealed from CKC that Trippodo's security history issues remained unresolved when CKC invited Trippodo to work on CKC's Germany contract, and (3) caused CKC to suffer damages because CKC ultimately had to replace Trippodo with a qualified worker. CKC moved for summary judgment, contending that the undisputed factual record confirms CKC's allegations. In response, Brach and IRC filed a cross motion for summary judgment, arguing (1) that Brach believed, based on Trippodo's statements, the Navy was would issue Trippodo a security clearance, (2) that even after CKC learned of potential problems with Trippodo's security clearance, CKC should have, but failed, to investigate further, (3) that CKC suffered no damages because the company quickly replaced Trippodo with an employee already present in Germany, and (4) that CKC failed to mitigate its damages because it did not enforce a contractual reimbursement clause against Trippodo.

Simply put, the factual record precludes the award of summary judgment on this claim to either party. On its part, CKC is not entitled to judgment as a matter of law because it is unclear whether CKC reasonably relied on Brach's representations that Trippdo was "clean." *See Signet*, 193 F.3d at 827 ("In all cases of fraud the plaintiff must prove that [the plaintiff] acted to its detriment in actual and justifiable reliance on the defendant's misrepresentation (or on the

assumption that the concealed fact does not exist)." In this regard, there is record evidence that Trippodo himself, while awaiting the results of his security clearance inquiry, kept CKC apprised of the status of that investigation. In addition, CKC's president, Stanley, testified that he does not remember if CKC performed any background check on Trippodo or verified whether Trippodo held a security clearance. These facts create a triable issue concerning whether CKC engaged in and relied on its own inquiry, relied on Trippodo's statements, or decided not to investigate based on Brach's representations. *See id.* at 827-28 (noting that a plaintiff typically cannot recover for fraud if the plaintiff made a partial inquiry or investigation, unless the party the defendant "diverted" the plaintiff from "making the reasonable inquiries which usually would be made").

And as for CKC's claim that Brach and IRC intentionally *concealed* information in the face of a duty to disclose, there is a factual dispute regarding whether in July 2015 Brach reasonably believed that Trippodo's security clearance issues were resolved. On one hand, there is record evidence that Trippodo informed Brach that the Navy had "recognized [an] error" and "put [Trippodo] in for a new secret clearance" that would have permitted Trippodo to work on CKC's Germany contract. On the other hand, it is undisputed that Brach advocated against other potential candidates who presented potential security clearance issues, and that Brach said nothing about Trippodo's red flag. And CKC has also cited record evidence that *after* Trippodo applied for a new clearance with the Navy, Trippodo informed Brach that Trippodo was still "troubled" by the security clearance issue. Moreover, CKC introduced a July 28, 2015 email in which Trippodo offered to "shield" and "help[]" Brach after Trippodo had been disqualified from working on the Germany contract for failure to have the requisite security clearance. This evidence creates a triable issue as to whether Brach and IRC *deliberately* concealed a material

fact with intent to prevent CKC from learning the truth. *See Signet*, 193 F.3d at 827; *Norris*, 495 S.E.2d at 812-813; *Holbert*, 318 S.E.2d at 597.

Similarly, Brach's and IRC's cross motion for summary judgment on the fraud claim must be denied. The genuine factual dispute regarding whether Brach reasonably believed that the Navy would issue Trippodo a security clearance necessarily means that there is a factual dispute concerning whether Brach fraudulently concealed information from CKC. And there is record evidence that Brach represented to CKC that Trippodo's background was "clean," which may well have diverted CKC from inquiring further. Furthermore, Brach's arguments about damages and mitigation do not present a ground on which summary judgment can be awarded. To state the obvious, the record reflects that CKC indeed suffered damages resulting from Brach's alleged misrepresentations—the company suffered sunk costs in hiring, training, transporting, and replacing Trippodo. Nor does Brach's argument regarding mitigation justify a grant of summary judgment. This is so because mitigation is an affirmative defense that does *not* bar the underlying claim. *See Monahan v. Obici Med. Mgmt. Servs., Inc.*, 628 S.E.2d 330, 337 (Va. 2006) ("Unlike most affirmative defenses, mitigation of damages is not a defense that, if proven, constitutes an absolute bar to the plaintiff's claim.").[51] Stated differently, the "defense of mitigation recognizes that a plaintiff's conduct following the defendant's negligence 'may be a reason for reducing damages,' but it does not necessarily bar all recovery." *Id.* (quoting *Sawyer v. Comerci*, 563 S.E.2d 748, 754 (Va. 2002)).[52] Thus, neither Brach nor IRC is entitled to summary judgment on the fraud claim.

---

[51] Brach and IRC properly preserved this affirmative defense in their answers to the counterclaim. *See* Docs. 91 & 92.

[52] Nor is Brach's mitigation defense appropriate for resolution on this record. In this regard, Brach has simply pointed out that CKC did not enforce against Trippodo a contractual

In sum, the cross motions for summary judgment on CKC's counterclaim of constructive fraud must be denied.

## VI.

For the foregoing reasons, Brach's motion for summary judgment on the three counterclaims must be denied. Furthermore, defendants' motion for summary judgment must be granted in part and denied in part. Specifically, the motion will be granted with respect to all of Brach's remaining claims, namely Count I (FCA retaliation), Count II (DCWPA reprisal), Count IV (FLSA overtime) and Count V (FLSA retaliation). And CKC's cross motion for summary judgment on Count III of the counterclaims (constructive fraud) must be denied. The matter will therefore proceed to trial solely on CKC's three counterclaims.

An appropriate order will issue.

Alexandria, Virginia
July 31, 2017

T. S. Ellis, III
United States District Judge

---

reimbursement clause. But Brach has identified neither the specifics of that contractual term nor the amount of money that should (or could) have been mitigated.